Christopher A. Seeger
Christopher L. Ayers
Justin M. Smigelsky
Nigel Halliday
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
(973) 639-9100

*Attorneys for Plaintiff and the Proposed Class*

*[Additional counsel listed on signature page]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JO ARONSTEIN, *individually and on behalf of all others similarly situated*, | ) ) ) ) | CASE NO.: _____ |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | **CLASS ACTION COMPLAINT** |
| KENVUE INC., a Delaware corporation, and JOHNSON & JOHNSON, a New Jersey corporation, JOHNSON & JOHNSON CONSUMER INC., a New Jersey corporation, | ) ) ) ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants. | ) ) | |

**Table of Contents**

SUMMARY OF THE CASE ........................................................................................................ 1

JURISDICTION AND VENUE ................................................................................................ 4

PARTIES .................................................................................................................................. 5

FACTUAL ALLEGATIONS ................................................................................................... 5

    A.   Background of Defendants' Business .......................................................................... 5

    B.   PFAS and Risks Associated with PFAS ...................................................................... 7

    C.   Testing for PFAS ...................................................................................................... 10

    D.   The Mamavation Study of Bandage Consumer Products ......................................... 13

    E.   Defendants' Band-Aid Adhesive Bandage Products, Representations, and Omissions.... 16

    F.   Plaintiff's Purchase and Use of Band-Aid Brand OURTONE Adhesive Bandages ......... 29

CLASS ALLEGATIONS ........................................................................................................ 31

TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS ............................................ 36

CAUSES OF ACTION ........................................................................................................... 37

    COUNT ONE Breach of Express Warranty (*On Behalf of the Nationwide Class*) .................. 37

    COUNT TWO Breach of Implied Warranty (*On Behalf of the Nationwide Class*) ................ 39

    COUNT THREE Fraudulent Concealment (*On Behalf of the Nationwide Class*) ................... 41

    COUNT FOUR Violation of Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390, *et seq.* (*On Behalf of Plaintiff and the Georgia Subclass*) ............................................................. 42

    COUNT FIVE Violation of Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370, *et seq.* (*On Behalf of Plaintiff and the Georgia Subclass*)............................................. 46

    COUNT SIX Unjust Enrichment/Quasi-Contract (*On Behalf of Plaintiff and the Classes*) .... 49

PRAYER FOR RELIEF .......................................................................................................... 50

JURY TRIAL DEMANDED ................................................................................................... 51

## CLASS ACTION COMPLAINT

Plaintiff, Jo Aronstein ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), alleges the following against Defendants Kenvue Inc. ("Kenvue") and Johnson & Johnson and Johnson & Johnson Consumer Inc. (the Johnson & Johnson defendants are referred to as "J&J" and, collectively with Kenvue, "Defendants") based on personal knowledge as to herself and on information and belief as to all other matters, including investigation conducted by her attorneys:

## SUMMARY OF THE CASE

1.     This class action is brought by Plaintiff on behalf of consumers who purchased certain Band-Aid Bandages products[1] ("Band-Aids") for personal care purposes.

2.     J&J and its spin-off entity, Kenvue, are—and have been for over 100 years—one of the "key players" in the global bandages market.

3.     Among Defendants' most-recognized products are their adhesive bandages, marketed under the trademarked name "Band-Aid." Today, the Band-Aid brand is one of the most recognizable brands worldwide, serving millions of people daily for the treatment of cuts, scrapes, and burns.

4.     For example, Band-Aids jingle "I am stuck on Band-Aid, 'cause Band-Aid's stuck on me" has been "an unforgettable earworm that resonated with audiences for generations," with the "catchy tune and simple lyrics contribut[ing] to the brand's memorability and widespread recognition."

---

[1] Band-Aid Flexible Fabric Comfortable Protection Bandages; Band-Aid OURTONE Flexible Fabric BR45 Bandages; Band-Aid OURTONE Flexible Fabric BR55 Bandages; and Band-Aid OURTONE Flexible Fabric BR65 Bandages.

5.      In another "groundbreaking marketing move," Defendants introduced themed and character bandages, which feature beloved cartoon characters, superheroes, and movie franchises on Band-Aids, creating a strong emotional appeal to children.

6.      Defendants' extensive marketing efforts routinely tout their commitment to the health of their customers, our communities, and our planet. By way of examples, Kenvue makes a "sustainability promise" on its website, stating:

> We're all about careful choices. Choices that heal and contribute to the best possible outcomes—for our customers, the planet, and the society we live in. That's why we hold ourselves to the highest standards when making safe products for you. It's why we try to minimize our footprint on the planet and contribute towards progressing healthcare in the communities we are part of. And why we try—every day—to make choices that will create a future that's bright and healthy for all of us.

7.      Kenvue also states in its "sustainability promise" that the Band-Aid brand has "Better Ingredients, Better Processes," for which it offers the following statements in support:

- "We prioritize safety and quality in the development of every wound care product."

- "Every piece of material in our BAND-AID Brand bandages and every ingredient in our antibiotic treatments are chosen with safety as the top concern. We thoroughly vet each supplier and only partner with those who meet our rigorous standards."

- "Our over-the-counter active ingredients have proven to be the best quality through safety assurance processes and ongoing evaluation."

- "Our manufacturing facilities undergo regular audits and certification so that we can ensure our products are manufactured with the highest standards and comply with most discerning regulatory standards."

- "Our scientists ensure the safety and efficacy of our products through clinical studies and laboratory models."

8.      As the result of Defendants' marketing efforts, Defendants' Band-Aid brand of bandages and first-aid supplies consistently rank highest in the United States as the brand consumers perceive most positively.

9.      What Defendants have not told consumers, however, is that PFAS "forever chemicals," notorious for having adverse effects on humans and our environment, are present in unsafe amounts in Band-Aid brand adhesive bandages. Upon information and belief, Defendants have used and continue to use PFAS chemicals in their adhesive bandages for the water-proof qualities.

10.     Modern science has demonstrated that there is no "safe" level of exposure to PFAS chemicals. Even "trace" levels of PFAS can be harmful to human health and our environment. Indeed, the State of New Jersey has set the maximum contaminant level for one particular PFAS, PFOA, at 14 parts per trillion, which is the equivalent of 14 drops of water in 20 olympic-sized pools. Such small quantities of PFAS are equally harmful when they are not ingested but, rather, are applied to the skin, because PFAS can be absorbed through the skin, the largest human organ.

11.     Defendants are well-aware that consumers are extremely concerned about the use of PFAS chemicals in their products, yet Defendants have continued to market and advertise their Band-Aid brand bandages using the representations described herein in order to profit off of unsuspecting consumers.

12.     Had Defendants disclosed to Plaintiff and Class Members that their adhesive bandages contained and contain PFAS chemicals, Plaintiff and Class Members would not have purchased Defendants' adhesive bandages, or they would have paid significantly less for them.

13.     As a direct and proximate result of Defendants' failures, Plaintiff and the Class Members have suffered and will continue to suffer serious injury.

3

14.     Accordingly, Plaintiff, on behalf of herself and the estimated thousands—if not millions—of similarly situated consumers of Band-Aid adhesive bandages seeks to hold Defendants responsible for the injuries suffered as the result of their misconduct and failure to act, and demands appropriate monetary, equitable, injunctive, and declaratory relief.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 putative members in the proposed class, and at least one Class Member (e.g., Plaintiff) is a citizen of a state different from  any Defendant.

16.     The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged are part of the same case or controversy.

17.     This Court has personal jurisdiction over Defendants. Defendant Kenvue is headquartered and routinely conducts business in the State of New Jersey, including in this District. Each of the Defendants have sufficient minimum contacts in this State, have intentionally availed themselves of this jurisdiction by conducting business in this State, including through marketing and/or selling products and/or services and/or by accepting and processing payments for those products and/or services within this State.

18.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events that gave rise to Plaintiff's claims took place within this District and Defendant Kenvue is headquartered and does business in this District.

## PARTIES

19.     Plaintiff Jo Aronstein is a citizen of the United States and domiciled in the City of Decatur, County of DeKalb, State of Georgia, where she has at all relevant times during the conduct alleged in this Complaint.

20.     Kenvue is a Delaware corporation, with principal executive offices located at 199 Grandview Road, Skillman, New Jersey.

21.     Johnson & Johnson is a New Jersey corporation, with principle executive offices located at One Johnson & Johnson Plaza, New Brunswick, New Jersey.

22.     Upon information and belief, Johnson & Johnson Consumer Inc. is a New Jersey corporation and subsidiary of Johnson & Johnson, with principle executive offices located at One Johnson & Johnson Plaza, New Brunswick, New Jersey.

## FACTUAL ALLEGATIONS

### A. Background of Defendants' Business

23.     Incorporated in New Jersey in 1887, J&J and its subsidiaries have approximately 131,900 employees worldwide engaged in the research and development, manufacture and sale of a broad range pf products in the healthcare field.

24.     According to J&J's Form 10-K filed with the Securities Exchange Commission for the fiscal year ended December 31, 2023, the company's primary focus is products related to human health and well-being.

25.     Kenvue was incorporated in Delaware in February 2022, as a wholly owned subsidiary of J&J, to serve as the ultimate parent company of J&J's Consumer Health Business.[2]

---

[2] According to J&J's Form 10-K, aside from Consumer Health, its other two business segments are Pharmaceutical and Medical Devices.

26.    In April of 2023, J&J completed the transfer of substantially all of the assets and liabilities of the Consumer Health Business to Kenvue and its subsidiaries.

27.    In May 2023, Kenvue completed an initial public offering and began trading on the New York Stock Exchange. Following the Kenvue IPO, J&J owned approximately 89.6% of its outstanding common stock; however, as part of an exchange offer J&J announced in July of 2023, under which its shareholders could exchange shares of J&J common stock for shares of Kenvue common stock, in August of 2023, J&J completed the exchange offer and thus the separation from J&J and transition to being a fully independent public company.[3]

28.    Following Kenvue's separation from J&J, J&J stated in its Form 10-K that it is now organized into two business segments: Innovative Medicine (focused on therapeutic areas, such as immunology, infectious diseases, oncology, and neuroscience) and Med. Tech. (includes a broad portfolio of products used in the interventional solutions, orthopaedics, surgery, and vision categories).

29.    Kenvue stated in its Form 10-K filed with the Securities Exchange Commission for the fiscal year ended December 31, 2023, "[w]ith $15.4 billion in net sales in 2023, we are the world's largest pure-play consumer health company."

30.    Kenvue further stated in its Form 10-K that its brand portfolio—consisting of BAND-AID Brand Adhesive Bandages, Tylenol, Neutrogena, Listerine, Johnson's, and others— allows it "to provide holistic consumer health solutions to our consumers across a spectrum of product categories and hold leading positions across numerous large and attractive categories globally. These comprehensive solutions are backed by science and several of our brands have a

---

[3] According to Kenvue's Form 10-K filed with the Securities Exchange Commission for the fiscal year ended December 31, 2023, J&J continues to own approximately 9.5% of Kenvue's outstanding common stock.

long history of recommendations by healthcare professionals, which further reinforces our consumers' confidence in our brands."

**B. PFAS and Risks Associated with PFAS**

31.     PFAS are a category of highly persistent—stain-resistant, oil-resistant, and water-resistant—and toxic manufactured chemicals that have been used in industry and consumer products since the 1940s.[4]

32.     In regard to bandages, upon information and belief, PFAS chemicals are used by Defendants for their waterproof qualities.

33.     One common characteristic of concern in regard to PFAS is that many types break down very slowly and can build up in people, animals, and the environment over time.[5] In fact, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—making them highly persistent in the environment and our bodies.[6]

34.     Consequently, PFAS chemicals are often referred to as "forever chemicals."

35.     PFAS can be categorized as either "long-chain" or "short-chain" based on the number of carbon atoms they contain. Long-chain PFAS contain 7 or more carbon atoms, while PFAS containing fewer than 7 carbon atoms are considered short-chain. Long-chain PFAS bioaccumulate and bio-magnify in both humans and in wildlife.

36.     Although PFAS manufacturers once claimed that short-chain PFAS were safer than long-chain varieties, these claims have been debunked. Indeed, studies have demonstrated that

---

[4] *Our Current Understanding of the Human Health and Environmental Risks of PFAS*, United States Environmental Protection Agency, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited April 6, 2024).

[5] *Id.*

[6] U.S. Department of Health and Human Services, National Toxicology Program, https://ntp.niehs.nih.gov/whatwestudy/topics/pfas (last visited April 7, 2024).

short-chain PFAS may be just as—if not more—harmful than long-chain versions, because they "are 'more widely detected, more persistent and mobile in aquatic systems,' which could present greater problems for humans and the environments in which they live."[7]

37.    PFAS chemicals can be harmful at extremely low levels of exposure. According to the EPA, the levels at which negative human health effects could occur are significantly lower than previously understood, including at near zero in some instances.[8]

38.    In other words, there is no "safe" level of exposure to PFAS chemicals. Even "trace" levels of PFAS can be harmful to human health.

39.    Humans may be exposed to PFAS through a variety of pathways, including ingestion, inhalation, and skin absorption. Studies dating back at least a decade have indicated that PFAS can be absorbed through skin, with evidence showing that PFAS in the blood increase after application to skin.

40.    PFAS "forever chemicals" are extremely problematic for the environment and human health. Per current scientific research, health effects associated with different PFAS include:

- Increased risk of cancers, including prostate, kidney, and testicular cancers;

- Endocrine disruption;

- Disruption to normal thyroid function;

- Increased risk of acute lymphoblastic leukemia;

---

[7] *Study: Newer PFAS Chemicals "May Pose More Risks" Than Those They Replaced,* The University of Rhode Island (Aug. 22, 2019), https://www.ewg.org/news-insights/news-release/study-newer-pfas-chemicals-may-pose-more-risks-those-they-replaced (last visited April 7, 2024).

[8] *EPA warns toxic "forever chemicals" more dangerous than once thought*, Washington Post (June 15, 2022), https://www.washingtonpost.com/climate-environment/2022/06/15/epa-pfas-forever-chemicals/ (last visited April 7, 2024).

- Reduced ability of the body's immune system to fight infections, including reduced vaccine response;

- Increased risk of allergies and asthma in young children;

- Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes;

- Increased cholesterol levels;

- Increased risk of metabolic diseases like obesity and diabetes;

- Cardiovascular disease; and

- Reproductive effects such as decreased fertility or increased blood pressure in pregnant women.

41.     There is no effective treatment for removal of PFAS chemicals from the body. Therefore, experts agree that the most effective strategy to decrease health risk is to avoid and/or limit exposure to products known to contain PFAS chemicals.

42.     Only in recent years has the presence of PFAS used in consumer products, and their consequent risks, begun to be publicized and discussed in the media and scientific literature. Based on this newly available information, consumers are rightfully concerned about the presence or risk of PFAS in various consumer products.

43.     In June 2022, the EPA announced a lifetime health advisory related to PFAS. A health advisory is not a binding regulation but serves as "informal technical guidance to assist government officials." The June 2022 advisory sets lifetime health advisory levels for PFOA at 0.004 parts per trillion (ppt) and PFOS at 0.02 ppt. These levels are below the detection capability of most measurement devices, meaning that EPA considers any detection of PFOA or PFOS to

exceed the lifetime health advisory level. The EPA advisory also set a lifetime health advisory level for the short-chain GenX at 10 ppt and for PFBS, a replacement for PFOS, at 2,000 ppt.[9]

44.     On July 28, 2022, the National Academy of Science, Engineering, and Medicine, at the request of the CDC, produced a report advising clinicians on how to test, diagnose, and treat individuals exposed to PFAS. The report recommends that doctors screen blood tests for a range of PFAS and advises that if a patient's blood shows combined PFAS above 20 nanograms per milliliter, the person is at high risk of adverse health effects. Individuals with combined PFAS between 2 and 20 nanograms per milliliter are at a "concern for adverse effects."[10] As this guidance shows, clinicians believe that all PFAS are capable of causing serious health impacts.

45.     As the many risks associated with PFAS become more widely known, it is likely that consumer awareness will continue to grow. It is reasonable for consumers to be concerned about these chemicals, which carry significant health risks and are often undisclosed by manufacturers.

**C.  Testing for PFAS**

46.     There are two primary testing methods for detecting PFAS in a particular sample: "targeted" analysis and total organic fluorine analysis.

---

[9] *EPA Announces New Drinking Water Health Advisories for PFAS Chemicals, $1 Billion in Bipartisan Infrastructure Law Funding to Strengthen Health Protections*, EPA (June 15, 2022) https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan (last visited April 7, 2024).

[10] *Guidance on PFAS Exposure, Testing, and Clinical Follow-Up*, National Academies Science Engineering Medicine (2022), https://nap.nationalacademies.org/catalog/26156/guidance-on-pfas-exposure-testing-and-clinical-follow-up (last visited April 7, 2024).

47.     Targeted PFAS analysis seeks to detect the presence of specific PFAS forms in a sample, with results limited to a fixed set of parameters (i.e., a limited and defined list of potential PFAS chemical targets).[11]

48.     Notwithstanding significant scientific advancement, targeted PFAS testing can only detect, at most, approximately 0.006% of PFAS chemicals in existence. Because targeted PFAS analysis can only detect a miniscule fraction of potential PFAS, targeted analysis cannot provide a comprehensive measure of the total quantity of PFAS that may be present in a sample.

49.     Thus, because of this limitation, targeted PFAS testing cannot support the conclusion that a sample is free of PFAS, but can only support a conclusion that a sample is free from the small portion of specific PFAS chemicals it can detect.

50.     Total organic fluorine analysis, on the other hand, is used to detect organic fluorine, which is the foundational element (and defining characteristic) of PFAS chemicals.

51.     In the context of chemistry, the term "organic" refers to compounds containing carbon. Organic fluorine is created by the chemical bond between carbon atoms and fluorine atoms. The strong bond created between carbon and fluorine is what defines PFAS chemicals and is the reason for their common usage.

52.     Total organic fluorine testing is critical to the detection of the 99.99% of PFAS that cannot be detected through limited targeted testing. Because organic fluorine is the identifying

---

[11] From a harm-reduction perspective, the specific type of PFAS chemical present in a consumer product is largely of no consequence. All PFAS chemicals bioaccumulate, meaning that once they are introduced to the body, they cannot be removed except through normal excretion, which can take years. In addition, all 12,000 PFAS structures present similar harm to human health and the environment. Accordingly, the only way to avoid the consequences of accumulated PFAS in the body is to avoid additional exposure to any PFAS chemical.

element of PFAS chemicals and is present in all PFAS varieties, the detection of organic fluorine in a sample necessarily means that PFAS chemicals are present in some form.

53.     It is nearly impossible for total organic fluorine testing to yield a false positive detection of PFAS in a sample. Total organic fluorine testing only measure fluorine that originates from a substance where fluorine is attached to a carbon backbone. Therefore, total organic fluorine testing does not detect any other forms of fluorine, such as inorganic fluorine (i.e., fluoride).

54.     Organic fluorine is not naturally present in the human body, and is practically nonexistent outside of its use in man-made PFAS chemicals.[12]

55.     In light of the noted limitations of targeted testing, total organic fluorine testing is the only method that is able to reliably detect the presence or absence of the thousands of varieties of PFAS chemicals for which targeted testing is not currently available.

56.     Consequently, total organic fluorine testing is widely accepted by scientists, researchers, and regulators as the reliable method to detect a PFAS chemical in a sample.

57.     Total organic fluorine analysis is typically reported in parts per million ("ppm"). By using the average proportion of organic fluorine in PFAS, organic fluorine concentration can also be used to provide an estimate of the maximum PFAS concentration in a sample.

---

[12] The rare examples of organic fluorine from sources other than manmade PFAS chemicals— such as the deadly poison monofluoroacetic acid ($FCH_2CO_2H$) found in "Gifblaar," a plant indigenous to South Africa—are not found or used in the industrial world and would never be the source of organic fluorine in a consumer product, even as an incidental contaminant. *Focusing on the Elements – Naturally Occuring Organic Fluorine Compounds,* https://www.tcichemicals.com/US/en/support-download/chemistry-clip/2013-10-08#:~:text=The%20most%20famous%20naturally%20existing (last visited April 7, 2024).

### D. The Mamavation Study of Bandage Consumer Products

58.     Mamavation is a consumer "watchdog" community group, which provides "eco-wellness product investigations for moms."[13]

59.     To enable consumers to avoid the harms associated with PFAS chemicals, Mamavation has commissioned consumer studies on numerous beauty and personal care products, foods and beverages, supplements, menstrual products, clothing, food packaging and parchment paper, baby and children products, electronic equipment, and cleaning and laundry products.[14]

60.     Because of known toxicity associated with PFAS, Mamavation commissioned scientific studies on indications of PFAS in bandages, to analyze popular bandages marketed to consumers.[15]

61.     To conduct the studies, bandages were purchased and donated from Mamavation community members between November 2022 and February 2024 from Walmart, CVS, Rite Aid, Target, or Amazon. Each of the products tested was recorded in Mamavation's database and then sent directly to the lab within the product's original packaging.

62.     Mamavation sent 40 bandages from 18 brands for testing at an EPA-certified laboratory, including Band-Aid Flexible Fabric Comfortable Protection Bandages,[16] Band-Aid OURTONE Flexible Fabric BR45 Bandages, Band-Aid OURTONE Flexible Fabric BR55

---

[13] https://www.mamavation.com/.

[14] https://www.mamavation.com/pfas-forever-chemical-consumer-studies.

[15] *"Band-Aids & Bandages with Indications of PFAS "Forever Chemicals" Report*, Mamavation (April 2, 2024), available at: https://www.mamavation.com/health/band-aids-bandages-pfas-forever-chemicals-report.html.

[16] Notably, Mamavation tested an older sample of this bandage, likely 7 years old or so, before Defendant J&J's divestiture of the Band-Aid brand to Kenvue.

Bandages, and Band-Aid OURTONE Flexible Fabric BR65 Bandages manufactured by Defendants.

63.     Mamavation's EPA-certified laboratory uses marker testing to identify the potential presence of PFAS chemicals in bandages. Organic fluorine is a marker for PFAS because all PFAS are carbon-based compounds that contain fluorine. The specific laboratory method used to test for total fluorine was the Determination of Total Fluorine by Oxygen Flask Combustion and Ion-Selective Electrode. If total fluorine was observed at a detection level of 10 ppm or greater, the laboratory did the Determination of free Fluoride Ion in the product by Ion-Selective Electrode and then subtracted that from the Total Fluorine to determine the amount of organic fluorine. This marker testing is likely to show the presence of PFAS. Organic fluorine can also capture other fluoropolymers, pharmaceuticals, and common hydrofluorocarbon refrigerants, such as 1,1,1,2-tetrafluoroethane (commonly known as R-134a) and 2,3,3,3-tetrafluoropropene (commonly known as HFO-1234yf), which are all also PFAS chemicals.

64.     According to Scott Belcher, Ph.D. & Associate Professor with the Center for Environmental & Health Effects of PFAS at North Carolina State University, "fluoropolymers, such as polytetrafluoroethylene (PTFE), are extremely common forms of PFAS that could be contributing to the organic fluorine found in bandages. Methods used for detecting individual PFAS, such as PFOA or GenX, cannot directly identify PTFE. However, the analysis of total organic fluorine (TOF) does account for all PFAS contaminants in bandages, including PTFE. Therefore, this method of testing serves as a good 'spot-check' of consumer products."

65.     Of the products tested, testing of Defendants' bandages resulted in the following ppm levels of organic fluorine:

- Band-Aid Flexible Fabric Comfortable Protection Bandages—188 ppm organic fluorine on the absorbent pad.

- Band-Aid OURTONE Flexible Fabric BR45 Bandages—262 ppm organic fluorine on the absorbent pad.

- Band-Aid OURTONE Flexible Fabric BR55 Bandages—250 ppm organic fluorine on the absorbent pad.

- Band-Aid OURTONE Flexible Fabric BR65 Bandages—260 ppm organic fluorine on the absorbent pads and 374 ppm on the sticky flaps.

66.    In response to the results of the studies, Linda Birnbaum, Scientist Emeritus and Former Director of the National Institute of Environmental Health Sciences and National Toxicology Program & Scholar in Residence at Duke University, and Adjunct Professor at Yale University and the University of North Carolina, stated: "Because bandages are placed upon open wounds, it's troubling to learn that they may also be exposing children and adults to PFAS. It's obvious from the data that PFAS are not needed for wound care, so it's important that the industry remove their presence to protect the public from PFAS and opt instead for PFAS-free materials."

67.    In response to the results of the studies, Terrence Collins, Teresa Heinz Professor of Green Chemistry & Director of the Institute for Green Sciences at Carnegie Mellon University, stated:

> It is discouraging to find yet another important product space, bandaids or bandages, containing PFAS compounds where transfers into users are conceivable. PFAS compounds deserve the "forever chemicals" name, such that when PFAS-containing bandaids and bandages are discarded post-use, the final resting places will be contaminated into the indefinite future. This is another Mamavation study serving beautifully to guide moms toward reducing PFAS exposures for their families and the wider world.

68.    Sixty-three percent (63%) of bandages marketed to People of Color with black and brown skin tones had indications of PFAS; specifically 10 detections out of 16 bandages tested had organic fluorine above 10 ppm according to the laboratory. Of the four bandage products manufactured by Defendants, the three OURTONE products of the Band-Aid brand are marketed to People of Color with black and brown skin tones.

**E.  Defendants' Band-Aid Adhesive Bandage Products, Representations, and Omissions**

69.    Among Defendants' most-recognized products are their adhesive bandages, marketed under the trademarked name "Band-Aid."[17]

70.    Kenvue states on its website: "For over 100 years, BAND-AID Brand has been a leader in first aid care."[18]



71.    In 1920, the Band-Aid brand adhesive bandage was invented when, combining two products from Johnson & Johnson—adhesive tape and gauze—Earle Dickson, a cotton buyer, created a bandage for his wife to apply herself.[19]

---

[17] Adhesive bandages are typically flexible sheets of material with absorbent pads in the middle and adhesive attached to sides that can be stuck on the skin to capture blood and serum from open wounds and also prevent anything from seeping into open wounds. The absorbent pad is placed against the open wound and the overlapping edges stick to the skin.

[18] https://www.band-aid.com/our-brand/brand-history.

[19] *Id.*



72.     One year later, in 1921, Band-Aid brand adhesive bandages made their first appearance in stores. By 1924, Johnson & Johnson was mass producing the Band-Aid brand adhesive bandages. In 1932, Band-Aid introduced its first waterproof bandage, called the "DryBak."[20]

73.     Today, the Band-Aid brand is one of the most recognizable brands worldwide, serving millions of people daily for the treatment of cuts, scrapes, and burns.[21] For example, Band-Aids' jingle "I am stuck on Band-Aid, 'cause Band-Aid's stuck on me" has been "an unforgettable earworm that resonated with audiences for generations," with the "catchy tune and simple lyrics contribut[ing] to the brand's memorability and widespread recognition."[22]

---

[20] *Id.*

[21] *The Marketing Marvel of Band-Aids: Strategies and Mix Decoded*, The Brand Hopper (July 26, 2023), https://thebrandhopper.com/2023/07/26/the-marketing-marvel-of-band-aid-strategies-and-mix-decoded/ (last visited April 7, 2024).

[22] *Id.*

74.     In another "groundbreaking marketing move," Defendants introduced themed and character bandages, which feature beloved cartoon characters, superheroes, and move franchises on Band-Aids, creating a strong emotional appeal to children.[23]

75.     As the result of Defendants' marketing efforts, J&J's Band-Aid brand of bandages and first-aid supplies ranked highest in the United States in YouGov's Best Brand Rankings 2021,[24] a list of the brands consumers perceive most positively, for the fifth-consecutive year as of 2021:

| OVERALL: CURRENT TOP 10 BRANDS | | |
|---|---|---|
| Rank | Brand Name | Score |
| 1 | BAND-AID | 50.0 |
| 2 | Dawn | 49.7 |
| 3 | Clorox | 46.7 |
| 4 | Hershey's | 46.0 |
| 5 | M&M's | 45.3 |
| 6 | Lysol | 44.3 |
| 7 | Lowe's | 43.8 |
| 8 | Cheerios | 42.8 |
| 9 | Quaker | 42.6 |
| 10 | CRAFTSMAN | 42.4 |

Scores show average data from 1 Oct 2020 - 30 Sep 2021

76.     As the result of Defendants' marketing efforts, as of 2023 reports comparing roughly 1,500 brands, "Band-Aid is the most trusted brand in the U.S., beating out Amazon and Visa."[25]

---

[23] *Id.*

[24] *BAND-AID and Dawn top Best Brand Rankings in the US while Pfizer is no surprise the biggest improver*, YouGov (Nov. 16, 2021), https://business.yougov.com/content/39431-yougov-us-best-brands-rankings-2021 (last visited April 8, 2024).

[25] *Band-Aid is the most trusted brand in the U.S., beating out Amazon and Visa*, Business Insider (May 24, 2023), https://www.businessinsider.com/band-aid-beats-out-amazon-visa-most-trusted-brand-us-2023-5 (last visited April 8, 2024).

18

77.     As the result of Defendants' brand recognition and reputation, Defendants are able to charge, and do charge, a premium above the price for bandages charged by competitors and generic manufacturers.

78.     Collectively, Defendants are currently one of a handful of "key players" in the global bandages market.[26]

79.     Defendants' referred, and continue to refer, to their Band-Aid brand of bandages as "the #1 doctor recommended bandage brand."

80.     In regard to Defendants' Band-Aid brand, Kenvue states on its website:[27]

> Our brands have been used by millions—even billions—of people for more than a century, giving BAND-AID Brand an iconic place in American culture. We reached that place through a history of innovation, healing, and caring for our customers. And while we're always looking forward to see what we can do next and how we can help, sometimes it's good to take a look back and see how far we've come.

81.     Kenvue markets its adhesive bandages on its website, stating: "Our adhesive bandages come in a variety of shapes, sizes, colors, and types to help cover and protect minor cuts, scrapes, and burns so they heal properly."[28]

82.     Kenvue makes a "sustainability promise" on its website[29] in regard to the Band-Aid brand, stating that it's "working for a healthy future" and:

> We're all about careful choices. Choices that heal and contribute to the best possible outcomes—for our customers, the planet, and the society we live in. That's why we hold ourselves to the highest standards when making safe products for you. It's why we try to

---

[26]     Bandages     Market     Analysis,     Coherent     Market     Insights, https://www.coherentmarketinsights.com/market-insight/bandages-market-2689 (last visited April 8, 2024).

[27] *Id.*

[28] https://www.band-aid.com/products/adhesive-bandages.

[29] https://www.band-aid.com/our-brand/band-aid-sustainability.

minimize our footprint on the planet and contribute towards progressing healthcare in the communities we are part of. And why we try—every day—to make choices that will create a future that's bright and healthy for all of us.

83.    Kenvue also states in its "sustainability promise"[30] that the Band-Aid brand has "Better Ingredients, Better Processes," for which it offers the following statements in support:

- "We prioritize safety and quality in the development of every wound care product."

- "Every piece of material in our BAND-AID Brand bandages and every ingredient in our antibiotic treatments are chosen with safety as the top concern. We thoroughly vet each supplier and only partner with those who meet our rigorous standards."

- "Our over-the-counter active ingredients have proven to be the best quality through safety assurance processes and ongoing evaluation."

- "Our manufacturing facilities undergo regular audits and certification so that we can ensure our products are manufactured with the highest standards and comply with most discerning regulatory standards."

- "Our scientists ensure the safety and efficacy of our products through clinical studies and laboratory models."

84.    Kenvue further makes representations as to its environmental consciousness and effectiveness in its "sustainability promise,"[31] stating "[w]e can't have healthy customers without a healthy planet. So we do our best to minimize our footprint on it and are constantly investigating new ways to minimize it further," and "[w]e're continually re-evaluating our manufacturing

---

[30] *Id.*

[31] *Id.*

processes working towards efficiencies, minimizing waste, and lowering water or energy consumption."

85.     In regard to co-Defendant Johnson & Johnson, Kenvue states on its website: "Our commitment to the health of our customers, our communities, and our planet goes beyond the efforts of BAND-AID and NEOSPORIN. Learn how our parent company, Johnson & Johnson Consumer Health, is taking action to make the planet healthier."

86.     Defendants' brands of adhesive bandages include:

• Band-Aid Flexible Fabric Comfortable Protection Bandages (one variety of which is depicted below):



• Band-Aid OURTONE Flexible Fabric BR45 Bandages (depicted below):



- Band-Aid OURTONE Flexible Fabric BR55 Bandages (depicted below):



- Band-Aid OURTONE Flexible Fabric BR65 Bandages (depicted below):



87.     In regard to the Band-Aid Flexible Fabric Comfortable Protection Bandages, Kenvue states on its website:[32]

> BAND-AID Brand Flexible Fabric Non-Stick Sterile Adhesive Bandages, offer comfortable protection for minor wounds. Made with MEMORY WEAVE fabric for ultimate flexibility, these BAND-AID Brand Flexible Fabric Bandages stretch as you move. Each sterile bandage features a QUILT-AID Comfort Pad designed to cushion painful wounds while you heal. Made with a non-stick HURT-FREE Pad, these comfortable flexible bandages won't stick to the wound, allowing for gentle removal.

88.     In regard to the Band-Aid brand OURTONE adhesive bandages, Kenvue states on its website[33] that the product line "prove[s] quality wound care solutions for brown skin tones. The line feautures three new skin tone complementing adhesive bandage shades: BR65 (Dark Brown), BR55 (Brown), BR45 (Light Brown)."

89.     Kenvue describes the OURTONE adhesive bandage line as "[m]ade with MEMORY WEAVE fabric to provide flexible protection and a QUILT-AID pad that wicks away blood and fluids, these comfortable skin-colored bandages help protect your larger wounds against dirt and germs and stays on for up to 24 hours. From the #1 doctor recommended brand."

90.     Kenvue stresses on its website the well-known necessity to clean cuts, scrapes, and burns; the importance of cleaning cuts, scrapes, and burns as part of the healing process; and the necessity to keep cuts, scrapes, and burns covered in an effort to prevent infection.[34]

91.     Defendants market their Band-Aid adhesive bandages for family use, especially for use on children. For example, on Kenvue's website, it states, "[f]rom soccer to camping, from the

---

[32] https://www.band-aid.com/products/adhesive-bandages/flexible-fabric-bandages.

[33] https://www.band-aid.com/our-brand/ourtone-uplifts.

[34] https://www.band-aid.com/frequently-asked-questions.

home medical cabinet to your glove box, first aid needs change from activity to activity and place to place," adjacent to the following depiction:



92.     Defendants also specifically market their Band-Aid adhesive bandages to children by printing popular children's characters on the bandages as depicted in the examples below:[35]

  

  

---

[35] https://www.band-aid.com/products/adhesive-bandages.

93.     For over 100 years, J&J and then Kenvue have cultivated a brand image of quality, trustworthiness, safety, and health.

94.     Defendants' packaging of Band-Aid brand adhesive bandages does not and, upon information and belief, has never disclosed the presence of PFAS chemicals.

95.     Defendants are, and have been, well aware of consumers' desire to avoid potentially harmful chemicals, such as PFAS, which is precisely why Defendants have engaged in a uniform marketing campaign intended to convince consumers that the Band-Aid brand products are safe, healthy, made with the "best ingredients," and environmentally conscious.

96.     Reasonable consumers purchased and continue to purchase Band-Aid brand adhesive bandages, based on Defendants' representations, that the bandages do not contain artificial, synthetic, or man-made chemicals that could adversely impact their health, the health of their children, or the environment.

97.     At all times relevant hereto, Defendants knew, or should have known, that their Band-Aid brand adhesive bandages contain PFAS chemicals.

98.     Throughout the class period, Defendants have targeted consumers who seek the highest quality and safest bandages, and have done so by falsely and misleadingly representing that their Band-Aid brand adhesive bandages are safe, healthy, made with the "best ingredients," and that the bandages and packaging are environmentally friendly.

99.     Consumer reliance upon Defendants' representations was reasonable and foreseeable. It is beyond reasonable dispute that the presence of harmful chemicals in adhesive bandages, particularly Defendants' premium quality and safety as advertised, is material to reasonable consumers.

100.    Consumers lack the expertise to ascertain the true ingredients in the adhesive bandages prior to purchase.

101.    Defendants had exclusive knowledge of the contents and ingredients of its Band-Aid brand adhesive bandages, including whether the products contained PFAS chemicals.

102.    Defendants also had exclusive knowledge of its ingredient suppliers and obtained or could have obtained information from their suppliers about the contents and ingredients to the Band-Aid adhesive bandages, including whether they contained PFAS chemicals.

103.    Defendants also had exclusive knowledge of its quality control testing, which detected or should have detected contamination in the manufacturing process to extent that contamination existed.

104.    Absent testing by a qualified lab, consumers such as Plaintiff and the Class Members were unable to determine that Defendants' Band-Aid brand adhesive bandages contained PFAS chemicals given Defendants' failure to disclose the presence of PFAS.

105.    Accordingly, reasonable consumers must, and do, rely on Defendants to accurately and honestly advertise their products' ingredients and benefits. Further, consumers rely on Defendants to not contradict those representations by using artificial chemicals in their adhesive bandages that are known to pose a risk to human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

106.    Defendants' representations that their adhesive bandages are healthy for humans and the environment, including the representations described herein and others, are false because products containing toxic, synthetic ingredients like PFAS chemicals are neither safe for consumers nor the environment.

107.    Defendants' representations are likely to mislead reasonable consumers, and did mislead Plaintiff and Class Members, regarding the presence of PFAS chemicals in their adhesive bandages. Accordingly, these acts and practices by Defendants are deceptive.

108.    Plaintiff and the Class Members are intended third-party beneficiaries of any implied warranty between Defendants and retailers. Retailers were not intended to be the ultimate consumer of the Band-Aid brand adhesive bandages, and any implied warranty that exists was intended to benefit consumers.

109.    Consumers reasonably relied on Defendants' false statements and misleading representations, and reasonably expected that Defendants' adhesive bandages would conform with their representations and, as such, would not contain artificial, man-made PFAS chemicals.

110.    Defendants' false statements, misleading, and material omissions are intentional and careless, and render their adhesive bandages worthless or less valuable.

111.    Had Defendants disclosed to Plaintiff and Class Members that their adhesive bandages contained and contain PFAS chemicals, Plaintiff and Class Members would not have purchased Defendants' adhesive bandages, or they would have paid significantly less for them.

112.    Plaintiff and Class Members were among the intended recipients of Defendants' deceptive representations and omissions described herein.

113.    Defendants' representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions, especially for a consumer health product such as a bandage.

114.    The materiality of the representations and omissions described herein also establishes causation between Defendants' conduct and the injuries Plaintiff and the Class Members sustained.

115.    Defendants acted negligently and/or intentionally to mislead consumers, including Plaintiff and Class Members.

116.    Defendants are aware that the consumers are concerned about the use of PFAS chemicals in their products, yet they have continued to market and advertise their bandages using the representations described herein in order to profit off of unsuspecting consumers, including Plaintiff and Class Members.

117.    Defendants knew or should have known that PFAS chemicals could be eliminated from its Band-Aid brand adhesive bandages, yet failed to do so.

118.    The presence of PFAS chemicals in Defendants' adhesive bandages is entirely inconsistent with Defendants' uniform representations and extensive marketing efforts.

119.    Defendants' knowingly false and misleading representations have the intended result of convincing reasonable consumers that their adhesive bandages are safe, healthy, made from the best ingredients, and environmentally conscientious and, therefore, do not contain artificial, man-made, toxic chemicals. No reasonable consumer would consider Defendants' adhesive bandages to be good for people and the environment, if she knew that the bandages contained harmful, artificial PFAS chemicals.

120.    Defendants' false, misleading, and deceptive representations, as described herein, were and remain likely to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiff and Class Members.

121.    In making the false, misleading, and deceptive representations, Defendants knew and intended consumers would pay a premium for their adhesive bandage products that are made from or contain synthetic or artificial chemical ingredients that are known to be harmful to humans and the environment.

122.    Plaintiff and Class Members paid money for Defendants' Band-Aid adhesive bandages, and paid a premium for an expected quality above (or at least comparable to) that of Defendants' competitors. However, Plaintiff and Class Members did not obtain the full value of the product due to Defendants' misrepresentations as described herein.

123.    Plaintiff and Class Members purchased, purchased more of, or paid more for, Defendants' Band-Aid brand adhesive bandages than they would have had they known the truth about the products' artificial, man-made, and harmful ingredients. Accordingly, Plaintiff and Class Members have suffered injury in fact and lost money or property as a result of Defendants' wrongful conduct.

124.    Defendants' widespread marketing campaign portraying their Band-Aid brand adhesive bandages as containing safe, healthy, environmentally friendly, and "the best" ingredients, as detailed herein, are misleading and deceptive to consumers, because the Band-Aid brand adhesive bandages are made with artificial and toxic ingredients.

**F.  Plaintiff's Purchase and Use of Band-Aid Brand OURTONE Adhesive Bandages**

125.    Plaintiff has purchased Defendants' Band-Aid brand OURTONE line of adhesive bandages on multiple occasions within the past few years.

126.    Plaintiff estimates that she purchased the bandages at least five times over a period of four or so years.

127.    Plaintiff purchased the Band-Aid brand OURTONE adhesive bandages because she reasonably believed the bandages to be safe for use on her skin.

128.    Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the bandages when making her decision to purchase the Band-Aid brand adhesive bandage products.

129.    Plaintiff followed the instructions and applied the bandages on her skin and the skin of others.

130.    Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient/content list, reputation, and disclosures when deciding to purchase the bandages.

131.    On information and belief, Plaintiff's bandages manufactured by Defendants, like the bandages tested as part of the Mamavation study, contained detectable levels of PFAS.

132.    Plaintiff was unaware that the Band-Aid brand adhesive bandage products contained detectable levels of PFAS.

133.    Plaintiff would not have purchased the bandages, or would have paid less for them, had she known that they contained and/or had a material risk of containing dangerous PFAS.

134.    The bandages were misleadingly advertised.

135.    As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid brand adhesive bandages that were not of the quality and safety promised and that Plaintiff would not have purchased if she had not been misled by Defendants.

136.    If Plaintiff or the members of the putative Class were to encounter the Band-Aid brand adhesive bandages in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging, labeling, and other disclosures corrected the misleading packaging omission.

## CLASS ALLEGATIONS

137.    Plaintiff brings this class action individually and as a representative of all those similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of herself and the following proposed Class and Subclass (collectively, the "Classes").

138.    As described below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a) and 23(b)(3) (as well as the requirements for certification of one or more issue classes under Rule 23(c)(4)). Accordingly, Plaintiff seeks certification under Federal Rule of Civil Procedure 23 of the following Classes:

**Nationwide Class:** All individuals in the United States who purchased the Band-Aid Products within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.

**Georgia Subclass:** All individuals who purchased the Band-Aid Products in the State of Georgia within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.

139.    Excluded from the Classes are (1) Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, any entity in which Defendants have a controlling interest; (2) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (3) those persons who have suffered personal injuries as a result of the facts alleged herein; (4) any and all federal, state, or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsel, and/or subdivisions; and (5) all judges presiding over this matter or assigned to hear any aspect of this litigation, along with judicial clerks and staff, and immediate family members.

140.     Plaintiff reserves the right to modify or amend the foregoing Class and Subclass definitions before the Court determines whether certification is appropriate.

141.     This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure 23 because there is a well-defined community of interest in the litigation and membership in the proposed Classes is readily ascertainable.

142.     **Numerosity (Federal Rule of Civil Procedure 23(a)(1)):** A class action is the only available method for the fair and efficient adjudication of this controversy. The members of each Class are so numerous and geographically dispersed that individual joinder of all Class Members is neither practicable nor possible. Plaintiff is informed and believes and, on that basis, alleges that the total number of Class Members is in the thousands, if not millions. Membership in the Class will be determined by analysis of Defendants' records.

143.     **Commonality (Federal Rule of Civil Procedure 23(a)(2) and (b)(3)):** Consistent with Rule 23(a)(2) and with Rule 23(b)(3)'s predominance requirement, Plaintiff and Class Members share a community of interest in that there are numerous common questions and issues of law and fact which predominate over any questions and issues solely affecting individual members, including, but not necessarily limited to:

   a.   Whether Defendants misrepresented that the Band-Aid brand adhesive bandages are free from harmful ingredients;

   b.   Whether Defendants failed to disclose that the Band-Aid brand adhesive bandages contained PFAS;

   c.   Whether Defendants failed to test, or require their suppliers to test, the Band-Aid brand adhesive bandages and their ingredients for the presence of PFAS;

d.  Whether Defendants engaged in deceptive trade practices by selling, packaging, or marketing their Band-Aid brand adhesive bandages containing PFAS chemicals;

e.  Whether Defendants engaged in false or misleading advertising by selling, packaging, or marketing their Band-Aid brand adhesive bandages containing PFAS chemicals;

f.  Whether Defendants' practices in marketing, advertising, and packaging the Band-Aid brand adhesive bandages tend to mislead reasonable consumer into believing that the bandages are free from harmful chemicals, including PFAS;

g.  Whether Defendants' conduct violates the Georgia Fair Business Practices Act and/or Georgia's Uniform Deceptive Trade Practices Act;

h.  Whether Plaintiff and Class Members paid a premium for the Band-Aid brand adhesive bandages that they would not have paid but for Defendants' false representations;

i.  Whether reasonable consumers would consider that the Band-Aid brand adhesive bandages contain detectable levels of PFAS to be a material fact in purchasing the bandages;

j.  Whether Plaintiff and Class Members would not have purchased Defendants' Band-Aid brand adhesive bandages but for Defendants' false representations;

k.  Whether Defendants' omission of the presence of PFAS chemicals in Band-Aid brand adhesive bandages was likely to mislead, deceive, confuse, or confound consumers acting reasonably;

l.  Whether Plaintiff and Class Members have suffered economic injury and the appropriate measure of their losses as a result of those injuries;

m. Whether Defendants have unjustly enriched themselves at consumers' expense; and

n. Whether Plaintiff and Class Members are entitled to injunctive, declaratory, or other equitable relief.

144. In the alternative, Plaintiff seeks certification under Rule 23(c)(4) with respect to one or more of the above issues or such other issues as may be identified in the future.

145. **Typicality (Federal Rule of Civil Procedure 23(a)(3)):** Plaintiff's claims are typical of the claims of the Classes. As the result of Defendants' common course of conduct in violation of laws and standards, as alleged herein, Plaintiff sustained damages akin to damages sustained by all Class Members, including financial loss caused by having purchased Band-Aid adhesive bandages that they would not have purchased, or would have paid significantly less for, but for Defendants' representations.

146. **Adequacy (Federal Rule of Civil Procedure 23(a)(4)):** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of each of the Classes because Plaintiff is a member of the Classes and is committed to pursuing this matter against Defendants to obtain relief for the Classes. Plaintiff is not subject to any individual defense unique from those conceivably applicable to other Class Members or the Classes in their entirety. Plaintiff anticipates no management difficulties in this litigation. Plaintiff has no conflicts of interest with the Classes. Plaintiff's Counsel is competent and experienced in litigating class actions, including extensive experience in litigation in regard to PFAS contamination and consumer-protection matters. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Classes' interests.

147. **Predominance and Superiority (Federal Rule of Civil Procedure 23(b)(3)):** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be

encountered in the management of this class action. Common issues in this litigation predominate over individual issues. The issues discussed above in regard to commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class-action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class Members are relatively small compared to the burden and expense required to individually litigate their respective claims against Defendants and, thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also burden and unreasonably strain the court system, and would result in undue delay. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class-action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

148. **Ascertainability:** The Class and Subclass are defined by reference to objective criteria, and there are feasible mechanisms to determine who fits within the Classes.

149. **Injunctive and Declaratory Relief:** Defendants have engaged in, and continue to engage in, business practices which are unfair and fraudulent by, among other things, failing to disclose the material fact that Band-Aid brand adhesive bandages contain detectable levels of PFAS. Plaintiff seeks class-wide injunctive relief on grounds consistent with the standards articulated in Rule 23(b)(2) that establish final injunctive relief as an appropriate class-wide remedy, in that Defendants continue to manufacture, market, and sell the contaminated bandages and omit material facts. The injuries suffered by Plaintiffs and the Class as a result of Defendant's actions are ongoing.

## **TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

150.    Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the presence of PFAS in the Band-Aid brand adhesive bandages and the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and Class Members were deceived regarding the Band-Aid brand adhesive bandages and could not reasonably discover that they contained PFAS.

151.    Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to expect that the Defendants were concealing the presence of PFAS in the Band-Aid brand adhesive bandages. As alleged herein, the presence of PFAS in the bandages was material to Plaintiff and Class Members at all relevant times. Within the time period of any applicable statute of limitations, Plaintiff and Class Members would not have discovered through the existence of reasonable diligence that the Band-Ad bandages contain PFAS.

152.    At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and the Class Members the true standard, quality, and grade of the Band-Aid brand adhesive bandages and to disclose the presence of PFAS due to its exclusive and superior knowledge of the contents and ingredient sourcing for the bandages.

153.    Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and Class Members reasonably relied on Defendants' knowing, active, and affirmative concealment.

154.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statues of limitations in defense of this action.

**CAUSES OF ACTION**

**COUNT ONE**
**Breach of Express Warranty**
(*On Behalf of the Nationwide Class*)

155.   Plaintiff, individually and on behalf of the Nationwide Class, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

156.   In connection with their sale of Band-Aid brand adhesive bandages, by and through statements in labels, packaging, and ingredient lists, and other written materials intended for consumers and the general public, Defendants made certain express affirmations of fact and/or promises relating to their bandages, and made such affirmations and promises to Plaintiff and the Class, as alleged herein.

157.   By way of examples, such affirmations and promises include the following:

- Defendants hold themselves to the highest standards when making safe products for consumers.

- "Every piece of material in our BAND-AID Brand bandages and every ingredient in our antibiotic treatments are chosen with safety as the top concern. We thoroughly vet each supplier and only partner with those who meet our rigorous standards."

- "Our over-the-counter active ingredients have proven to be the best quality through safety assurance processes and ongoing evaluation."

- "Our manufacturing facilities undergo regular audits and certification so that we can ensure our products are manufactured with the highest standards and comply with most discerning regulatory standards."

- "Our scientists ensure the safety and efficacy of our products through clinical studies and laboratory models."

158.    These express affirmations of fact and/or promises include ingredient lists and labels that purport to attest to the health and safety of the bandages, but fail to include any warning to consumers that the products contained PFAS chemicals.

159.    Defendants advertised, labeled, marketed, and promoted the Band-Aid adhesive bandages product line with such express affirmations of fact and/or promises in such a way as to induce Plaintiff and Class Members to purchase and use the bandages, thereby making an express warranty that the bandages would conform to the representations of being safe; meet scientific and medical, and regulatory standards; and be subjected to appropriate studies and testing.

160.    Defendants' affirmations of fact and/or promises about the Band-Aid brand adhesive bandages, as set forth herein, constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain.

161.    Despite the express warranties Defendants created with respect to the Band-Aid brand adhesive bandages, Defendants delivered bandages to Plaintiff and the Class Members that did not conform to Defendants' express warranties in that such bandages were defective, dangerous, and unfit for use, did not contain labels adequately representing the nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendants breached the express warranties by representing through its labeling, advertising, and marketing materials that its Band-Aid brand adhesive bandages were safe, and intentionally withheld information about the contents containing detectable levels of PFAS and the risks associated with use.

162. Plaintiff and Class Members relied on Defendants' express promises and representations that the bandages were safe to use on human skin and fit to be used for their intended purpose as contained on the labels, packaging, and ingredient lists.

163. Defendants had sole access to material facts concerning the contents of their Band-Aid brand adhesive bandages and the nature of the risks associated with the use of the Products, as Defendants expressly stated on their labels and website the safety of the bandages, and knew that consumers and purchasers, such as Plaintiff and Class Members, could not have reasonably discovered that the express statements were inadequate and inaccurate.

164. Plaintiff and each member of the Class have had sufficient direct dealings with Defendants or their agents (including distributors, dealers, and authorized sellers) to establish privity of contract between Defendants and Plaintiff and each member of the Class.

165. As a direct and proximate result of Defendants' breaches of express warranties, as alleged herein, Plaintiff and the Class Members sustained economic loss in an amount to be proven at trial. Band-Aid brand adhesive bandages contained PFAS, which will require Plaintiff and Class Members to incur costs to prematurely replace the product and costs to discontinue use of the product before expiration.

166. As a result of Defendants' breaches of express warranties, as alleged herein, Plaintiff and the Class Members seek an order awarding compensatory damages and any other just and proper relief available under the law.

## COUNT TWO
### Breach of Implied Warranty
#### (On Behalf of the Nationwide Class)

167. Plaintiff, individually and on behalf of the Class, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

168.    At all relevant times, Defendants were merchants of Band-Aid brand adhesive bandages that were sold to Plaintiff and Class members and were in the business of marketing, promoting, and selling such products to the consuming public. Defendants designed, developed, and sold the bandages knowing that Plaintiffs and Class members would use the bandages.

169.    Each bandage product sold by Defendants comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used. Defendants expected the consuming public, including Plaintiff and Class Members, to use the bandages on their skin and such use was reasonably foreseeable. Plaintiff and Class Members also expected the bandages to be useable and to perform in a manner consistent with their packaging and labeling.

170.    Defendants breached its implied warranty of merchantability because their Band-Aid brand adhesive bandages were not in merchantable condition when sold because they contain or have a material risk of containing dangerous PFAS.

171.    Defendants' Band-Aid brand adhesive bandages are not fit for the ordinary purpose for which they were sold because they contain or have a material risk of containing dangerous PFAS.

172.    Defendants did not properly disclaim the warranty of merchantability and fitness for a particular purpose.

173.    Plaintiff and Class Members were injured as a direct and proximate result of Defendants' breaches of implied warranties of merchantability. Plaintiff and Class Members were damaged as a result of Defendants' breaches of implied warranties of merchantability because, had they been aware of the unmerchantable condition of the bandages, they would not have purchased such products.

174.    As a result of Defendants' breaches of implied warranties of merchantability, as alleged herein, Plaintiff and the Class Members seek an order awarding compensatory damages and any other just and proper relief available under the law.

## COUNT THREE
### Fraudulent Concealment
### (*On Behalf of the Nationwide Class*)

175.    Plaintiff, individually and on behalf of the Nationwide Class, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

176.    Defendants concealed and failed to disclose on the Band-Aid brand packaging and labeling the material fact that the bandages contained or risked containing PFAS, and that the bandages were not safe or healthy for use.

177.    As discussed at great length above, it has been known since the 1950s that PFAS are harmful chemicals to humans, animals, and the environment.  The EPA, CDC and many other groups and publications have further reported on the potential risks and dangers of PFAS chemicals. Accordingly, Defendants knew or should have known that PFAS are dangerous, and concealing this known fact is detrimental to the consumer.

178.    Defendants have a duty to disclose that the bandages contained or risked containing PFAS; however, Defendants did not make this disclosure.

179.    Plaintiff and the Class Members all paid a premium for the Band-Aid brand adhesive bandages based upon the way the product is represented, which did not include the inclusion of PFAS. Products that are tainted with PFAS are not worth a premium to a reasonable consumer.

180.    Defendants had superior knowledge or means of knowledge available to them and knew that Plaintiff and Class Members would rely upon the representations and omissions of

41

Defendants regarding the quality and ingredients of its bandages.  Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains PFAS, especially at the point of sale.

181.    Defendants' concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers such as Plaintiff and the Class Members are influenced by the ingredients and contents listed, as well as any warnings (or lack thereof) on the products they buy.  Defendants know that if they had not omitted that the bandages contained or risked containing PFAS, then Plaintiff and the Class Members would not have agreed to pay a premium price for the Band-Aid brand adhesive bandages, or would not have purchased the bandages at all; however, Defendants wanted to increase sales and profits.

182.    Defendants' concealment misled Plaintiff and the Class Members as to the true nature of what they were buying and putting onto their and their family's bodies.

183.    Defendants fraudulently concealed that the Band-Aid adhesive bandages contained or risked containing PFAS. Consequently, Plaintiffs and the other members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

### COUNT FOUR
**Violation of Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390, *et seq*.**
**(*On Behalf of Plaintiff and the Georgia Subclass*)**

184.    Plaintiff, individually and on behalf of the Georgia Subclass, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

185.    Each Defendant is a "person" as defined by the Georgia Fair Business Practices Act ("Georgia FBPA").

186.    Plaintiff and Class Members are "consumers" within the meaning of the Georgia FBPA.

187.    The purchase of bandages by Plaintiff and Subclass Members constituted "consumer transactions" as defined by the Georgia FBPA.

188.    The Georgia FBPA declares "[u]nfair or deceptive acts or practices in the conduct of consumer transaction and consumer acts or practices in trade or commerce" to be unlawful, including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade...if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised."

189.    By failing to disclose the existence of PFAS chemicals in its Band-Aid brand adhesive bandages, representing that the bandages had characteristics and benefits that they do not have, and representing the bandages to be of a particular standard or quality (when they were of another), Defendants violated the Georgia FBPA.

190.    Plaintiff and Subclass Members did not discover and did not know of any facts that would have caused a reasonable person to expect that the Defendants were concealing the presence of PFAS in the Band-Aid brand adhesive bandages. As alleged herein, the presence of PFAS in the bandages was material to Plaintiff and Subclass Members at all relevant times. Within the time period of any applicable statute of limitations, Plaintiff and Subclass Members would not have discovered through the existence of reasonable diligence that the Band-Ad bandages contain PFAS.

191.   By reason of the conduct alleged herein, Defendants engaged in material and misleading labeling and advertising of its Band-Aid brand adhesive bandages by statements and omission. The false advertising occurred in part within Georgia.

192.   Defendants' Band-Aid brand adhesive bandages contain PFAS chemicals—a fact they omitted to disclose—and Defendants misrepresented that their bandages were safe for use on human skin. Defendants knew or should have known that their Band-Aid brand adhesive bandages should not contain PFAS and that by manufacturing and providing for commercial sale of Band-Aid brand adhesive bandages containing PFAS, Plaintiff and Subclass members were not getting safe products to use on their skin.

193.   Plaintiff and Subclass members would not have purchased the Band-Aid brand adhesive bandages at issue had they known the truth about the presence of PFAS. There is no other use for Defendants' tainted Products.

194.   Defendants violated the Georgia by designing, manufacturing, marketing, and selling Band-Aid brand adhesive bandages containing PFAS and failing to properly represent, both by affirmative conduct and by omission, the actual contents of their bandages.

195.   Defendants knew or should have known that their conduct violated the Georgia FBPA.

196.   If Defendants had not sold Band-Aid brand adhesive bandages containing undisclosed PFAS, Plaintiff and Subclass Members would not have suffered the extent of damages caused by Defendants' sales.

197.   Defendants' advertisements and labels for their Band-Aid brand adhesive bandages violate the Georgia FBPA in that, among others things, Defendants actively and knowingly misrepresented or omitted disclosure of material information, including the fact that Defendants'

bandages contained PFAS, on the labels and advertisements, knowing that Plaintiff and Subclass Members would see and rely on the labels at the time they purchased the Band-Aid brand adhesive bandages, and that Defendants failed to disclose and give timely warnings or notices regarding the presence of PFAS in their bandages that were purchased by Plaintiff and Subclass Members.

198.    The conduct alleged herein constitutes an unconscionable business practice in that Defendants have, by the use of false statements and/or material omissions in their labels and advertisements, failed to properly represent and/or concealed the presence of detectable levels of PFAS in their bandages. Such conduct constitutes "unfair or deceptive acts or practices in the conduct of consumer transaction and consumer acts or practices in trade or commerce."

199.    Members of the public, including Plaintiff and Subclass Members, were deceived by and relied upon Defendants' affirmative misrepresentations and failures to disclose.

200.    Such material and misleading advertisements and labels designed and disseminated by Defendant are and were likely to mislead a reasonable consumer purchasing Band-Aid brand adhesive bandages.

201.    To this day, Defendants continue to engage in unfair or deceptive acts or practices in violation of the Georgia FBPA. Defendants continue to conceal the defective nature of their bandages and have failed to disclose the true nature of their bandages, including that they contains PFAS.

202.    Defendants' violations present a continuing risk to Plaintiff, Subclass Members, and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

203.    Defendants were provided notice of the defective nature of their products through their own testing and the instant Mamavation consumer report. Affording Defendants a reasonable

opportunity to cure the defects in their bandages would be unnecessary and futile here because Defendants have known of and concealed the condition of their products and have failed to provide a suitable remedy within a reasonable time.

204.    As a direct and proximate cause of Defendants' conduct, Plaintiff and Subclass Members suffered actual damages as alleged above.

205.    In addition to or in lieu of actual damages, because of the injury, Plaintiff and the Subclass Members seek statutory, treble damages, and punitive damages as permitted under the Georgia FBPA.

206.    Plaintiff also seeks injunctive relief for Defendants to refrain from the continued advertising of Band-Aid adhesive bandages that omit or misrepresent material facts, including that the bandages contain PFAS. Plaintiff further seek injunctive relief forcing Defendants to replace all bandages.

## COUNT FIVE
**Violation of Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370, *et seq*.**
***(On Behalf of Plaintiff and the Georgia Subclass)***

207.    Plaintiff, individually and on behalf of the Subclass, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

208.    Defendants, Plaintiff, and Subclass Members are "persons" within the meaning of Georgia's Uniform Deceptive Trade Practices Act ("Georgia's UDTPA").

209.    The Georgia UDTPA prohibits "deceptive trade practices" which include the "misrepresentation of standard, quality, or grade of goods and services," "engaging in any other conduct which similarly creates a likelihood of confusion or misunderstanding," and "representing that goods or services have sponsorship, approval, characteristic, ingredients, uses, or benefits that they do not have," and "[a]dvertising goods or services with intent not to sell them as advertised."

210.    Defendants' unfair and deceptive acts or practices described at length herein occurred repeatedly in Defendants' course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public and, as a result, caused economic harm to consumers of their Band-Aid brand adhesive bandages.

211.    Defendants knew or should have known that their conduct was deceptive in that they misrepresented the characteristics and benefits of the bandages, and misrepresented the standard, quality, or grade of their bandages when they knew they were of another. Thus, Defendants violated the Georgia UDTPA, and knew or should have known that their conduct violated the Georgia UDTPA.

212.    Defendants' Band-Aid brand adhesive bandages contain PFAS chemicals—a fact they omitted to disclose—and Defendants misrepresented that their bandages were safe for use on human skin. Defendants knew or should have known that their Band-Aid brand adhesive bandages should not contain PFAS and that by manufacturing and providing for commercial sale of Band-Aid brand adhesive bandages containing PFAS, Plaintiff and Subclass members were not getting safe products to use on their skin. Notwithstanding, Defendants represented that their products "Every piece of material in our BAND-AID Brand bandages and every ingredient in our antibiotic treatments are chosen with safety as the top concern," they "thoroughly vet each supplier and only partner with those who meet our rigorous standards," their "manufacturing facilities undergo regular audits and certification so that we can ensure our products are manufactured with the highest standards and comply with most discerning regulatory standards," and their "scientists ensure the safety and efficacy of our products through clinical studies and laboratory models."

213.    Defendants were under a duty to Plaintiff and Subclass Members to disclose the defective nature of their adhesive bandages because they had exclusive knowledge of its quality

control testing, which detected or should have detected contamination in the manufacturing process to extent that contamination existed. Absent testing by a qualified lab, consumers such as Plaintiff and the Subclass Members were unable to determine that Defendants' Band-Aid brand adhesive bandages contained PFAS chemicals given Defendants' failure to disclose the presence of PFAS.

214.    Despite their exclusive information to the contrary, Defendants failed to disclose that the Band-Aid brand adhesive bandages contained PFAS chemicals.

215.    The facts Defendants concealed from Plaintiff and Subclass Members, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions, especially for a consumer health product such as a bandage. Had Plaintiff and Subclass Members known the true facts in regard to the bandages they purchased, they would not have purchased the bandages or would have paid considerably less for them.

216.    As a direct and proximate cause of Defendants' conduct, Plaintiff and Subclass Members suffered actual damages as alleged above.

217.    In addition to or in lieu of actual damages, because of the injury, Plaintiff and the Subclass Members seek statutory, treble damages, and punitive damages to the extent permitted under the Georgia UDTPA.

218.    Plaintiff also seeks injunctive relief for Defendants to refrain from the continued deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA and applicable law.

## COUNT SIX
## Unjust Enrichment/Quasi-Contract
### (On Behalf of Plaintiff and the Classes)

219.     Plaintiff, individually and on behalf of the Classes, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

220.     As the intended and expected result of its conscious wrongdoing alleged herein, Defendants have profited and benefited from Plaintiff's and Class Members' purchases of the Band-Aid brand adhesive bandages.  Plaintiff's and Class Members' payments for the bandages, directly or indirectly, flowed to Defendants.

221.     Defendants voluntarily accepted and retained these profits and benefits derived from Plaintiff and the Class Members, with full knowledge and awareness that as a result of their misconduct Plaintiff and the Class Members were not receiving products of the quality, nature, fitness, or value that had been represented by Defendants and that Plaintiff and the Class Members, as reasonable consumers, expected for a product applied to the skin.

222.     If Plaintiff and Class Members knew that the Defendants' Band-Aid brand adhesive bandages were not safe and contained PFAS as alleged herein, they would not have purchased Defendants' adhesive bandages.

223.      Defendants have been unjustly enriched by their fraudulent and deceptive withholding of benefits to its customers at the expense of Plaintiff and the Class Members.

224.     Defendants profited from Plaintiff's purchases and used Plaintiff and Class Members' monetary payments for business purposes. Defendants' retention of these profits and benefits is inequitable and against good conscience. Principles of equity and good conscience preclude Defendants from retaining these profits and benefits.

49

225.     As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and the Class Members suffered injury and seek the disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits, plus interest, to the extent and in the amount deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, individually and on behalf of all other members of the proposed Nationwide Class and Georgia Subclass, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

A.     Declaring, adjudging, and decreeing that this action is a proper class action, and certifying the proposed Class and/or Subclass pursuant to Federal Rule of Civil Procedure 23, including designating Plaintiff as Class representative and appointing Plaintiff's counsel as Class Counsel;

B.     Awarding Plaintiff and the Classes appropriate monetary relief, including actual damages; statutory damages; consequential damages; punitive damages; exemplary damages; nominal damages; restitution; and disgorgement of all earnings, interest, profits, compensation, and benefits received as a result of their unlawful acts, omissions, and practices;

C.     Awarding Plaintiff and the Classes equitable, injunctive, and declaratory relief as may be appropriate to protect the interests of Plaintiff and Class Members, including but not limited to an Order enjoining Defendants from engaging in the wrongful and unlawful conduct complained of herein;

D.     Compelling Defendants to pay the costs associated with notification of Class Members about the judgment and administration of claims;

E.   Awarding Plaintiff and the Classes pre-judgment and post-judgment interest to the maximum extent allowable;

F.   Awarding Plaintiff and the Classes reasonable attorneys' fees, costs, and expenses; and

G.   Awarding Plaintiff and the Classes such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff, individually and on behalf of the Class and/or Subclass, hereby demands a trial by jury of all issues in this Complaint so triable.

Dated:  April 8, 2024                     Respectfully submitted,

By: /s/  *Christopher A. Seeger*
Christopher A. Seeger
Christopher L. Ayers
Justin M. Smigelsky
Nigel Halliday
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
Telephone: (973) 639-9100
Facsimile: (973) 639-9393
cayers@seegerweiss.com
cseeger@seegerweiss.com
jsmigelsky@seegerweiss.com
nhalliday@seegerweiss.com

James E. Cecchi
Jason H. Alperstein*
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
jalperstein@carellabyrne.com

51

*Attorneys for Plaintiff and the Proposed Classes*
*\*Pro Hac Vice forthcoming*