Christopher A. Seeger
Stephen A. Weiss
Christopher L. Ayers
Justin M. Smigelsky
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
(973) 639-9100

*Attorneys for Plaintiffs and the Proposed Class*

*[Additional counsel listed on signature page]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JO ARONSTEIN, REBEKAH BADILLA, MARY JANE CASTLE, BRANDI BALDWIN-JONES, PRADEEP ARORA, SERGE BELOZEROV, JOYCETTE GOODWIN,  REINHARD MAZARIEGOS, SHARNAY MOULTRIE, FRANK ORTEGA, CHRISTINA OTEY, MELISSA PAVLICK, LESTER POUNDER, CARL SAPUTO, JR., GRACE SIT, PAULA SKOPOW, VALERIE TORRES, SARI WEINER, ERIC WILIM, ELIZABETH WITOWSKI, individually and on behalf of all others similarly situated, | **CASE NO.: 3:24-cv-04665** |
|  |  |
|  | **CONSOLIDATED CLASS ACTION COMPLAINT** |
|  |  |
| Plaintiff, | DEMAND FOR JURY TRIAL |
|  |  |
| v. |  |
|  |  |
| KENVUE INC., a Delaware corporation, and JOHNSON & JOHNSON, a New Jersey corporation, JOHNSON & JOHNSON CONSUMER INC., a New Jersey corporation, |  |
|  |  |
| Defendants. |  |

## Table of Contents

SUMMARY OF THE CASE ................................................................................................. 1

JURISDICTION AND VENUE ......................................................................................... 6

PARTIES ........................................................................................................................... 6

FACTUAL ALLEGATIONS ............................................................................................ 33

   A.   Background of Defendants' Business................................................................. 33

   B.   PFAS and Risks Associated with PFAS ........................................................... 35

   C.   Testing for PFAS ............................................................................................... 40

   D.   The Mamavation Study of Bandage Consumer Products................................. 42

   E.   Independent Lab Testing Confirm Presence of PFAS in the Band-Aid Products, Including Products Purchased by Plaintiffs. ..................................................... 45

   F.   Defendants' Band-Aid Adhesive Bandage Products, Representations, and Omissions... 51

   G.   Defendants Control the Manufacturing and Quality Control Process. ............... 66

CLASS ACTION ALLEGATIONS ................................................................................. 68

TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS ............................. 74

CAUSES OF ACTION .................................................................................................... 75

   COUNT ONE Breach of Express Warranty (*On Behalf of the Nationwide Class or, in the Alternative, On Behalf of the Statewide Classes*) ................................................. 75

   COUNT TWO Breach of Implied Warranty (*On Behalf of the Nationwide Class or, in the Alternative, On Behalf of the Statewide Classes*) ................................................. 78

   COUNT THREE Fraudulent Concealment (*On Behalf of the Nationwide Class or, in the Alternative, On Behalf of the Statewide Classes*) ................................................. 79

   COUNT FOUR Unjust Enrichment (*On Behalf of the Nationwide Class or, in the Alternative, On Behalf of the Statewide Classes*) ................................................. 81

   COUNT FIVE Violation of California Unfair Competition Law (*On Behalf of the California Subclass*) ................................................................................................. 83

   COUNT SIX Violation of California False Advertising Law ("FAL") (*On Behalf of the California Subclass*) ................................................................................................. 85

   COUNT SEVEN Violation of Florida's Unfair & Deceptive Trade Practices Act (*On Behalf of the Florida Subclass*) ........................................................................... 87

   COUNT EIGHT Violation of Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390 *et seq. (On Behalf of the Georgia Subclass)* ........................................ 90

   COUNT NINE Violation of Georgia's Uniform Deceptive Trade Practices Act O.C.G.A. § 10-1-370 et seq. *(On Behalf of the Georgia Subclass)* ........................................ 94

   COUNT TEN Violation of Hawaii Rev. Stat. § 480 et seq. *(On Behalf of the Hawaii Subclass)* ......................................................................................................... 96

COUNT ELEVEN Violation of Illinois Consumer Fraud and Deceptive Business Practices Act *(On Behalf of the Illinois Subclass)*.................................................. 99

COUNT TWELVE Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903 et seq. *(On Behalf of the Michigan Subclass)* ............................ 101

COUNT THIRTEEN Violation of New York General Business Law § 349 *(On Behalf of the New York Subclass)*.................................................................. 104

COUNT FOURTEEN Violation of New York General Business Law § 350 *(On Behalf of the New York Subclass)*.................................................................. 107

COUNT FIFTEEN Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law *(On Behalf of the Pennsylvania Subclass)* .................................. 109

PRAYER FOR RELIEF ..................................................................................... 112

JURY TRIAL DEMANDED ................................................................................ 113

## CLASS ACTION COMPLAINT

Plaintiffs, individually and on behalf of all others similarly situated consumers ("Class Members"), alleges the following against Defendants Kenvue Inc. ("Kenvue") and Johnson & Johnson and Johnson & Johnson Consumer Inc. (the Johnson & Johnson defendants are referred to as "J&J" and, collectively with Kenvue, "Defendants") based on personal knowledge as to their own circumstances and on information and belief as to all other matters, including investigation conducted by their attorneys:

## SUMMARY OF THE CASE

1. This class action litigation is brought by Plaintiffs on behalf of Class Members who purchased Band-Aid bandages ("Band-Aid Products")[1] for personal, family, or household use and seeks to hold Defendants accountable for selling these products they knew or should have known contained dangerous per- or polyfluoroalkyl substances ("PFAS") and failing to warn Plaintiffs and Class Members about the risks.

2. Independent laboratory testing confirmed the Band-Aid Products contain harmful levels of toxic PFAS, a class of harmful "forever chemicals" linked to cancer, hormone disruption, immune system harm, and other health risks. The presence of PFAS in these bandages raises serious concerns, especially given that they are applied to open wounds, where harmful chemicals could be absorbed into the body.

3. The inclusion of PFAS in the Band-Aid Products is particularly troubling because:

- PFAS are not necessary for the function of a bandage;

---

[1] The Band-Aid Products involved are: Band-Aid Flexible Fabric Comfortable Protection Bandages ("Flexible Fabric Bandages") and Band-Aid OURTONE Flexible Fabric Bandages ("OURTONE Bandages") including OURTONE BR45 Bandages; OURTONE BR55 Bandages; and Band-Aid OURTONE BR65 Bandages.

1

- The PFAS chemicals may be absorbed into the skin or bloodstream, posing potential health risks; and

- It is especially concerning that a product marketed specifically to consumers of color has been found to contain high levels of toxic substances.

4.     J&J and its spin-off entity, Kenvue, are—and have been for over 100 years—among the "key players" in the global bandages market.

5.     Among Defendants' most-recognized products are their adhesive bandages, marketed under the trademarked name "Band-Aid." Today, the Band-Aid brand is one of the most recognizable brands worldwide, serving millions of people daily for the treatment of cuts, scrapes, and burns. Indeed, the brand name "Band-Aid" has been genericized and become the commonly used name for an adhesive bandage.

6.     For example, Band-Aid's jingle "I am stuck on Band-Aid, 'cause Band-Aid's stuck on me" has been "an unforgettable earworm that resonated with audiences for generations," with the "catchy tune and simple lyrics contribut[ing] to the brand's memorability and widespread recognition."

7.     Band-Aid launched OURTONE Band-Aid Products in 2021, marketed as an inclusive product line addressing the historic lack of representation in personal care products and designed to match a wider range of skin tones, particularly for consumers of color. This was part of a broader push for diversity and inclusivity after criticism that standard "flesh-colored" bandages primarily matched lighter skin tones.

8.     Instead of empowering communities of color, the Band-Aid Products put the community's health at risk. By marketing OURTONE Band-Aid Products specifically for Black and Brown consumers while containing high levels of harmful PFAS, Defendants have effectively

2

exposed these communities to harmful chemicals at a disproportionate rate. Communities of color have historically faced higher exposure to environmental toxins and hazardous substances due to systemic inequities.

9.     People of Color already experience higher rates of chronic health conditions linked to PFAS exposure, including cancer, cardiovascular diseases, and immune system dysfunction. The presence of PFAS in OURTONE Band-Aid Products adds another layer of risk to populations already facing significant health disparities.

10.     Defendants marketed OURTONE Band-Aid Products as inclusive, consumer-conscious products without disclosing the presence of PFAS. This is particularly problematic because it exploits consumer trust, especially among communities that may already be skeptical of corporate health practices due to historical injustices (e.g., medical experimentation, lack of healthcare access).

11.     And it is deeply troubling that Defendants and particularly J&J, a company with a history of consumer trust violations (such as lawsuits over asbestos in baby powder), would release products specifically for People of Color without ensuring their safety. This raises questions about corporate accountability and whether Defendants took necessary precautions in developing and testing OURTONE in accordance with industry standards.

12.     Despite the presence of harmful levels of PFAS in the Band-Aid Products, Defendants' extensive marketing efforts routinely tout their commitment to the health of their customers, our communities, and our planet. By way of example, Kenvue makes a "sustainability promise" on its website, stating:

>     We're all about careful choices. Choices that heal and contribute to the best possible outcomes—for our customers, the planet, and the society we live in. That's why we hold ourselves to the highest standards when making safe products for you. It's why we try to

minimize our footprint on the planet and contribute towards progressing healthcare in the communities we are part of. And why we try—every day—to make choices that will create a future that's bright and healthy for all of us.

13.    Kenvue also states in its "sustainability promise" that the Band-Aid brand has "Better Ingredients, Better Processes," for which it offers the following statements in support:

- "We prioritize safety and quality in the development of every wound care product."

- "Every piece of material in our BAND-AID Brand bandages and every ingredient in our antibiotic treatments are chosen with safety as the top concern. We thoroughly vet each supplier and only partner with those who meet our rigorous standards."

- "Our over-the-counter active ingredients have proven to be the best quality through safety assurance processes and ongoing evaluation."

- "Our manufacturing facilities undergo regular audits and certification so that we can ensure our products are manufactured with the highest standards and comply with most discerning regulatory standards."

- "Our scientists ensure the safety and efficacy of our products through clinical studies and laboratory models."

14.    As the result of Defendants' marketing efforts, Defendants' Band-Aid brand of bandages and first-aid supplies consistently rank highest in the United States as the brand that consumers perceive most positively.

15.    What Defendants have not told consumers, however, is that PFAS "forever chemicals," notorious for having adverse effects on humans and our environment, are present in

unsafe amounts in the Band-Aid Products. Upon information and belief, Defendants have used and continue to use PFAS chemicals in their adhesive bandages for the water-proof qualities.

16.     Modern science has demonstrated that there is no "safe" level of exposure to PFAS chemicals. Even "trace" levels of PFAS can be harmful to human health and our environment. Indeed, the State of New Jersey has set the maximum contaminant level for one particular PFAS, PFOA, at 14 parts per trillion ("ppt"), which is the equivalent of 14 drops of water in 20 olympic-sized pools. Such small quantities of PFAS are equally harmful when they are not ingested but, rather, are applied to the skin, because PFAS can be absorbed through the skin, the largest human organ.

17.     Defendants are well aware that consumers are extremely concerned about the use of PFAS chemicals in their products, yet Defendants have continued to market and advertise their Band-Aid Products using the representations described herein in order to profit off of unsuspecting consumers.

18.     Had Defendants disclosed to Plaintiff and Class Members that their adhesive bandages contained and contain PFAS chemicals, Plaintiff and Class Members would not have purchased Defendants' Band-Aid Products, or they would have paid significantly less for them.

19.     As a direct and proximate result of Defendants' failures, Plaintiff and absent Class Members have suffered and will continue to suffer serious injury.

20.     Accordingly, Plaintiff, on behalf of herself and the estimated hundreds of thousands—if not millions—of similarly situated consumers of Band-Aid Products seeks to hold Defendants responsible for the injuries suffered as the result of their misconduct and failure to act, and demands appropriate monetary, equitable, injunctive, and declaratory relief.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 putative members in the proposed class and subclass, and at least one Class and Subclass Member (e.g., Plaintiff) is a citizen of a state different from any Defendant.

22.     The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged are part of the same case or controversy.

23.     This Court has personal jurisdiction over Defendants. Defendant Kenvue is headquartered and routinely conducts business in the State of New Jersey, including in this District. Each of the Defendants have sufficient minimum contacts in this State, have intentionally availed themselves of this jurisdiction by conducting business in this State, including through marketing and/or selling products and/or services and/or by accepting and processing payments for those products and/or services within this State.

24.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events that gave rise to Plaintiffs' claims took place within this District and Defendant Kenvue is headquartered and does business in this District.

## PARTIES
## PLAINTIFFS

25.     Each and every Plaintiff and each Class member has suffered a concrete and particularized injury, including, but not limited to, loss of the benefit of the bargain and diminished value of their product, as a result of Defendants' concealment of PFAS in the Band-Aid Products, which Plaintiffs and Class members purchased. Independent testing shows that the Band-Aid Products contained toxic levels of PFAS, such as PFOA, greatly in excess of EPA advisory levels.

It is highly likely that the Band-Aid Products purchased by each and every Plaintiff and each Class member contained the same or substantially similar levels of PFAS. Any reasonable consumer would expect that the Band-Aid Products they purchased would be safe and free from harmful and undisclosed PFAS.

**Plaintiff Jo Aronstein**

26.     At all relevant times, Plaintiff Jo Aronstein is and was a citizen of the United States and domiciled in the City of Decatur, County of DeKalb, State of Georgia. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages during the relevant period.

27.     As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because she reasonably believed they were safe for use around, adjacent to, and near skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to her and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making her decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

28.     On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contain the same or substantially similar levels of PFAS.

29.     Plaintiff would not have purchased the Band-Aid Products, or would have paid significantly less for them, had she known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

30.     The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if she had not been misled by Defendants.

31.     If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Pradeep Arora**

32.     At all relevant times, Plaintiff Pradeep Arora is and was a citizen of the United States and domiciled in the City of Honolulu, County of Honolulu, State of Hawaii. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages during the relevant period.

33.     As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because they reasonably believed they were safe for use around, adjacent to, and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to their and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making his decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

34.    On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contain the same or substantially similar levels of PFAS.

35.    Plaintiff would not have purchased the Band-Aid Products, or would have paid less for them, had he known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

36.    The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if they had not been misled by Defendants.

37.    If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Serge Belozerov**

38.    At all relevant times, Plaintiff Serge Belozerov is and was a citizen of the United States and domiciled in the City of Worcester, County of Worcester, State of Massachusetts. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages (BR45) during the relevant period.

39.    As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because he reasonably believed they were safe for use around, adjacent to,

9

and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to his and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making his decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

40.     On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contain the same or substantially similar levels of PFAS.

41.     Plaintiff would not have purchased the Band-Aid Products, or would have paid less for them, had he known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

42.     The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if they had not been misled by Defendants.

43.     If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Reinhard Mazariegos**

44.     At all relevant times, Plaintiff Reinhard Mazariegos is and was a citizen of the United States and domiciled in the City of Palmdale, County of Los Angeles, State of California. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages during the relevant period.

45.     As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because he reasonably believed they were safe for use around, adjacent to, and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to his and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making his decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

46.     On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contain the same or substantially similar levels of PFAS.

47.     Plaintiff would not have purchased the Band-Aid Products, or would have paid less for them, had he known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

11

48.     The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if he had not been misled by Defendants.

49.     If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Sharnay Moultrie**

50.     At all relevant times, Plaintiff Sharnay Moultrie is and was a citizen of the United States and domiciled in the City of Antioch, County of Contra Costa, State of California. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages during the relevant period.

51.     As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because she reasonably believed they were safe for use around, adjacent to, and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to her and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making her decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

52.     On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of

sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contain the same or substantially similar levels of PFAS.

53.     Plaintiff would not have purchased the Band-Aid Products, or would have paid less for them, had she known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

54.     The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if she had not been misled by Defendants.

55.     If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Frank Ortega**

56.     At all relevant times, Plaintiff Frank Ortega is and was a citizen of the United States and domiciled in the City of Reseda, County of Los Angeles, State of California. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages during the relevant period.

57.     As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because he reasonably believed they were safe for use around, adjacent to, and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to his and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making his decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable

13

consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

58.     On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contain the same or substantially similar levels of PFAS.

59.     Plaintiff would not have purchased the Band-Aid Products, or would have paid less for them, had he known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

60.     The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if he had not been misled by Defendants.

61.     If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Christina Otey**

62.     At all relevant times, Plaintiff Christina Otey is a citizen of the United States and domiciled in the City of Glenn Heights, County of Dallas, State of Texas. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages (BR45) during the relevant period.

14

63.     As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because she reasonably believed they were safe for use around, adjacent to, and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to her and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making her decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

64.     On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contain the same or substantially similar levels of PFAS.

65.     Plaintiff would not have purchased the Band-Aid Products, or would have paid less for them, had she known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

66.     The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if she had not been misled by Defendants.

67.     If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Melissa Pavlick**

68.     At all relevant times, Plaintiff Melissa Pavlick is and was a citizen of the United States and domiciled in the City of Park Forest, County of Cook, State of Illinois. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages (BR65) during the relevant period.

69.     As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because she reasonably believed they were safe for use around, adjacent to, and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to her and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making her decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

70.     On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contain the same or substantially similar levels of PFAS.

71.    Plaintiff would not have purchased the Band-Aid Products, or would have paid less for them, had she known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

72.    The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if she had not been misled by Defendants.

73.    If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Lester Pounder**

74.    At all relevant times, Plaintiff Lester Pounder is and was a citizen of the United States and domiciled in the City of Lawrenceville, County of Mercer, State of New Jersey. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages (BR55) during the relevant period.

75.    As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because he reasonably believed they were safe for use around, adjacent to, and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to his and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making his decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures

when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

76.     On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contain the same or substantially similar levels of PFAS.

77.     Plaintiff would not have purchased the Band-Aid Products, or would have paid less for them, had he known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

78.     The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if he had not been misled by Defendants.

79.     If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Grace Sit**

80.     At all relevant times, Plaintiff Grace Sit is and was a citizen of the United States and domiciled in the City of St. Peters, County of St. Charles, State of Missouri. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages (BR45) during the relevant period.

18

81.     As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because she reasonably believed they were safe for use around, adjacent to, and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to her and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making her decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

82.     On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contain the same or substantially similar levels of PFAS.

83.     Plaintiff would not have purchased the Band-Aid Products, or would have paid less for them, had she known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

84.     The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if she had not been misled by Defendants.

85.     If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Paula Skopow**

86.     At all relevant times, Plaintiff Paula Skopow is and was a citizen of the United States and domiciled in the City of Pleasantville, County of Venango, State of Pennsylvania. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages (BR45 and BR65) during the relevant period.

87.     As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because she reasonably believed they were safe for use around, adjacent to, and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to her and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making her decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

88.     On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contain the same or substantially similar levels of PFAS.

89.     Plaintiff would not have purchased the Band-Aid Products, or would have paid less for them, had she known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

90.     The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if she had not been misled by Defendants.

91.     If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Sari Weiner**

92.     At all relevant times, Plaintiff Sari Weiner is and was a citizen of the United States and domiciled in the City of Henderson, County of Clark, State of Nevada. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages (BR45, BR55, and BR65) during the relevant period.

93.     As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because she reasonably believed they were safe for use around, adjacent to, and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to her and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making her decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures

when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

94.    On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contain the same or substantially similar levels of PFAS.

95.    Plaintiff would not have purchased the Band-Aid Products, or would have paid less for them, had she known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

96.    The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if she had not been misled by Defendants.

97.    If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Eric Wilim**

98.    At all relevant times, Plaintiff Eric Wilim is and was a citizen of the United States and domiciled in the City of Grayslake, County of Lake, State of Illinois. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages during the relevant period.

99.    As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because he reasonably believed they were safe for use around, adjacent to, and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to his and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making his decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

100.    On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contain the same or substantially similar levels of PFAS.

101.    Plaintiff would not have purchased the Band-Aid Products, or would have paid less for them, had he known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

102.    The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if he had not been misled by Defendants.

103.    If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Elizabeth Witowski**

104.    At all relevant times, Plaintiff Elizabeth Witowski is and was a citizen of the United States and domiciled in the City of McHenry, County of McHenry, State of Illinois. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages (BR45) during the relevant period.

105.    As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because she reasonably believed they were safe for use around, adjacent to, and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to her and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making her decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

106.    On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contain the same or substantially similar levels of PFAS.

107.     Plaintiff would not have purchased the Band-Aid Products, or would have paid less for them, had she known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

108.     The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if she had not been misled by Defendants.

109.     If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Carl Saputo, Jr.**

110.     At all relevant times, Plaintiff Carl Saputo, Jr. is and was a citizen of the United States and domiciled in Barstow, San Bernadino County, State of California. Plaintiff has purchased one or more boxes of Band-Aid Flexible Fabric Bandages during the relevant period.

111.     As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because he reasonably believed they were safe for use around, adjacent to, and near skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to his and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making his decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

112.     On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contained the same or substantially similar levels of PFAS.

113.     Plaintiff would not have purchased the Band-Aid Products, or would have paid significantly less for them, had he known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

114.     The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if he had not been misled by Defendants.

115.     If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Valerie Torres**

116.     At all relevant times, Plaintiff Valerie Torres is and was a citizen of the United States and domiciled in Los Angeles, Los Angeles County, State of California. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages (BR45, BR55, and BR65) during the relevant period.

117.     As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because she reasonably believed they were safe for use around, adjacent

26

to, and near skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to her and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making her decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

118. On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contained the same or substantially similar levels of PFAS.

119. Plaintiff would not have purchased the Band-Aid Products, or would have paid significantly less for them, had she known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

120. The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if she had not been misled by Defendants.

121. If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Joycette Goodwin**

122.    At all relevant times, Plaintiff Valerie Torres is and was a citizen of the United States and domiciled in Gardena, Los Angeles County, State of California. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages (BR55 and BR65) during the relevant period.

123.    As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because she reasonably believed they were safe for use around, adjacent to, and near skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to her and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making her decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products. Plaintiff was unaware that the Band-Aid Products contained harmful levels of PFAS.

124.    On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contained the same or substantially similar levels of PFAS.

125.    Plaintiff would not have purchased the Band-Aid Products, or would have paid significantly less for them, had she known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

126.    The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if she had not been misled by Defendants.

127.    If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Mary Jane Castle**

128.    At all relevant times, Plaintiff Mary Jane Castle is and was a citizen of the United States and domiciled in the Charter Township of Waterford, County of Oakland, State of Michigan. Plaintiff has purchased one or more boxes of Band-Aid Flexible Fabric Bandages during the relevant period.

129.    As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because she reasonably believed they were safe for use around, adjacent to, and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to her and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making her decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products

130.    On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of

sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contained the same or substantially similar levels of PFAS.

131.    Plaintiff would not have purchased the Band-Aid Products, or would have paid significantly less for them, had she known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

132.    The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if she had not been misled by Defendants.

133.    If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Brandi Baldwin-Jones**

134.    At all relevant times, Plaintiff Brandi Baldwin-Jones is and was a citizen of the United States and domiciled in the City of Northville, County of Oakland, State of Michigan. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages during the relevant period.

135.    As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because she reasonably believed they were safe for use around, adjacent to, and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to her and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when

30

making her decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products

136.    On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contained the same or substantially similar levels of PFAS.

137.    Plaintiff would not have purchased the Band-Aid Products, or would have paid significantly less for them, had she known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

138.    The Band-Aid Products were misleadingly advertised. As a result of Defendants' negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if she had not been misled by Defendants.

139.    If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

**Plaintiff Rebekah Badilla**

140.    At all relevant times, Plaintiff Rebekah Badilla is and was a citizen of the United States and domiciled in the City of New York, State of New York. Plaintiff has purchased one or more boxes of Band-Aid OURTONE Bandages during the relevant period.

141.    As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the Band-Aid Products because she reasonably believed they were safe for use around, adjacent to, and near their skin and open wounds. Plaintiff followed the instructions and applied the Band-Aid Products to their and family members' skin and open wounds. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging and the ingredient lists for the Band-Aid Products when making their decision to purchase one of the Band-Aid Products. Plaintiff, like other reasonable consumers, reasonably relied on Defendants' packaging, labeling, ingredient list, and disclosures when deciding to purchase one of the Band-Aid Products

142.    On information and belief, the Band-Aid Products purchased by Plaintiff contained harmful levels of PFAS. Independent testing, detailed in Section E, and published research, detailed in Section D, confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff's Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, to contained the same or substantially similar levels of PFAS.

143.    In addition, independent testing was conducted on the Product purchased by Plaintiff Badilla. This testing was performed according to industry testing standards by a laboratory accredited by an ISO accredited testing laboratory. Testing conducted on the product actually purchased by Plaintiff Badilla confirmed the presence of harmful PFAS including PFHxA, PFOA, PFOS, and DONA.

144.    Plaintiff would not have purchased the Band-Aid Products, or would have paid significantly less for them, had she known that the products contained dangerous PFAS. In fact, Plaintiff has stopped using the Band-Aid Products since learning they contain PFAS.

145.    The Band-Aid Products were misleadingly advertised. As a result of Defendants'

negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by purchasing, at a premium price, the Band-Aid Products that were not of the quality and safety promised and that Plaintiff would not have purchased if they had not been misled by Defendants.

146. If Plaintiff or the members of the putative Class were to encounter the Band-Aid Products in the future, they could not reasonably rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected the misleading packaging omission.

## **DEFENDANTS**

147. Kenvue is a Delaware corporation, with principal executive offices located at 199 Grandview Road, Skillman, New Jersey.

148. Johnson & Johnson is a New Jersey corporation, with principle executive offices located at One Johnson & Johnson Plaza, New Brunswick, New Jersey.

149. Upon information and belief, Johnson & Johnson Consumer Inc. is a New Jersey corporation and subsidiary of Johnson & Johnson, with principle executive offices located at One Johnson & Johnson Plaza, New Brunswick, New Jersey.

## **FACTUAL ALLEGATIONS**

### A. Background of Defendants' Business

150. Incorporated in New Jersey in 1887, J&J and its subsidiaries have approximately 131,900 employees worldwide engaged in the research and development, manufacture and sale of a broad range of products in the healthcare field.

151. According to J&J's Form 10-K filed with the Securities Exchange Commission for the fiscal year ended December 31, 2023, the company's primary focus is products related to human health and well-being.

152.    Kenvue was incorporated in Delaware in February 2022, as a wholly owned subsidiary of J&J, to serve as the ultimate parent company of J&J's Consumer Health Business.[2]

153.    In April of 2023, J&J completed the transfer of substantially all of the assets and liabilities of the Consumer Health Business to Kenvue and its subsidiaries.

154.    In May 2023, Kenvue completed an initial public offering and began trading on the New York Stock Exchange. Following the Kenvue IPO, J&J owned approximately 89.6% of its outstanding common stock; however, as part of an exchange offer J&J announced in July of 2023, under which its shareholders could exchange shares of J&J common stock for shares of Kenvue common stock, in August of 2023, J&J completed the exchange offer and thus the separation from J&J and transition to being a fully independent public company.[3]

155.    Following Kenvue's separation from J&J, J&J stated in its Form 10-K that it is now organized into two business segments:  Innovative Medicine (focused on therapeutic areas, such as immunology, infectious diseases, oncology, and neuroscience) and Med. Tech. (includes a broad portfolio of products used in the interventional solutions, orthopaedics, surgery, and vision categories).

156.    Kenvue stated in its Form 10-K filed with the Securities Exchange Commission for the fiscal year ended December 31, 2023, "[w]ith $15.4 billion in net sales in 2023, we are the world's largest pure-play consumer health company."

157.    Kenvue further stated in its Form 10-K that its brand portfolio—consisting of BAND-AID Brand Adhesive Bandages, Tylenol, Neutrogena, Listerine, Johnson's, and others—

---

[2] According to J&J's Form 10-K, aside from Consumer Health, its other two business segments are Pharmaceutical and Medical Devices.

[3] According to Kenvue's Form 10-K filed with the Securities Exchange Commission for the fiscal year ended December 31, 2023, J&J continues to own approximately 9.5% of Kenvue's outstanding common stock.

allows it "to provide holistic consumer health solutions to our consumers across a spectrum of product categories and hold leading positions across numerous large and attractive categories globally. These comprehensive solutions are backed by science and several of our brands have a long history of recommendations by healthcare professionals, which further reinforces our consumers' confidence in our brands."

## B. PFAS and Risks Associated with PFAS

158.    PFAS are a category of highly persistent—stain-resistant, oil-resistant, and water-resistant—and toxic manufactured chemicals that have been used in industry and consumer products since the 1940s.[4]

159.    In regard to bandages, upon information and belief, PFAS chemicals are used by Defendants for their waterproof qualities.

160.    One common characteristic of concern in regard to PFAS is that many types break down very slowly and can build up in people, animals, and the environment over time.[5] In fact, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—making them highly persistent in the environment and our bodies.[6]

161.    Consequently, PFAS chemicals are often referred to as "forever chemicals."

162.    PFAS can be categorized as either "long-chain" or "short-chain" based on the number of carbon atoms they contain. Long-chain PFAS contain 7 or more carbon atoms, while

---

[4] *Our Current Understanding of the Human Health and Environmental Risks of PFAS*, United States Environmental Protection Agency, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited Apr. 6, 2024).

[5] *Id.*

[6] U.S. Department of Health and Human Services, National Toxicology Program, https://ntp.niehs.nih.gov/whatwestudy/topics/pfas (last visited Apr. 7, 2024).

PFAS containing fewer than 7 carbon atoms are considered short-chain. Long-chain PFAS bioaccumulate and bio-magnify in both humans and in wildlife.

163.    Although PFAS manufacturers once claimed that short-chain PFAS were safer than long-chain varieties, these claims have been debunked. Indeed, studies have demonstrated that short-chain PFAS may be just as—if not more—harmful than long-chain versions, because they "are 'more widely detected, more persistent and mobile in aquatic systems,' which could present greater problems for humans and the environments in which they live."[7]

164.    PFAS chemicals can be harmful at extremely low levels of exposure.  According to the U.S. Environmental Protection Agency ("EPA"), the levels at which negative human health effects could occur are significantly lower than previously understood, including at near zero in some instances.[8]

165.    In other words, there is no "safe" level of exposure to PFAS chemicals. Even "trace" levels of PFAS can be harmful to human health.

166.    Humans may be exposed to PFAS through a variety of pathways, including ingestion, inhalation, and skin absorption. Studies dating back at least a decade have indicated that PFAS can be absorbed through skin, with evidence showing that PFAS in the blood increase after application to skin.

---

[7] *Study: Newer PFAS Chemicals "May Pose More Risks" Than Those They Replaced,* The University of Rhode Island (Aug. 22, 2019), https://www.ewg.org/news-insights/news-release/study-newer-pfas-chemicals-may-pose-more-risks-those-they-replaced (last visited Apr. 7, 2024).

[8] *EPA warns toxic "forever chemicals" more dangerous than once thought*, Washington Post (June 15, 2022), https://www.washingtonpost.com/climate-environment/2022/06/15/epa-pfas-forever-chemicals/ (last visited Apr. 7, 2024).

167.    PFAS "forever chemicals" are extremely problematic for the environment and human health. Per current scientific research, health effects associated with different PFAS include:

- Increased risk of cancers, including prostate, kidney, and testicular cancers;

- Endocrine disruption;

- Disruption to normal thyroid function;

- Increased risk of acute lymphoblastic leukemia;

- Reduced ability of the body's immune system to fight infections, including reduced vaccine response;

- Increased risk of allergies and asthma in young children;

- Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes;

- Increased cholesterol levels;

- Increased risk of metabolic diseases like obesity and diabetes;

- Cardiovascular disease; and

- Reproductive effects such as decreased fertility or increased blood pressure in pregnant women.

168.    A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[9]

---

[9] Emerging chemical risks in Europe — 'PFAS', EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified Mar. 9, 2021) https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.



169.    The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[10]

170.    There is no effective treatment for removal of PFAS chemicals from the body. Therefore, experts agree that the most effective strategy to decrease health risk is to avoid or limit exposure to products known to contain PFAS chemicals.

171.    Only in recent years has the presence of PFAS used in consumer products, and their consequent risks, begun to be publicized and discussed in the media and scientific literature. Based

---

[10] *Id*

on this newly available information, consumers are rightly concerned about the presence or risk of PFAS in various consumer products.

172.    In June 2022, the EPA announced a lifetime health advisory related to PFAS. A health advisory is not a binding regulation but serves as "informal technical guidance to assist government officials." The June 2022 advisory sets lifetime health advisory levels for PFOA at 0.004 ppt and PFOS at 0.02 ppt.  These levels are below the detection capability of most measurement devices, meaning that EPA considers any detection of PFOA or PFOS to exceed the lifetime health advisory level. The EPA advisory also set a lifetime health advisory level for the short-chain GenX at 10 ppt and for PFBS, a replacement for PFOS, at 2,000 ppt.[11]

173.    On July 28, 2022, the National Academy of Science, Engineering, and Medicine, at the request of the CDC, produced a report advising clinicians on how to test, diagnose, and treat individuals exposed to PFAS. The report recommends that doctors screen blood tests for a range of PFAS and advises that if a patient's blood shows combined PFAS above 20 nanograms per milliliter, the person is at high risk of adverse health effects. Individuals with combined PFAS between 2 and 20 nanograms per milliliter are at a "concern for adverse effects."[12] As this guidance shows, clinicians believe that all PFAS are capable of causing serious health impacts.

174.    On April 10, 2024, the Biden Administration issues the first-ever national, legally enforceable drinking water standard to protect communities from exposure to PFAS. The standards

---

[11] *EPA Announces New Drinking Water Health Advisories for PFAS Chemicals, $1 Billion in Bipartisan Infrastructure Law Funding to Strengthen Health Protections*, EPA (June 15, 2022) https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan (last visited Apr. 7, 2024).

[12] *Guidance on PFAS Exposure, Testing, and Clinical Follow-Up*, National Academies Science Engineering Medicine (2022), https://nap.nationalacademies.org/catalog/26156/guidance-on-pfas-exposure-testing-and-clinical-follow-up (last visited Apr. 7, 2024).

are set a maximum contaminant level of 4 ppt for PFOA and PFOS individually. For other forms of PFAS, the maximum set by the Administration is 10 ppt.

175.    Moreover, for PFOA and PFOS, EPA is setting a Maximum Contaminant Level health-based goal at zero. This is reflective of the latest science supporting that there is no level of exposure to PFAS without risk of health impacts, including several cancers.

176.    For context, 10 ppt equated to .0001 parts per million ("ppm"). This means that the PFAS found in Defendants' Band-Aid Products of up to 262 ppm goes well beyond the limitations set forth by the government on drinking water.

177.    As the many risks associated with PFAS become more widely known, it is likely that consumer awareness will continue to grow. It is reasonable for consumers to be concerned about these chemicals, which carry significant health risks and are often undisclosed by manufacturers.

**C.  Testing for PFAS**

178.    There are two primary testing methods for detecting PFAS in a particular sample: "targeted" analysis and total organic fluorine analysis.

179.    Targeted PFAS analysis seeks to detect the presence of specific PFAS forms in a sample, with results limited to a fixed set of parameters (i.e., a limited and defined list of potential PFAS chemical targets).[13]

---

[13] From a harm-reduction perspective, the specific type of PFAS chemical present in a consumer product is largely of no consequence. All PFAS chemicals bioaccumulate, meaning that once they are introduced to the body, they cannot be removed except through normal excretion, which can take years. In addition, all 12,000 PFAS structures present similar harm to human health and the environment. Accordingly, the only way to avoid the consequences of accumulated PFAS in the body is to avoid additional exposure to any PFAS chemical.

180.    Notwithstanding significant scientific advancement, targeted PFAS testing can only detect, at most, approximately 0.006% of PFAS chemicals in existence. Because targeted PFAS analysis can only detect a miniscule fraction of potential PFAS, targeted analysis cannot provide a comprehensive measure of the total quantity of PFAS that may be present in a sample.

181.    Thus, because of this limitation, targeted PFAS testing cannot support the conclusion that a sample is free of PFAS, but can only support a conclusion that a sample is free from the small portion of specific PFAS chemicals it can detect.

182.    Total organic fluorine analysis, on the other hand, is used to detect organic fluorine, which is the foundational element (and defining characteristic) of PFAS chemicals.

183.    In the context of chemistry, the term "organic" refers to compounds containing carbon. Organic fluorine is created by the chemical bond between carbon atoms and fluorine atoms. The strong bond created between carbon and fluorine is what defines PFAS chemicals and is the reason for their common usage.

184.    Total organic fluorine testing is critical to the detection of the 99.99% of PFAS that cannot be detected through limited targeted testing. Because organic fluorine is the identifying element of PFAS chemicals and is present in all PFAS varieties, the detection of organic fluorine in a sample necessarily means that PFAS chemicals are present in some form.

185.    It is nearly impossible for total organic fluorine testing to yield a false positive detection of PFAS in a sample. Total organic fluorine testing measures only fluorine that originates from a substance where fluorine is attached to a carbon backbone. Therefore, total organic fluorine testing does not detect any other forms of fluorine, such as inorganic fluorine (i.e., fluoride).

186.    Organic fluorine is not naturally present in the human body and is practically nonexistent outside of its use in man-made PFAS chemicals.[14]

187.    In light of the noted limitations of targeted testing, total organic fluorine testing is the only method that is able to reliably detect the presence or absence of the thousands of varieties of PFAS chemicals for which targeted testing is not currently available.

188.    Consequently, total organic fluorine testing is widely accepted by scientists, researchers, and regulators as the reliable method to detect a PFAS chemical in a sample.

189.    Total organic fluorine analysis is typically reported in ppm. By using the average proportion of organic fluorine in PFAS, organic fluorine concentration can also be used to provide an estimate of the maximum PFAS concentration in a sample.

**D.  The Mamavation Study of Bandage Consumer Products**

190.    Mamavation is a consumer "watchdog" community group, which provides "eco-wellness product investigations for moms."[15]

191.    To enable consumers to avoid the harms associated with PFAS chemicals, Mamavation has commissioned consumer studies on numerous beauty and personal care products, foods and beverages, supplements, menstrual products, clothing, food packaging and parchment paper, baby and children's products, electronic equipment, and cleaning and laundry products.[16]

---

[14] The rare examples of organic fluorine from sources other than manmade PFAS chemicals—such as the deadly poison monofluoroacetic acid ($FCH_2CO_2H$) found in "Gifblaar," a plant indigenous to South Africa—are not found or used in the industrial world and would never be the source of organic fluorine in a consumer product, even as an incidental contaminant. *Focusing on the Elements – Naturally Occuring Organic Fluorine Compounds*, https://www.tcichemicals.com/US/en/support-download/chemistry-clip/2013-10-08#:~:text=The%20most%20famous%20naturally%20existing (last visited Apr. 7, 2024).

[15] https://www.mamavation.com/.

[16] https://www.mamavation.com/pfas-forever-chemical-consumer-studies.

192.    Because of known toxicity associated with PFAS, Mamavation commissioned scientific studies on indications of PFAS in bandages, to analyze popular bandages marketed to consumers.[17]

193.    To conduct the studies, bandages were purchased and donated from Mamavation community members between November 2022 and February 2024. The purchases were made from Walmart, CVS, Rite Aid, Target, or Amazon. Each of the products tested was recorded in Mamavation's database and then sent directly to the laboratory in the product's original packaging.

194.    Mamavation sent 40 bandages from 18 brands for testing at an EPA-certified laboratory, including Band-Aid Flexible Fabric Comfortable Protection Bandages,[18] Band-Aid OURTONE Flexible Fabric BR45 Bandages, Band-Aid OURTONE Flexible Fabric BR55 Bandages, and Band-Aid OURTONE Flexible Fabric BR65 Bandages manufactured by Defendants.

195.    Mamavation's EPA-certified laboratory uses marker testing to identify the potential presence of PFAS chemicals in bandages. Organic fluorine is a marker for PFAS because all PFAS are carbon-based compounds that contain fluorine. The specific laboratory method used to test for total fluorine was the Determination of Total Fluorine by Oxygen Flask Combustion and Ion-Selective Electrode. If total fluorine was observed at a detection level of 10 ppm or greater, the laboratory did the Determination of free Fluoride Ion in the product by Ion-Selective Electrode and then subtracted that from the Total Fluorine to determine the amount of organic fluorine.  This marker testing is likely to show the presence of PFAS. Organic fluorine can also capture other

---

[17] *"Band-Aids & Bandages with Indications of PFAS "Forever Chemicals" Report*, Mamavation (Apr. 2, 2024), available at:  https://www.mamavation.com/health/band-aids-bandages-pfas-forever-chemicals-report.html (last visited Apr. 18, 2024).

[18] Notably, Mamavation tested an older sample of this bandage, likely 7 years old or so, before Defendant J&J's divestiture of the Band-Aid brand to Kenvue.

fluoropolymers, pharmaceuticals, and common hydrofluorocarbon refrigerants, such as 1,1,1,2-tetrafluoroethane (commonly known as R-134a) and 2,3,3,3-tetrafluoropropene (commonly known as HFO-1234yf), which are all also PFAS chemicals.

196.    According to Scott Belcher, Ph.D., who is an Associate Professor with the Center for Environmental & Health Effects of PFAS at North Carolina State University, "fluoropolymers, such as polytetrafluoroethylene (PTFE), are extremely common forms of PFAS that could be contributing to the organic fluorine found in bandages. Methods used for detecting individual PFAS, such as PFOA or GenX, cannot directly identify PTFE. However, the analysis of total organic fluorine (TOF) does account for all PFAS contaminants in bandages, including PTFE. Therefore, this method of testing serves as a good 'spot-check' of consumer products."

197.    Of the Band-Aid Products tested, testing of Defendants' bandages resulted in the following ppm levels of organic fluorine:

- Band-Aid Flexible Fabric Comfortable Protection Bandages—188 ppm organic fluorine on the absorbent pad.

- Band-Aid OURTONE Flexible Fabric BR45 Bandages—262 ppm organic fluorine on the absorbent pad.

- Band-Aid OURTONE Flexible Fabric BR55 Bandages—250 ppm organic fluorine on the absorbent pad.

- Band-Aid OURTONE Flexible Fabric BR65 Bandages—260 ppm organic fluorine on the absorbent pads and 374 ppm on the sticky flaps. A second product tested had 169 ppm on the absorbent pad.[19]

---

[19] *Id.*

198.    In response to the results of the studies, Linda Birnbaum, Scientist Emeritus and Former Director of the National Institute of Environmental Health Sciences and National Toxicology Program & Scholar in Residence at Duke University, and Adjunct Professor at Yale University and the University of North Carolina, stated:  "Because bandages are placed upon open wounds, it's troubling to learn that they may also be exposing children and adults to PFAS. It's obvious from the data that PFAS are not needed for wound care, so it's important that the industry remove their presence to protect the public from PFAS and opt instead for PFAS-free materials."

199.    In response to the results of the studies, Terrence Collins, Teresa Heinz Professor of Green Chemistry and Director of the Institute for Green Sciences at Carnegie Mellon University, stated:

> It is discouraging to find yet another important product space, bandaids or bandages, containing PFAS compounds where transfers into users are conceivable. PFAS compounds deserve the "forever chemicals" name, such that when PFAS-containing bandaids and bandages are discarded post-use, the final resting places will be contaminated into the indefinite future. This is another Mamavation study serving beautifully to guide moms toward reducing PFAS exposures for their families and the wider world.

200.    Sixty-three percent (63%) of bandages marketed to People of Color with black and brown skin tones had indications of PFAS; specifically 10 detections out of 16 bandages tested had organic fluorine above 10 ppm according to the laboratory. Of the four bandage products manufactured by Defendants, the three OURTONE Band-Aid Products are marketed to People of Color with black and brown skin tones.

### E.  Independent Lab Testing Confirm Presence of PFAS in the Band-Aid Products, Including Products Purchased by Plaintiffs.

201.    Plaintiffs arranged for independent third-party testing to determine whether the Band-Aid Products contained undisclosed PFAS.

202.    To perform this testing, Plaintiffs sought an independent laboratory that utilized EPA-approved methodology to detect PFAS constituents in the adhesive strips and pads of the Band-Aid Products. The laboratory analysis tested for approximately 40 specific PFAS. The testing and analysis were performed in 2024.

203.    Plaintiffs' independent testing from a third-party lab determined that PFAS, including certain long-chain PFAS like PFOA, were present at detectable levels[20] within each of the Band-Aid Products.

204.    Plaintiffs tested in most cases 5 different boxes of each Band-Aid Product from at least 2 different lots.

205.    Plaintiffs' laboratory analysis detected harmful levels of PFOA in each of the Band-Aid Products.

206.    Specifically, the lab testing detected the following:

a.    Flexible Fabric: PFHxA, PFHpA, PFOA, PFNA, and PFDA were detected above the Limit of Quantification ("LOQ")[21] in adhesive strips from each of the 8 boxes tested and from 3 different lots. PFOA was the most abundant PFAS compound in all the Flexible Fabric adhesive strip samples, with an average concentration of 4.42 ng/g in lots #3033B and #3043B, and 2.2 ng/g in lot #NA. The total concentration of PFAS compounds above LOQ ranged from 9.1 ng/g (lots #3033B and 3043B) to 4.8 ng/g (lot #NA). Additionally, PFHxA and

---

[20] Detection Limit ("DL") is defined as the minimum measured concentration of a substance that can be reported with 99% confidence that the measured concentration is distinguishable from method blank results (EPA 821-R-16-006).
[21] The Limit of Quantification ("LOQ") is the is lowest concentration at which the laboratory has demonstrated target analytes can be reliably measured and reported with a 95% confidence.

PFOA were detected in some pads at concentrations below the LOQ (0.479 ng/g), making them not quantifiable with accuracy.

b. <u>OURTONE Products</u>: PFAS were detected above the LOQ in the adhesive strips of the OURTONE Products BR45, BR45XL, BR55, BR55XL, BR65, and BR65XL and are summarized in Figures 1 to 7 below. With the exception of BR65,[22] all OURTONE Products exhibit a consistent pattern of PFHxA, PFHpA, PFOA, PFNA, and PFDA concentrations. Among these compounds, PFOA has the highest concentration, ranging from an average of 1.23 ng/g for XL BR65 lot 2582B to an average of 3.05 ng/g for BR55 lots #0833B and #3002B. The total PFAS concentration measured above LOQ ranged from 2.3 ng/g for BR65XL (lot #2582B) to 6.7 ng/g for BR55 (average of lots #0833B and #3002B).



*Figure 1: PFAS concentrations detected above the LOQ in Ourtone BR45 adhesive strips. The error bars in the graph represent the 95% confidence interval of the averaged data.*

---

[22] OURTONE BR65 lots #1821B and #2461B show an average PFOS concentration of approximately 0.14 ng/g, which is an exception compared to the other OURTONE Products.



*Figure 2: PFAS concentrations detected above the LOQ in Ourtone XL BR45 adhesive strips. The error bars in the graph represent the 95% confidence interval of the averaged data.*



*Figure 3: PFAS concentrations detected above the LOQ in Ourtone BR55 adhesive strips. The error bars in the graph represent the 95% confidence interval of the averaged data.*



*Figure 4: PFAS concentrations detected above the LOQ in Ourtone XL BR55 adhesive strips. The error bars in the graph represent the 95% confidence interval of the averaged data.*



*Figure 5: PFAS concentrations detected above the LOQ in Ourtone BR65 adhesive strips. The error bars in the graph represent the 95% confidence interval of the averaged data.*



*Figure 6: PFAS concentrations detected above the LOQ in Ourtone XL BR65 adhesive strips. The error bars in the graph represent the 95% confidence interval of the averaged data.*

207.    The presence of harmful levels of PFAS in the Band-Aid Products that are applied to open wounds is material to Plaintiffs, customers, and putative Class Members.

208.    Furthermore, the detection of multiple PFAS is even more concerning in light of guidance from the ASTDR advising that if a patient's blood shows combined PFAS above 20 nanograms per milliliter, the person is at high risk of adverse health effects. PFAS absorbed through the skin bioaccumulate in the blood and liver.

209.    As set forth below, none of the Band-Aid Products identified herein disclose to the consumer that they contain any PFAS, let alone PFOA.

210.    Notably, the inclusion of PFAS in the Band-Aid Product is particularly troubling because PFAS are not necessary for the function of a bandage. In addition to the Band-Aid Products, the independent lab also tested two different bandages marketed to People of Color; namely, TruColour and Truetone. The results of the TruColour adhesive bandages, for both the pads and adhesive strips, indicated no PFAS compounds were detected above the detection limit. No PFAS compounds were identified above the detection limit in any of the Truetone pads;

however, PHxA was detected above the limit of quantification of .213 ng/l at a concentration of 2.7 ng/g in the adhesive strips from one box.[23]

211.    The independent lab also tested two additional Band-Aid bandages marketed to children. The analysis of the Encanto bandages showed that no PFAS compounds were detected above the DL, except for PFBA and PFNA, which were found at concentrations lower than the LOQ and could not be quantified accurately. PFHxA was identified at concentrations of 0.89 ng/g and 0.2 ng/g in the bandages from Mickey Mouse boxes 1 and 4 of lot 2933B. PFBA was detected at a concentration below the LOQ in the Mickey Mouse bandages, just as it was in the Encanto bandages. No other PFAS compounds were detected above the DL in the Mickey Mouse bandages.

**F.  Defendants' Band-Aid Adhesive Bandage Products, Representations, and Omissions**

212.    Among Defendants' most-recognized products are their adhesive bandages, marketed under the trademarked name "Band-Aid."[24]

213.    Kenvue states on its website: "For over 100 years, BAND-AID Brand has been a leader in first aid care."[25]

---

[23] In another Truetone box, PFHxA was detected at a concentration below the LOQ but above the DL, meaning it could not be quantified accurately. Box 3 of Truetone did not show any PFAS compounds detected above the DL.

[24] Adhesive bandages are typically flexible sheets of material with absorbent pads in the middle and adhesive attached to sides that can be stuck on the skin to capture blood and serum from open wounds and also prevent anything from seeping into open wounds. The absorbent pad is placed against the open wound and the overlapping edges stick to the skin.

[25] https://www.band-aid.com/our-brand/brand-history.



214.    In 1920, the Band-Aid brand adhesive bandage was invented when, combining two products from Johnson & Johnson—adhesive tape and gauze—Earle Dickson, a cotton buyer, created a bandage for his wife to apply herself.[26]



215.    One year later, in 1921, Band-Aid brand adhesive bandages made their first appearance in stores. By 1924, Johnson & Johnson was mass producing the Band-Aid brand adhesive bandages. In 1932, Band-Aid introduced its first waterproof bandage, called the "DryBak."[27]

---

[26] *Id.*

[27] *Id.*

216.    Today, the Band-Aid brand is one of the most recognizable brands worldwide, serving millions of people daily for the treatment of cuts, scrapes, and burns.[28] For example, Band-Aids' jingle "I am stuck on Band-Aid, 'cause Band-Aid's stuck on me" has been "an unforgettable earworm that resonated with audiences for generations," with the "catchy tune and simple lyrics contribut[ing] to the brand's memorability and widespread recognition."[29]

217.    In another "groundbreaking marketing move," Defendants introduced themed and character bandages, which feature beloved cartoon characters, superheroes, and move franchises on Band-Aids, creating a strong emotional appeal to children.[30]

218.    As the result of Defendants' marketing efforts, J&J's Band-Aid brand of bandages and first-aid supplies ranked highest in the United States in YouGov's Best Brand Rankings 2021,[31] a list of the brands consumers perceive most positively, for the fifth-consecutive year as of 2021:

---

[28] *The Marketing Marvel of Band-Aids: Strategies and Mix Decoded*, The Brand Hopper (July 26, 2023), https://thebrandhopper.com/2023/07/26/the-marketing-marvel-of-band-aid-strategies-and-mix-decoded/ (last visited Apr. 7, 2024).

[29] *Id.*

[30] *Id.*

[31] *BAND-AID and Dawn top Best Brand Rankings in the US while Pfizer is no surprise the biggest improver*, YouGov (Nov. 16, 2021), https://business.yougov.com/content/39431-yougov-us-best-brands-rankings-2021 (last visited Apr. 8, 2024).

| OVERALL: CURRENT TOP 10 BRANDS | | |
|---|---|---|
| Rank | Brand Name | Score |
| 1 | BAND-AID | 50.0 |
| 2 | Dawn | 49.7 |
| 3 | Clorox | 46.7 |
| 4 | Hershey's | 46.0 |
| 5 | M&M's | 45.3 |
| 6 | Lysol | 44.3 |
| 7 | Lowe's | 43.8 |
| 8 | Cheerios | 42.8 |
| 9 | Quaker | 42.6 |
| 10 | CRAFTSMAN | 42.4 |

Scores show average data from 1 Oct 2020 - 30 Sep 2021

219.     As the result of Defendants' marketing efforts, as of 2023 reports comparing roughly 1,500 brands, "Band-Aid is the most trusted brand in the U.S., beating out Amazon and Visa."[32]

220.     As the result of Defendants' brand recognition and reputation, Defendants are able to charge, and do charge, a premium above the price for bandages charged by competitors and generic manufacturers.

221.     Collectively, Defendants are currently among a handful of "key players" in the global bandages market.[33]

222.     Defendants have referred, and continue to refer, to their Band-Aid brand of bandages as "the #1 doctor recommended bandage brand."

223.     In regard to Defendants' Band-Aid brand, Kenvue states on its website:[34]

> Our brands have been used by millions—even billions—of people for more than a century, giving BAND-AID Brand an iconic place in American culture. We reached that place through a history of

---

[32] *Band-Aid is the most trusted brand in the U.S., beating out Amazon and Visa*, Business Insider (May 24, 2023), https://www.businessinsider.com/band-aid-beats-out-amazon-visa-most-trusted-brand-us-2023-5 (last visited Apr. 8, 2024).

[33]     Bandages Market Analysis, Coherent Market Insights, https://www.coherentmarketinsights.com/market-insight/bandages-market-2689 (last visited Apr. 8, 2024).

[34] *Id.*

54

innovation, healing, and caring for our customers. And while we're always looking forward to see what we can do next and how we can help, sometimes it's good to take a look back and see how far we've come.

224.    Kenvue markets its adhesive bandages on its website, stating: "Our adhesive bandages come in a variety of shapes, sizes, colors, and types to help cover and protect minor cuts, scrapes, and burns so they heal properly."[35]

225.    Kenvue makes a "sustainability promise" on its website[36] in regard to the Band-Aid brand, stating that it's "working for a healthy future" and:

> We're all about careful choices. Choices that heal and contribute to the best possible outcomes—for our customers, the planet, and the society we live in. That's why we hold ourselves to the highest standards when making safe products for you. It's why we try to minimize our footprint on the planet and contribute towards progressing healthcare in the communities we are part of. And why we try—every day—to make choices that will create a future that's bright and healthy for all of us.

226.    Kenvue also states in its "sustainability promise"[37] that the Band-Aid brand has "Better Ingredients, Better Processes," for which it offers the following statements in support:

- "We prioritize safety and quality in the development of every wound care product."

- "Every piece of material in our BAND-AID Brand bandages and every ingredient in our antibiotic treatments are chosen with safety as the top concern. We thoroughly vet each supplier and only partner with those who meet our rigorous standards."

---

[35] https://www.band-aid.com/products/adhesive-bandages.

[36] https://www.band-aid.com/our-brand/band-aid-sustainability.

[37] Id.

- "Our over-the-counter active ingredients have proven to be the best quality through safety assurance processes and ongoing evaluation."

- "Our manufacturing facilities undergo regular audits and certification so that we can ensure our products are manufactured with the highest standards and comply with most discerning regulatory standards."

- "Our scientists ensure the safety and efficacy of our products through clinical studies and laboratory models."

227.    Kenvue further makes representations as to its environmental consciousness and effectiveness in its "sustainability promise,"[38] stating "[w]e can't have healthy customers without a healthy planet. So we do our best to minimize our footprint on it and are constantly investigating new ways to minimize it further," and "[w]e're continually re-evaluating our manufacturing processes working towards efficiencies, minimizing waste, and lowering water or energy consumption."

228.    In regard to co-Defendant Johnson & Johnson, Kenvue states on its website: "Our commitment to the health of our customers, our communities, and our planet goes beyond the efforts of BAND-AID and NEOSPORIN. Learn how our parent company, Johnson & Johnson Consumer Health, is taking action to make the planet healthier."

229.    Defendants' brands of adhesive bandages include:

- Band-Aid Flexible Fabric Comfortable Protection Bandages (one variety of which is depicted below):

---

[38] *Id.*



- Band-Aid OURTONE Flexible Fabric BR45 Bandages (depicted below):



- Band-Aid OURTONE Flexible Fabric BR55 Bandages (depicted below):



- Band-Aid OURTONE Flexible Fabric BR65 Bandages (depicted below):

57



230.    In regard to the Band-Aid Flexible Fabric Comfortable Protection Bandages, Kenvue states on its website:[39]

> BAND-AID Brand Flexible Fabric Non-Stick Sterile Adhesive Bandages, offer comfortable protection for minor wounds. Made with MEMORY WEAVE fabric for ultimate flexibility, these BAND-AID Brand Flexible Fabric Bandages stretch as you move. Each sterile bandage features a QUILT-AID Comfort Pad designed to cushion painful wounds while you heal. Made with a non-stick HURT-FREE Pad, these comfortable flexible bandages won't stick to the wound, allowing for gentle removal.

231.    In regard to the Band-Aid brand OURTONE adhesive bandages, Kenvue states on its website[40] that the product line "prove[s] quality wound care solutions for brown skin tones. The line feautures three new skin tone complementing adhesive bandage shades: BR65 (Dark Brown), BR55 (Brown), BR45 (Light Brown)."

232.    Kenvue describes the OURTONE adhesive bandage line as "[m]ade with MEMORY WEAVE fabric to provide flexible protection and a QUILT-AID pad that wicks away blood and fluids, these comfortable skin-colored bandages help protect your larger wounds against dirt and germs and stays on for up to 24 hours.  From the #1 doctor recommended brand."

---

[39] https://www.band-aid.com/products/adhesive-bandages/flexible-fabric-bandages.

[40] https://www.band-aid.com/our-brand/ourtone-uplifts.

233.    Kenvue stresses on its website the well-known necessity to clean cuts, scrapes, and burns; the importance of cleaning cuts, scrapes, and burns as part of the healing process; and the necessity to keep cuts, scrapes, and burns covered in an effort to prevent infection.[41]

234.    Defendants market their Band-Aid adhesive bandages for family use, especially for use on children.  For example, Kenvue's website states: "[f]rom soccer to camping, from the home medical cabinet to your glove box, first aid needs change from activity to activity and place to place," adjacent to the following depiction:



235.    Defendants also specifically market their Band-Aid adhesive bandages to children by printing popular children's characters on the bandages as depicted in the examples below[42]:

  

---

[41] https://www.band-aid.com/frequently-asked-questions.

[42] https://www.band-aid.com/products/adhesive-bandages.

59



236.    For over 100 years, J&J and then Kenvue have cultivated a brand image of quality, trustworthiness, safety, and health. Defendants' packaging of Band-Aid Products does not and, upon information and belief, has never disclosed the presence of PFAS chemicals.

237.    Defendants are, and have been, well aware of consumers' desire to avoid potentially harmful chemicals, such as PFAS, which is precisely why Defendants have engaged in a uniform marketing campaign intended to convince consumers that Band-Aid Products are safe, healthy, made with the "best ingredients," and environmentally conscious.

238.    The labels on packaging of Band-Aid Products lead a reasonable consumer to believe that the Band-Aid Products are safe, healthy, made with the "best ingredients," and environmentally conscious.

239.    Reasonable consumers purchased and continue to purchase Band-Aid Products, based on Defendants' representations, that the bandages do not contain artificial, synthetic, or man-made chemicals that could adversely impact their health, the health of their children, or the environment.

240.    At all times relevant hereto, Defendants knew, or should have known, that their Band-Aid Products contain harmful PFAS chemicals.

241.    Throughout the class period, Defendants have targeted consumers who seek the highest quality and safest bandages, and have done so by falsely and misleadingly representing

that their Band-Aid Products are safe, healthy, made with the "best ingredients," and that the bandages and packaging are environmentally friendly.

242.    Consumer reliance upon Defendants' representations was reasonable and foreseeable. It is beyond reasonable dispute that the presence of harmful chemicals in adhesive bandages, particularly Defendants' premium quality and safety as advertised, is material to reasonable consumers.

243.    Consumers lack the expertise to ascertain the true ingredients in the adhesive bandages prior to purchase. . As a result, they must and do rely on Defendants to be transparent and properly disclose on the packaging all material information regarding the products and their safety and not to misrepresent the nature and qualities of the Products.

244.    Reasonable consumers, like Plaintiffs, trust manufacturers like Defendants to sell health products Band-Aids that are free from harmful toxins, contaminants, and chemicals. Reasonable consumers, like Plaintiffs, certainly expect the health products like Band-Aids that they and their families use to be free from harmful toxins, contaminants, and chemicals, known to have adverse health consequences. If such toxins, contaminants, and chemicals are contained in, or risk being contained in, the healthcare products sold by a manufacturer, reasonable consumers expect that this will be disclosed on the products' packaging so that they can have full and fair information to decide for themselves whether they want to consume the product and the amounts they want to consume of the product.

245.    Defendants had exclusive knowledge of the contents and ingredients of its Band-Aid Products, including whether the products contained PFAS chemicals.

246.    Defendants also had exclusive knowledge of its ingredient suppliers and obtained or could have obtained information from their suppliers about the contents and ingredients to the Band-Aid Products, including whether they contained PFAS chemicals.

247.    Defendants also had exclusive knowledge of its quality control testing, which detected or should have detected contamination in the manufacturing process to the extent that contamination existed.

248.    Absent testing by a qualified lab, consumers such as Plaintiff and absent Class Members were unable to determine that Defendants' Band-Aid Products contained PFAS chemicals given Defendants' failure to disclose the presence of PFAS.

249.    Accordingly, reasonable consumers must, and do, rely on Defendants to accurately and honestly advertise their products' ingredients and benefits. Furthermore, consumers rely on Defendants to not contradict those representations by using artificial chemicals in their adhesive bandages that are known to pose a risk to human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

250.    Defendants' representations that their Band-Aid Products are healthy for humans and the environment, including the representations described herein and others, are false because products containing toxic, synthetic ingredients like PFAS chemicals are neither safe for consumers nor safe for the environment.

251.    Defendants' representations are likely to mislead reasonable consumers, and did mislead Plaintiff and absent Class Members, regarding the presence of PFAS chemicals in their adhesive bandages. Accordingly, these acts and practices by Defendants are deceptive.

252.    Plaintiff and absent Class Members are intended third-party beneficiaries of any implied warranty between Defendants and retailers. Retailers were not intended to be the ultimate

consumer of the Band-Aid Products, and any implied warranty that exists was intended to benefit consumers.

253.    Consumers reasonably relied on Defendants' false statements and misleading representations, and reasonably expected that Defendants' Band-Aid Products would conform with their representations and, as such, would not contain artificial, man-made PFAS chemicals.

254.    Defendants  knew or should have known that Plaintiffs and other Class Members would rely upon the packaging and advertising of the Band-Aid Products stating or suggesting that the Products are healthy and safe when used as directed, and  Defendants intended for consumers to do so.

255.    While representing that the Band-Aid Products are beneficial are safe and healthy, Defendants regularly omitted and continues to omit material information regarding the presence and countervailing detrimental health effects of the high levels of PFAS in the Band-Aid Products.

256.    Nowhere on the label of Band-Aid Products, nor in the off-label advertising for the Band-Aid Products including on its website, does Defendants disclose to consumers the PFAS content of the Products, nor even the possibility that using the Band-Aid Products may expose consumers to PFAS which can be absorbed into the bloodstream.

257.    Defendants are under a duty to disclose this information to consumers because it is revealing some information about the Band-Aid Products—enough to suggest they are safe for use and beneficial to health—without revealing directly relevant information regarding the presence of PFAS.

258.    Defendants are further under a duty to disclose this information because its deceptive omissions concern human health and safety, specifically the detrimental health consequences of using the Band-Aid Products with PFAS to cover wounds, scrapes, cuts ….

259.    Defendants are further under a duty to disclose this information because it was in a superior position to know of the dangers presented by the PFAS in the Band-Aid Products, as it is a large, sophisticated healthcare company that holds itself out as having expert knowledge regarding the health impact of using the Band-Aid Products.

260.    Finally, Defendants are under a duty to disclose this information because, including through the acts alleged herein, it actively concealed material facts not known to Plaintiffs and other Class Members concerning PFAS in the Products, and its detrimental effects, particularly when consumed repeatedly and regularly use the Band-Aid Products.

261.    Defendants' false statements, misleading, and material omissions are intentional and careless, and render their adhesive bandages worthless or less valuable.

262.    Had Defendants disclosed to Plaintiff and Class Members that their Band-Aid Products contained and contain PFAS chemicals, Plaintiff and Class Members would not have purchased Defendants' Band-Aid Products, or they would have paid significantly less for them.

263.    Plaintiff and Class Members were among the intended recipients of Defendants' deceptive representations and omissions described herein.

264.    Defendants' representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions, especially for a consumer health product such as a bandage.

265.    The materiality of the representations and omissions described herein also establishes causation between Defendants' conduct and the injuries Plaintiff and the Class Members sustained.

266.    Defendants acted negligently or intentionally to mislead consumers, including Plaintiff and Class Members.

267.    Defendants are aware the consumers are concerned about the use of PFAS chemicals in their products, yet they have continued to market and advertise their bandages using the representations described herein in order to profit from unsuspecting consumers, including Plaintiff and Class Members.

268.    Defendants knew or should have known that PFAS chemicals could be eliminated from their Band-Aid Products, yet they failed to do so.

269.    The presence of PFAS chemicals in Defendants' Band-Aid Products is entirely inconsistent with Defendants' uniform representations and extensive marketing efforts.

270.    Defendants' knowingly false and misleading representations have the intended result of convincing reasonable consumers that their Band-Aid Products are safe, healthy, made from the best ingredients, and environmentally conscientious and, therefore, do not contain artificial, man-made, toxic chemicals. Reasonable consumers would not consider Defendants' Band-Aid Products to be good for people and the environment if they knew the bandages contained harmful, artificial PFAS chemicals.

271.    Defendants' false, misleading, and deceptive representations, as described herein, were and remain likely to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiff and Class Members.

272.    In making the false, misleading, and deceptive representations, Defendants knew and intended that consumers would pay a premium for their adhesive bandage products that are made from or contain synthetic or artificial chemical ingredients that are known to be harmful to humans and the environment.

273.    Plaintiff and Class Members paid money for Defendants' Band-Aid Products, and paid a premium for an expected quality above (or at least comparable to) that of Defendants' competitors. Plaintiff and Class Members, however, did not obtain the full value of the Band-Aid Products due to Defendants' misrepresentations as described herein.

274.    Plaintiff and Class Members purchased, purchased more of, or paid more for, Defendants' Band-Aid Products than they would have had they known the truth about the products' artificial, man-made, and harmful ingredients. Accordingly, Plaintiff and Class Members have suffered injury in fact and lost money or property as a result of Defendants' wrongful conduct.

275.    Defendants' widespread marketing campaign portraying their Band-Aid Products as containing safe, healthy, environmentally friendly, and "the best" ingredients, as detailed herein, are misleading and deceptive to consumers, because the Band-Aid Products are made with artificial and toxic ingredients.

### G. Defendants Control the Manufacturing and Quality Control Process.

276.    Defendants are responsible for selecting and sourcing the ingredients used in the Band-Aid Products, for manufacturing the Band-Aid Products, and for conducting all relevant quality assurance protocols, including testing, for the Band-Aid Products. Therefore, Defendants knew, or should have known, that PFAS were present in their Band-Aid Products, that failing to disclose the presence of harmful levels of PFAS was a material omission, and that it was concealing the true quality, nature, and safety of the Band-Aid Products by not disclosing this toxic constituent.

277.    Upon information and belief, Defendants utilize consistent manufacturing and production processes that ensure their bandage products, including the Band-Aid Products, are of consistent quality across large-scale production runs.

278.    To achieve this, Defendants use standardized manufacturing and production protocols designed to minimize variations in the production process. These protocols include strict quality control measures, standardized ingredient sourcing, and rigorous testing procedures to ensure the final products meet the companies' quality standards.

279.    Additionally, Defendants utilize automated manufacturing processes, which reduce the risk of human error and ensure consistency.

280.    These stringent quality control measures and standardized protocols ensure consistency in Defendants' products and ensure that Defendants understand all the constituents of their final products, including the Band-Aid Products.

281.    Defendants knew or should have known it could control the levels of PFAS in the Band-Aid Products by properly monitoring for their presence, sourcing ingredients, adjusting the Products' formulations to eliminate PFAS, and improving its manufacturing processes to eliminate introduction of PFAS into the Band-Aid Products. In the interest of cost-savings, however, Defendants failed to implement sufficient quality control systems and procedures in Band-Aids Products' formulation and manufacturing.

282.    Further, because the federal government and numerous states where Defendants operate, including New Jersey, have been aggressively regulating PFAS for at least a decade, Defendants knew or should have known that PFAS, including PFOA, posed a significant health risk to consumers and that they needed to ensure that raw materials and water sources used in the manufacturing process were not contaminated.

283.    On information and belief, because Defendants utilize strict quality control methods, they knew or should have known whether contaminated water or raw materials were being used to manufacture the Band-Aid Products.

67

284.    Following publication of the Mamavation research, Defendants knew or should have known that high concentrations of PFAS were present in the Band-Aid Products.

285.    Defendants kept their manufacturing process strictly confidential. At all relevant times, Defendants concealed and never disclosed that harmful levels of PFAS were introduced into the Band-Aid Products during the manufacturing process. To date, Defendants have not disclosed the PFAS in their Band-Aid Products and have not redesigned the products to be PFAS free.

286.    Defendants also knew or should have known the Band-Aid Products contain toxic PFAS at the point of sale. Defendants' pre- and post-production quality control testing should have identified the dangerous concentrations of PFAS present in these products.

287.    Plaintiffs' independent testing clearly shows the Band-Aid Products do, in fact, contain harmful levels of PFAS, including harmful levels of a likely carcinogen, PFOA, in quantities that exceed the EPA's advisory levels. This information was not available to Plaintiffs, absent Class members, or the public at large.

288.    The results of Plaintiffs' testing confirm the earlier research performed by researchers at Mamavation, which found the Band-Aid Products contained large concentrations of total organic fluorine, indicating the presence of PFAS.

### CLASS ACTION ALLEGATIONS

289.    Plaintiffs bring this class action individually and as representatives of all those similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of themselves and the following proposed Class and Subclass (collectively, the "Classes").

290.    As described below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a) and 23(b)(3) (as well as the

requirements for certification of one or more issue classes under Rule 23(c)(4)). Accordingly, Plaintiffs seek certification under Federal Rule of Civil Procedure 23 of the following Classes:

> **Nationwide Class:** All individuals in the United States who purchased the Band-Aid Products within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.

> **California Subclass:** All individuals who purchased the Band-Aid Products in the State of California within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.

> **Georgia Subclass:** All individuals who purchased the Band-Aid Products in the State of Georgia within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.

> **Illinois Subclass:** All individuals who purchased the Band-Aid Products in the State of Illinois within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.

> **Massachusetts Subclass:** All individuals who purchased the Band-Aid Products in the State of Massachusetts within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.

> **Michigan Subclass:** All individuals who purchased the Band-Aid Products in the State of Michigan within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.

> **Missouri Subclass:** All individuals who purchased the Band-Aid Products in the State of Missouri within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.

**New Jersey Subclass:** All individuals who purchased the Band-Aid Products in the State of New Jersey within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.

**New York Subclass:** All individuals who purchased the Band-Aid Products in the State of New York within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.

291.    Excluded from the Classes are (1) Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, any entity in which Defendants have a controlling interest; (2) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (3) those persons who have suffered personal injuries as a result of the facts alleged herein; (4) any and all federal, state, or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsel, and/or subdivisions; and (5) all judges presiding over this matter or assigned to hear any aspect of this litigation, along with judicial clerks and staff, and immediate family members.

292.    Plaintiffs reserve the right to modify or amend the foregoing Class and Subclass definitions before the Court determines whether certification is appropriate.

293.    This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure 23 because there is a well-defined community of interest in the litigation and membership in the proposed Classes is readily ascertainable.

294.    **Numerosity (Federal Rule of Civil Procedure 23(a)(1)):** A class action is the only available method for the fair and efficient adjudication of this controversy. The members of each Class are so numerous and geographically dispersed that individual joinder of all Class Members is neither practicable nor possible. Upon information and belief, the total number of Class

Members is in the thousands, if not millions. Membership in the Class will be determined by analysis of Defendants' records.

295. **Commonality (Federal Rule of Civil Procedure 23(a)(2) and (b)(3)):** Consistent with Rule 23(a)(2) and with Rule 23(b)(3)'s predominance requirement, Plaintiffs and Class Members share a community of interest in that there are numerous common questions and issues of law and fact which predominate over any questions and issues solely affecting individual members, including, but not necessarily limited to:

a. Whether Defendants misrepresented that the Band-Aid Products are free from harmful ingredients;

b. Whether Defendants failed to disclose that the Band-Aid Products contained PFAS;

c. Whether Defendants failed to test, or require their suppliers to test, the Band-Aid Products and their ingredients for the presence of PFAS;

d. Whether Defendants engaged in deceptive trade practices by selling, packaging, or marketing their Band-Aid Products containing PFAS chemicals;

e. Whether Defendants engaged in false or misleading advertising by selling, packaging, or marketing their Band-Aid Products containing PFAS chemicals;

f. Whether Defendants' practices in marketing, advertising, and packaging the Band-Aid Products tend to mislead reasonable consumer into believing that the bandages are free from harmful chemicals, including PFAS;

g. Whether Defendants' conduct violates any state's statute and/or uniform deceptive trade practices act;

h. Whether Plaintiffs and Class Members have suffered economic injury and the appropriate measure of their losses as a result of those injuries;

   i. Whether Defendants have unjustly enriched themselves at consumers' expense; and

   j. Whether Plaintiffs and Class Members are entitled to injunctive, declaratory, or other equitable relief.

296. In the alternative, Plaintiff seeks certification under Rule 23(c)(4) with respect to one or more of the above issues or such other issues as may be identified in the future.

297. **Typicality (Federal Rule of Civil Procedure 23(a)(3)):** Plaintiffs' claims are typical of the claims of absent Class Members. As the result of Defendants' common course of conduct in violation of laws and standards, as alleged herein, Plaintiff sustained damages akin to damages sustained by all Class Members, including financial loss caused by having purchased Band-Aid Products that they would not have purchased, or would have paid significantly less for, but for Defendants' representations.

298. **Adequacy (Federal Rule of Civil Procedure 23(a)(4)):** Consistent with Rule 23(a)(4), Plaintiffs are an adequate representative of each of the Classes because Plaintiffs are members of the Classes and are committed to pursuing this matter against Defendants to obtain relief for the Classes. Plaintiffs are not subject to any individual defense unique from those conceivably applicable to other Class Members. Plaintiffs anticipates no management difficulties in this litigation. Plaintiffs have no conflicts of interest with absent members of the Classes. Plaintiffs' Counsel is competent and experienced in litigating class actions, including extensive experience in litigation in regard to PFAS contamination and consumer-protection matters. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Classes' interests.

299. **Predominance and Superiority (Federal Rule of Civil Procedure 23(b)(3)):** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair

and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation predominate over individual issues. The issues discussed above in regard to commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class-action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class Members are relatively small compared to the burden and expense required to individually litigate their respective claims against Defendants and, thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also burden and unreasonably strain the court system, and would result in undue delay. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class-action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

300. **Ascertainability:** The Class and Subclass are defined by reference to objective and demonstrable criteria. There are feasible mechanisms to determine who fits within the Classes, including purchase receipts, invoices, retailer purchase records, and similar objective proofs of purchase in the possession of Plaintiffs, Defendants, and third-parties. At the time of class certification, the class shall be defined with using the specific reliable and administratively feasible methods for identifying class members identified through discovery.

301. **Injunctive and Declaratory Relief:** Defendants have engaged in, and continue to engage in, business practices which are unfair and fraudulent by, among other things, failing to disclose the material fact that Band-Aid Products contain detectable levels of PFAS. Plaintiffs seek

73

class-wide injunctive relief on grounds consistent with the standards articulated in Rule 23(b)(2) that establish final injunctive relief as an appropriate class-wide remedy, in that Defendants continue to manufacture, market, and sell the contaminated bandages and omit material facts. The injuries suffered by Plaintiffs and the Class as a result of Defendants' actions are ongoing.

## **TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

302.    Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the presence of PFAS in the Band-Aid Products and the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived regarding the Band-Aid Products and could not reasonably discover that they contained PFAS.

303.    Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to expect that the Defendants were concealing the presence of PFAS in the Band-Aid Products. As alleged herein, the presence of PFAS in the bandages was material to Plaintiffs and Class Members at all relevant times. Within the time period of any applicable statute of limitations, Plaintiffs and Class Members would not have discovered through the existence of reasonable diligence that the Band-Aid Products contain PFAS.

304.    At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and the Class Members the true standard, quality, and grade of the Band-Aid Products and to disclose the presence of PFAS due to its exclusive and superior knowledge of the contents and ingredient sourcing for the bandages.

305.    Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiffs and Class Members reasonably relied on Defendants' knowing, active, and affirmative concealment.

306.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statues of limitations in defense of this action.

## CAUSES OF ACTION

### COUNT ONE
### Breach of Express Warranty
***(On Behalf of the Nationwide Class or, in the Alternative, On Behalf of the Statewide Classes)***

307.    Plaintiffs, individually and on behalf of the Nationwide Class, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

308.    This claim is brought by Plaintiffs on behalf of the Nationwide Class under New Jersey law. In the alternative, this claim is brought by Plaintiffs on behalf of the California, Florida, Georgia, Hawaii, Illinois, Massachusetts, Michigan, Nevada, New York, Pennsylvania, and Texas Statewide Classes.

309.    In connection with their sale of Band-Aid brand adhesive bandages, by and through statements in labels, packaging, and ingredient lists, and other written materials intended for consumers and the general public, Defendants made certain express affirmations of fact and/or promises relating to their bandages and made such affirmations and promises to Plaintiffs and the Classes, as alleged herein.

310.    By way of examples, such affirmations and promises include the following:

- Defendants hold themselves to the highest standards when making safe products for consumers.

- "Every piece of material in our BAND-AID Brand bandages and every ingredient in our antibiotic treatments are chosen with safety as the top concern.

We thoroughly vet each supplier and only partner with those who meet our rigorous standards."

- "Our over-the-counter active ingredients have proven to be the best quality through safety assurance processes and ongoing evaluation."

- "Our manufacturing facilities undergo regular audits and certification so that we can ensure our products are manufactured with the highest standards and comply with most discerning regulatory standards."

- "Our scientists ensure the safety and efficacy of our products through clinical studies and laboratory models."

311.   These express affirmations of fact and/or promises include ingredient lists and labels that purport to attest to the health and safety of the bandages but fail to include any warning to consumers that the products contained PFAS chemicals.

312.   Defendants advertised, labeled, marketed, and promoted the Band-Aid adhesive bandages product line with such express affirmations of fact and/or promises in such a way as to induce Plaintiffs and Class Members to purchase and use the bandages, thereby making an express warranty that the bandages would conform to the representations of being safe; meet scientific, medical, and regulatory standards; and be subjected to appropriate studies and testing.

313.   Defendants' affirmations of fact and/or promises about the Band-Aid brand adhesive bandages, as set forth herein, constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain.

314.    Despite the express warranties Defendants created with respect to the Band-Aid brand adhesive bandages, Defendants delivered bandages to Plaintiffs and the Class Members that did not conform to Defendants' express warranties in that such bandages were defective,

dangerous, and unfit for use, did not contain labels adequately representing the nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendants breached the express warranties by representing through their labeling, advertising, and marketing materials that Band-Aid brand adhesive bandages were safe, and intentionally withheld information about the products containing detectable levels of PFAS and the risks associated with use.

315.    Plaintiffs and Class Members relied on Defendants' express promises and representations that the bandages were safe to use on human skin and fit to be used for their intended purpose as contained on the labels, packaging, and ingredient lists.

316.    Defendants had sole access to material facts concerning the contents of their Band-Aid brand adhesive bandages and the nature of the risks associated with the use of the Products, as Defendants expressly stated on their labels and website the safety of the bandages, and knew that consumers and purchasers, such as Plaintiffs and Class Members, could not have reasonably discovered that the express statements were inadequate and inaccurate.

317.    Plaintiffs and each member of the Class have had sufficient direct dealings with Defendants or their agents (including distributors, dealers, and authorized sellers) to establish privity of contract between Defendants and Plaintiffs and each member of the Classes.

318.    As a direct and proximate result of Defendants' breaches of express warranties, as alleged herein, Plaintiffs and the Class Members sustained economic loss in an amount to be proven at trial. Band-Aid brand adhesive bandages contained PFAS, which will require Plaintiffs and Class Members to incur costs to prematurely replace the product and costs to discontinue use of the product before expiration.

319.    As a result of Defendants' breaches of express warranties, as alleged herein, Plaintiffs and the Class Members seek an order awarding compensatory damages and any other just and proper relief available under the law.

## COUNT TWO
### Breach of Implied Warranty
**(*On Behalf of the Nationwide Class or, in the Alternative, On Behalf of the Statewide Classes*)**

320.    Plaintiffs, individually and on behalf of the Nationwide Class, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

321.    This claim is brought by Plaintiffs on behalf of the Nationwide Class under New Jersey law. In the alternative, this claim is brought by Plaintiffs on behalf of the California, Florida, Georgia, Hawaii, Illinois, Massachusetts, Michigan, Nevada, New York, Pennsylvania, and Texas Statewide Classes

322.    At all relevant times, Defendants were merchants of Band-Aid brand adhesive bandages that were sold to Plaintiffs and Class members and Defendants were in the business of marketing, promoting, and selling such products to the consuming public. Defendants designed, developed, and sold the bandages knowing that Plaintiffs and Class members would use the bandages.

323.    Each bandage product sold by Defendants comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used. Defendants expected the consuming public, including Plaintiffs and Class Members, to use the bandages on their skin and such use was reasonably foreseeable. Plaintiffs and Class Members also expected the bandages to be useable and to perform in a manner consistent with their packaging and labeling.

324.    Defendants breached its implied warranty of merchantability because their Band-Aid brand adhesive bandages were not in merchantable condition when sold because they contain or have a material risk of containing dangerous PFAS.

325.    Defendants' Band-Aid brand adhesive bandages are not fit for the ordinary purpose for which they were sold because they contain or have a material risk of containing dangerous PFAS.

326.    Defendants did not properly disclaim the warranty of merchantability and fitness for a particular purpose.

327.    Plaintiffs and Class Members were injured as a direct and proximate result of Defendants' breaches of implied warranties of merchantability. Plaintiffs and Class Members were damaged as a result of Defendants' breaches of implied warranties of merchantability because, had they been aware of the unmerchantable condition of the bandages, they would not have purchased such products.

328.    As a result of Defendants' breaches of implied warranties of merchantability, as alleged herein, Plaintiffs and the Class Members seek an order awarding compensatory damages and any other just and proper relief available under the law.

## COUNT THREE
### Fraudulent Concealment
*(On Behalf of the Nationwide Class or, in the Alternative, On Behalf of the Statewide Classes)*

329.    Plaintiffs, individually and on behalf of the Nationwide Class, restate, re-allege, and incorporate by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

330.    This claim is brought on behalf of the Nationwide Class under New Jersey law. In the alternative, this claim is brought by Plaintiffs on behalf of the California, Florida, Georgia,

Hawaii, Illinois, Massachusetts, Michigan, Nevada, New York, Pennsylvania, and Texas Statewide Classes.

331.    Defendants concealed and failed to disclose on the Band-Aid brand packaging and labeling the material fact that the bandages contained or risked containing PFAS, and that the bandages were not safe or healthy for use.

332.    As discussed at great length above, it has been known since the 1950s that PFAS are harmful chemicals to humans, animals, and the environment.  The EPA, CDC and many other knowledgeable groups and publications have further reported on the potential risks and dangers of PFAS chemicals. Accordingly, Defendants knew or should have known that PFAS are dangerous, and concealing this known fact is detrimental to the consumer.

333.    Defendants have a duty to disclose that the Band-Aid products they manufactured and sold for consumer use contained or risked containing PFAS; however, Defendants did not make this disclosure.

334.    Plaintiffs and the Class Members all paid a premium for the Band-Aid brand adhesive bandages based upon the way the product is represented, which did not include the inclusion of PFAS. Products that contain PFAS are not worth a premium to a reasonable consumer.

335.    Defendants had superior knowledge or means of knowledge available to them and knew that Plaintiffs and Class Members would rely upon the representations and omissions of Defendants regarding the quality and ingredients of their bandages.  Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains PFAS, especially at the point of sale.

336.    Defendants' concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies.  Consumers

such as Plaintiffs and the Class Members are influenced by the ingredients and contents listed on a product's packaging and ingredient list, as well as any warnings (or lack thereof) on the products they buy. Defendants know that if they had not omitted that the bandages contained or risked containing PFAS, then Plaintiffs and the Class Members would not have agreed to pay a premium price for the Band-Aid brand adhesive bandages, or would not have purchased the bandages at all; however, Defendants wanted to increase sales and profits and thus chose to conceal that their Band-Aid products contain PFAS.

337.  Defendants' concealment misled Plaintiffs and the Class Members as to the true nature of what they were buying and putting onto their and their family's bodies.

338.  Defendants fraudulently concealed that the Band-Aid adhesive bandages contained or risked containing PFAS. Consequently, Plaintiffs and absent members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

### COUNT FOUR
### Unjust Enrichment
#### (On Behalf of the Nationwide Class or, in the Alternative, On Behalf of the Statewide Classes)

339.  Plaintiffs, individually and on behalf of the Nationwide Class, restate, re-allege, and incorporate by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

340.  This claim is brought by Plaintiffs on behalf of the Nationwide Class under New Jersey law. In the alternative, this claim is brought by Plaintiffs on behalf of the California, Florida, Georgia, Hawaii, Illinois, Massachusetts, Michigan, Nevada, New York, Pennsylvania, and Texas Statewide Classes.

341.  As the intended and expected result of their conscious wrongdoing alleged herein, Defendants have profited and benefitted from Plaintiffs' and Class members' purchases of the

Band-Aid Products. Plaintiffs' and Class members' payments for the Band-Aid Products flowed to Defendants.

342.    Defendants voluntarily accepted and retained these profits and benefits derived from Plaintiffs and the Classes, with full knowledge and awareness that, as a result of their misconduct, Plaintiffs and the Classes were not receiving products of the quality, nature, fitness, or value that had been represented by Defendants and that Plaintiffs and the Classes, as reasonable consumers, expected for a product applied to the skin.

343.    If Plaintiffs and Class members knew the Defendants' Band-Aid Products were not safe and contained PFAS as alleged herein, they would not have purchased these products.

344.    Defendants have been unjustly enriched by their fraudulent and deceptive marketing of the Band-Aid Products, at the expense of Plaintiffs and the Classes.

345.    Defendants profited from Plaintiffs' purchases and used Plaintiffs' and Class members' monetary payments for business purposes. Defendants' retention of these profits and benefits is inequitable and against good conscience. Principles of equity and good conscience preclude Defendants from retaining these profits and benefits.

346.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and the Classes suffered injury and seek the disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits, plus interest, to the extent and in the amount deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Defendant's unjust enrichment.

## COUNT FIVE
### Violation of California Unfair Competition Law
### *(On Behalf of the California Subclass)*

347.    Plaintiffs, individually and on behalf of the California Subclass, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

348.    This claim is brought by Plaintiffs on behalf of the California Subclass under California law.

349.    California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice." For the reasons discussed herein, Defendants have engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

350.    By committing the acts and practices alleged herein, Defendants have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

351.    Defendants have violated the UCL's proscription against engaging in unlawful business practices because of their violations of California's Song-Beverly Act, California's False Advertising Law, and the CLRA, in addition to breach of warranty and violations of common law.

352.    As more fully described above, Defendants' misleading marketing, advertising, packaging, and labeling of the Band-Aid Products is likely to deceive reasonable consumers. In addition, Defendants have committed unlawful business practices by, *inter alia*, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

83

353.    Plaintiffs and members of the California Subclass reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

354.    Defendants have also violated the UCL's proscription against engaging in unfair business practices. Defendants' act, omissions, misrepresentations, practices and non-disclosures, as alleged herein, constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq.* in that Defendants' conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

355.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

356.    Defendants have further violated the UCL's proscription against engaging in fraudulent business practices. Defendants' claims, nondisclosures, and misleading statements with respect to the Band-Aid Products were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

357.    Plaintiffs and the members of the California Subclass suffered a substantial injury by virtue of buying the Band-Aid Products that they would not otherwise have purchased, or by paying more than they otherwise would have for those products, absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Band-Aid Products.

358.    There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Band-Aid Products.

359.    Plaintiffs and other members of the California Subclass had no way of reasonably knowing that the Band-Aid Products they purchased were not as marketed, advertised, packaged, or labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

360.    The gravity of the consequences of Defendants' conduct as described outweighs any justification, motive, or reason for engaging in this conduct, particularly considering the available legal alternatives which exist in the marketplace, and Defendants' conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs and members of the California Subclass.

361.    Pursuant to California Business & Professions Code § 17203, Plaintiffs and the California Subclass seek an order of this Court that includes, but is not limited to, requiring Defendants to (a) provide restitution to Plaintiffs and the members of the California Subclass; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay attorney fees and costs.

## COUNT SIX
### Violation of California False Advertising Law ("FAL")
### *(On Behalf of the California Subclass)*

362.    Plaintiffs, individually and on behalf of the California Subclass, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

363.    This claim is brought by Plaintiffs on behalf of the California Subclass under California law.

364.    Defendants' acts and practices, as described herein, have deceived and/or are likely to continue to deceive California Subclass members and the public. As described herein, Defendants misrepresented the Band-Aid Products as being safe and reasonable for application on

the skin when, in fact, the Band-Aid Products were not safe because they contained harmful and toxic PFAS.

365.    By its actions, Defendants disseminated uniform advertising regarding the Band-Aid Products to and across California. The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of California Business & Professions Code § 17500 *et seq.* Such advertisements were intended to and likely did deceive the consuming public for the reasons described herein.

366.    The above-described false, misleading, and deceptive advertising Defendants disseminated continues to have a likelihood to deceive in that Defendants failed to disclose that the Band-Aid Products contain substances that pose a significant risk to the health and well-being of Plaintiffs and members of the California Subclass.

367.    Defendants continue to misrepresent to consumer that the Band-Aid Products are safe for their intended use. But that is not the case.

368.    In making and disseminating these statements and representations, Defendants knew, or should have known, their advertisements were untrue and/or misleading in violation of California law. Plaintiffs and other members of the California Subclass based their purchasing decisions on Defendants' misrepresentation and omission of material facts. Plaintiffs and members of the California Subclass were injured in fact and lost money and property as a result.

369.    The misrepresentations and non-disclosures by Defendants of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of California Business & Professions Code § 17500 *et seq.*

370.    As a result of Defendants' wrongful conduct, Plaintiffs and the California Subclass lost money in an amount to be proven at trial. Plaintiffs and members of the California Subclass are therefore entitled to restitution as appropriate for this case of action.

371.    Plaintiffs and members of the California Subclass seek all monetary and non-monetary relief permitted by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs; injunctive relief; and other appropriate and equitable relief.

372.    Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price, and an injunction requiring either (1) adequate disclosure of the PFAS contained in the Band-Aid Products and its effects; or (2) the removal of such chemicals from the Products, will ensure that Plaintiffs and members of the California Subclass are in the same place they would have been had Defendants' wrongful conduct not occurred, i.e., the position to make an informed decision about the purchase of the Band-Aid Products absent omissions and misrepresentations with the full purchase price at their disposal.

**COUNT SEVEN**
**Violation of Florida's Unfair & Deceptive Trade Practices Act**
***(On Behalf of the Florida Subclass)***

373.    Plaintiffs, individually and on behalf of the Florida Subclass, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

374.    This claim is brought by Plaintiffs on behalf of the Florida Subclass under Florida law.

375. Plaintiffs and members of the Florida Subclass are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

376. Defendants engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

377. The Florida Unfair & Deceptive Trade Practices Act ("FUDTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). By concealing that the Band-Aid Products contained harmful levels of PFAS, Defendants participated in unfair and deceptive trade practices that violated the FUDTPA as described herein. The fact that the Band-Aid Products contain a harmful, carcinogenic substance—namely, PFAS—is material to a reasonable consumer.

378. Defendants' actions, as set forth herein, occurred in the conduct of trade or commerce.

379. In the course of their business, Defendants concealed the defective nature of the Band-Aid Products and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Band-Aid Products.

380. Defendants knew or should have known that the Band-Aid Products contained harmful PFAS, or were highly likely to, but concealed that information from consumers.

381. By failing to disclose and by actively concealing the presence of PFAS in the Band-Aid Products, which Defendants' marketed as safe, reliable, and of high quality, Defendants engaged in unfair and deceptive business practices in violation of the FUDTPA.

382. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and members of the Florida Subclass, about the true safety and reliability of their vehicles.

383. Defendants owed Plaintiffs and members of the Florida Subclass a duty to disclose that PFAS was present in the Band-Aid Products because Defendants (i) possessed exclusive knowledge that PFAS were present in the Products, (ii) concealed this fact from consumers, and (iii) made incomplete representations about the safety and quality of the Band-Aid Products, while purposefully withholding material facts that contradicted those representations.

384. Because Defendants unreasonably concealed the presence of PFAS in the Band-Aid Products, Plaintiffs and members of the Florida Subclass were deprived of the benefit of their bargain since the Band-Aid Products they purchased were worth less than they would have been if free from defects. Had Plaintiffs and members of the Florida Subclass been aware that PFAS was present in the Band-Aid Products, they would have either not bought the Products or would have paid less for them.

385. As a direct and proximate result of Defendants' violations of the FUDTPA, Plaintiffs and members of the Florida Subclass have suffered injury-in-fact and/or actual damage as alleged above.

386. Plaintiffs and members of the Florida Subclass are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

387.    Plaintiffs and members of the Florida Subclass also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

## COUNT EIGHT
### Violation of Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390 *et seq.*
### *(On Behalf of the Georgia Subclass)*

388.    Plaintiffs, individually and on behalf of the Georgia Subclass, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

389.    This claim is brought by Plaintiffs on behalf of the Georgia Subclass under Georgia law.

390.    Each Defendant is a "person" as defined by the Georgia Fair Business Practices Act ("Georgia FBPA").

391.    Plaintiffs and Class Members are "consumers" within the meaning of the Georgia FBPA.

392.    The purchase of Band-Aid Products by Plaintiffs and Georgia Subclass Members constituted "consumer transactions" as defined by the Georgia FBPA.

393.    The Georgia FBPA declares "[u]nfair or deceptive acts or practices in the conduct of consumer transaction and consumer acts or practices in trade or commerce" to be unlawful, including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade...if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised."

90

394.    By failing to disclose the existence of PFAS chemicals in their Band-Aid Products, representing that the bandages had characteristics and benefits that they do not have, and representing the bandages to be of a particular standard or quality (when they were of another), Defendants violated the Georgia FBPA.

395.    Plaintiffs and Georgia Subclass Members did not discover and did not know of any facts that would have caused a reasonable person to expect that the Defendants were concealing the presence of PFAS in the Band-Aid Products. As alleged herein, the presence of PFAS in the bandages was material to Plaintiffs and Georgia Subclass Members at all relevant times. Within the time period of any applicable statute of limitations, Plaintiffs and Georgia Subclass Members would not have discovered through the existence of reasonable diligence that the Band-Aid Products.

396.    By reason of the conduct alleged herein, Defendants engaged in material and misleading labeling and advertising of their Band-Aid Products by statements and omission. The false advertising occurred in part within Georgia.

397.    Defendants' Band-Aid Products contain PFAS chemicals—a fact they omitted to disclose—and Defendants misrepresented that their bandages were safe for use on human skin. Defendants knew or should have known that their Band-Aid Products should not contain PFAS and that by manufacturing and providing for commercial sale of Band-Aid Products containing PFAS, Plaintiffs and Georgia Subclass members were not getting safe products to use on their skin.

398.    Plaintiffs and Georgia Subclass members would not have purchased the Band-Aid Products at issue had they known the truth about the presence of PFAS. There is no other use for Defendants' tainted Products.

399.    Defendants violated the Georgia FBPA by designing, manufacturing, marketing, and selling Band-Aid Products containing PFAS and failing to properly represent, both by affirmative conduct and by omission, the actual contents of their bandages.

400.    Defendants knew or should have known that their conduct violated the Georgia FBPA.

401.    If Defendants had not sold Band-Aid Products containing undisclosed PFAS, Plaintiffs and Georgia Subclass members would not have suffered the extent of damages caused by Defendants' sales.

402.    Defendants' advertisements and labels for their Band-Aid Products violate the Georgia FBPA in that, among others things, Defendants actively and knowingly misrepresented or omitted disclosure of material information, including the fact that Defendants' bandages contained PFAS, on the labels and advertisements, knowing that Plaintiffs and Georgia Subclass Members would see and rely on the labels at the time they purchased the Band-Aid Products, and that Defendants failed to disclose and give timely warnings or notices regarding the presence of PFAS in their bandages that were purchased by Plaintiff and Georgia Subclass Members.

403.    The conduct alleged herein constitutes an unconscionable business practice in that Defendants have, by the use of false statements and/or material omissions in their labels and advertisements, failed to properly represent and/or concealed the presence of detectable levels of PFAS in their bandages. Such conduct constitutes "unfair or deceptive acts or practices in the conduct of consumer transaction and consumer acts or practices in trade or commerce."

404.    Members of the public, including Plaintiffs and Georgia Subclass Members, were deceived by and relied upon Defendants' affirmative misrepresentations and failures to disclose.

405.    Such material and misleading advertisements and labels designed and disseminated by Defendants are and were likely to mislead a reasonable consumer purchasing Band-Aid Products.

406.    To this day, Defendants continue to engage in unfair or deceptive acts or practices in violation of the Georgia FBPA. Defendants continue to conceal the defective nature of their bandages and have failed to disclose the true nature of their bandages, including that they contain PFAS.

407.    Defendants' violations present a continuing risk to Plaintiffs, Georgia Subclass Members, and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

408.    Defendants were provided notice of the defective nature of their products through their own testing and the Mamavation consumer report. Affording Defendants a reasonable opportunity to cure the defects in their bandages would be unnecessary and futile here because Defendants have known of and concealed the condition of their products and have failed to provide a suitable remedy within a reasonable time.

409.    As a direct and proximate cause of Defendants' conduct, Plaintiffs and Georgia Subclass Members suffered actual damages as alleged above.

410.    In addition to or in lieu of actual damages, because of the injury, Plaintiffs and the Georgia Subclass members seek statutory, treble damages, and punitive damages as permitted under the Georgia FBPA.

411.    Plaintiffs also seek injunctive relief for Defendants to refrain from the continued advertising of Band-Aid Products that omit or misrepresent material facts, including that the bandages contain PFAS. Plaintiffs further seek injunctive relief forcing Defendants to replace all

Band-Aid Products to ensure no bandages are available for purchase that contain undisclosed PFAS.

## COUNT NINE
### Violation of Georgia's Uniform Deceptive Trade Practices Act O.C.G.A. § 10-1-370 et seq.
*(On Behalf of the Georgia Subclass)*

412.    Plaintiffs, individually and on behalf of the Georgia Subclass, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

413.    This claim is brought by Plaintiffs on behalf of the Georgia Subclass under Georgia law.

414.    Defendants, Plaintiffs, and Georgia Subclass Members are "persons" within the meaning of Georgia's Uniform Deceptive Trade Practices Act ("Georgia's UDTPA").

415.    The Georgia UDTPA prohibits "deceptive trade practices" which include the "misrepresentation of standard, quality, or grade of goods and services," "engaging in any other conduct which similarly creates a likelihood of confusion or misunderstanding," and "representing that goods or services have sponsorship, approval, characteristic, ingredients, uses, or benefits that they do not have," and "[a]dvertising goods or services with intent not to sell them as advertised."

416.    Defendants' unfair and deceptive acts or practices described at length herein occurred repeatedly in Defendants' course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public and, as a result, caused economic harm to consumers of their Band-Aid Products.

417.    Defendants knew or should have known that their conduct was deceptive in that they misrepresented the characteristics and benefits of the bandages, and misrepresented the standard, quality, or grade of their bandages when they knew they were of another. Thus,

Defendants violated the Georgia UDTPA, and knew or should have known that their conduct violated the Georgia UDTPA.

418.    Defendants' Band-Aid Products contain PFAS chemicals—a fact they omitted to disclose—and Defendants misrepresented that their bandages were safe for use on human skin. Defendants knew or should have known that their Band-Aid brand adhesive bandages should not contain PFAS and that by manufacturing and providing for commercial sale of Band-Aid Products containing PFAS, Plaintiffs and Georgia Subclass members were not getting safe products to use on their skin. Notwithstanding, Defendants represented that "[e]very piece of material in our BAND-AID Brand bandages and every ingredient in our antibiotic treatments are chosen with safety as the top concern," and asserted that they "thoroughly vet each supplier and only partner with those who meet our rigorous standards." Defendants claimed their "manufacturing facilities undergo regular audits and certification so that we can ensure our products are manufactured with the highest standards and comply with most discerning regulatory standards," and their "scientists ensure the safety and efficacy of our products through clinical studies and laboratory models."

419.    Defendants were under a duty to Plaintiffs and Georgia Subclass members to disclose the defective nature of their adhesive bandages because they had exclusive knowledge of its quality control testing, which detected or should have detected PFAS in the manufacturing process. Absent testing by a qualified lab, consumers such as Plaintiffs and the Georgia Subclass Members were unable to determine that Defendants' Band-Aid Products contained PFAS chemicals given Defendants' failure to disclose the presence of PFAS.

420.    Despite their exclusive information to the contrary, Defendants failed to disclose that the Band-Aid Products contained PFAS chemicals.

421.    The facts Defendants concealed from Plaintiffs and Georgia Subclass Members, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions, especially for a consumer health product such as a bandage. Had Plaintiffs and Georgia Subclass members known the true facts in regard to the bandages they purchased, they would not have purchased the bandages or would have paid considerably less for them.

422.    As a direct and proximate cause of Defendants' conduct, Plaintiffs and Georgia Subclass members suffered actual damages as alleged above.

423.    In addition to or in lieu of actual damages, because of the injury, Plaintiffs and the Georgia Subclass members seek statutory, treble damages, and punitive damages to the extent permitted under the Georgia UDTPA.

424.    Plaintiffs also seek injunctive relief for Defendants to refrain from the continued deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA and applicable law.

<u>**COUNT TEN**</u>
**Violation of Hawaii Rev. Stat. § 480 et seq.**
*(On Behalf of the Hawaii Subclass)*

425.    Plaintiffs, individually and on behalf of the Hawaii Subclass, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

426.    This claim is brought by Plaintiffs on behalf of the Hawaii Subclass under Hawaii law.

427.    Defendants are "persons" under Haw. Rev. Stat. § 480-1.

96

428.    Plaintiffs are "consumers" as defined by Haw. Rev. Stat. § 480-1, who purchased one or more packages of Band-Aid Products.

429.    Defendants acts or practices set forth herein occurred in the conduct of trade or commerce.

430.    The Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." By systematically concealing the fact that Band-Aid Products contain toxic PFAS, Defendants engaged in unfair and deceptive trade practices prohibited by the Hawaii Act. The fact that Band-Aid Products contained PFAS is material to a reasonable consumer.

431.    In the course of their business, Defendants concealed the presence of PFAS in the Band-Aid Products as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Band-Aid Products.

432.    By failing to disclose and by actively concealing the presence of PFAS in the Band-Aid Products, which Defendants marketed as safe, reliable, and of high quality, Defendants engaged in unfair and deceptive business practices in violation of the Hawaii Act.

433.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and members of the Hawaii Subclass, about the true safety of the Band-Aid Products.

434.    Defendants knew or should have known that their conduct violated the Hawaii Act.

97

435.    As alleged herein, Defendants made material statements about the safety and suitability for use of the Band-Aid Products that were either false or misleading.

436.    Defendants had a duty to disclose that the Band-Aid Products contained PFAS because Defendants (1) possessed exclusive knowledge about the presence of PFAS in the bandages, (ii) intentionally concealed this from Plaintiffs and the Hawaii Subclass, and (iii) made incomplete representations about the safety and suitability of the Band-Aid Products, while purposefully withholding material facts from Plaintiffs and members of the Hawaii Subclass that contradicted these representations.

437.    As a result of Defendants' deception, Plaintiffs and members of the Hawaii Subclass were deprived the benefit of their bargain since the Band-Aid Products they purchased were worth less than they would have been if they were free from PFAS.

438.    As a direct and proximate result of Defendants' violations of the Hawaii Act, Plaintiffs and members of the Hawaii Subclass have suffered injury-in-fact and/or actual damage as alleged herein.

439.    Pursuant to Hawaii Rev. Stat. § 480-13, Plaintiff seeks monetary relief against Defendants measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be proven at trial.

440.    Under Haw. Rev. Stat. § 480-13.5, Plaintiffs seek an additional award against Defendants of up to $10,000 for each violation directed at a Hawaiian elder. Defendants knew or should have known that their conduct was directed to one or more class members who are elders. Defendants' conduct caused one or more of these elders injury, as described herein. Class members who are elders are more vulnerable to Defendants' conduct because of age, poor health or

infirmity, impaired understanding, restricted mobility, or disability, and each of these class members were also harmed by Defendants' deceptive conduct.

## COUNT ELEVEN
### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act
### *(On Behalf of the Illinois Subclass)*

441.    Plaintiffs, individually and on behalf of the Illinois Subclass, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

442.    This claim is brought by Plaintiffs on behalf of the Illinois Subclass under Illinois law.

443.    Defendants are "persons" as that term is defined in 815 ILCS 505/1(c).

444.    Plaintiffs and members of the Illinois Subclass are "consumers" as that term is defined in 815 ILCS 505/1(e).

445.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use of employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

446.    Defendants participated in misleading, false, or deceptive acts that violated the Illinois CFA. By concealing the fact that PFAS was present in their Band-Aid Products, Defendants engaged in deceptive business practices prohibited by the Illinois CFA. The fact that PFAS was present in the Band-Aid Products is material to a reasonable consumer.

447.    Defendants' actions, as set forth herein, occurred in the conduct of trade or commerce.

448.    In the course of their business, Defendants concealed the fact that the Band-Aid Products contained PFAS and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Band-Aid Products.

449.    By failing to disclose and by actively concealing the presence of PFAS in the Band-Aid Products, which they marketed as safe, reliable, and of high quality, Defendants engaged in unfair and deceptive business practices in violation of the Illinois CFA.

450.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their Band-Aid Products.

451.    Defendants knew or should have known that their conduct violated the Illinois CFA.

452.    As alleged herein, Defendants made material statements about the safety and suitability of the Band-Aid Products that were either false or misleading.

453.    Defendants owed Plaintiffs and members of the Illinois Subclass a duty to disclose the true safety and suitability of the Band-Aid Products because Defendants (1) possessed exclusive knowledge about the presence of PFAS in the Band-Aid Products, (2) intentionally concealed that fact from consumers, and (3) made incomplete representations about the safety and

suitability of the Band-Aid Products, while purposefully withholding material facts from consumers that contradicted those representations.

454.    Because Defendants fraudulently concealed the PFAS in the Band-Aid Products, Plaintiffs and members of the Illinois Subclass were deprived of the benefit of their bargain since the bandages they purchased were worth less than they would have been if free from defects.

455.    As a direct and proximate result of Defendants' violations of the Illinois CFA, Plaintiffs and members of the Illinois Subclass have suffered injury-in-fact and/or actual damage as alleged herein.

456.    Pursuant to 815 ILCS 505/10a(a), Plaintiffs seek monetary relief against Defendants in the amount of actual damages, as well as punitive damages because Defendants acted with fraud and/or malice and/or were grossly negligent.

457.    Plaintiffs also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq*.

## COUNT TWELVE
### Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903 et seq.
#### *(On Behalf of the Michigan Subclass)*

458.    Plaintiffs, individually and on behalf of the Michigan Subclass, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

459.    This claim is brought by Plaintiffs on behalf of the Michigan Subclass under Michigan law.

460.    Plaintiffs and Michigan Subclass members are "persons" as defined under Mich. Comp. Laws § 445.902(1)(d).

101

461.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commers," including "[r]epresenting that goods or services have . . . characteristics [or] ingredients . . . that they do not have," "[r]epresenting that goods or services are of a particular standard . . . if they are of another," "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer," [m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is," and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws. § 445.903(1).

462.    Defendants' Band-Aid Products contains PFAS—a fact they omitted to disclose—and Defendants misrepresented that its Products were safe for use on the skin. Defendants knew or should have known that their Band-Aid Products should not contain PFAS and that by manufacturing and providing for commercial sale Band-Aid Products containing PFAS, Plaintiffs and Michigan Subclass members were not getting safe products to use on their skin.

463.    Plaintiffs and class members would not have purchased the Band-Aid Products at issue had they known the truth about the presence of PFAS. There is no other use for Defendants' tainted Band-Aid Products.

464.    In the course of its business, Defendants willfully failed to disclose and actively concealed that the Band-Aid Products contained PFAS. Accordingly, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices including representing that the Band-Aid Products have characteristics or components that they do not have and  that they are of a particular standard when they are of another; failed to

reveal a material fact, the omission of which tends to deceive the consumer and which cannot be reasonably known to the consumer; made a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failed to reveal material facts in light of representations made in a positive manner.

465.    By failing to disclose and by actively concealing the presence of PFAS in the Band-Aid Products, which they marketed as safe, reliable, and of high quality, Defendants engaged in unfair and deceptive business practices in violation of the Michigan CPA.

466.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their Band-Aid Products.

467.    Defendants knew or should have known that their conduct violated the Michigan CPA.

468.    As alleged herein, Defendants made material statements about the safety and suitability of the Band-Aid Products that were either false or misleading.

469.    Defendants owed Plaintiffs and members of the Michigan Subclass a duty to disclose the true safety and suitability of the Band-Aid Products because Defendants (1) possessed exclusive knowledge about the presence of PFAS in the Band-Aid Products, (2) intentionally concealed that fact from consumers, and (3) made incomplete representations about the safety and suitability of the Band-Aid Products, while purposefully withholding material facts from consumers that contradicted those representations.

470.    Because Defendants fraudulently concealed the PFAS in the Band-Aid Products, Plaintiffs and members of the Michigan Subclass were deprived of the benefit of their bargain since the bandages they purchased were worth less than they would have been if free from defects.

471.    As a direct and proximate result of Defendants' violations of the Michigan CPA, Plaintiffs and members of the Michigan Subclass have suffered injury-in-fact and/or actual damage as alleged herein.

472.    Plaintiffs seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiffs and each class Member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.  Plaintiffs also seek punitive damages against Defendants because it carried out despicable conduct with willful and conscious disregard of the rights of others. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

**COUNT THIRTEEN**
**Violation of New York General Business Law § 349**
***(On Behalf of the New York Subclass)***

473.    Plaintiffs, individually and on behalf of the New York Subclass, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

474.    This claim is brought by Plaintiffs on behalf of the New York Subclass under New York law.

475.    New York General Business Law ("NYGBL") § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

476.    By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of the NYGBL § 349. The conduct alleged herein is a "business practice" within the meaning of the NYGBL § 349, and the deception occurred and originated in part within New York State.

477.    Defendants' Band-Aid Products contain PFAS—a fact they omitted to disclose—and Defendants misrepresented that their Products were safe for use on the skin. Defendants knew or should have known that their Band-Aid Products should not contain PFAS and that by manufacturing and providing for commercial sale Band-Aid Products containing PFAS, Plaintiffs and New York Subclass members were not getting safe products to use on their skin.

478.    Plaintiffs and New York Subclass members would not have purchased the Band-Aid Products at issue had they known the truth about the presence of PFAS. There is no other use for Defendants' tainted Band-Aid Products.

479.    Defendants violated the NYGBL § 349 by designing, manufacturing, and selling Band-Aid Products containing PFAS and by failing to properly represent, both by affirmative conduct and by omission, the actual contents of their Band-Aid Products.

480.    If Defendants had not sold Band-Aid Products containing undisclosed PFAS, Plaintiffs and New York Subclass members would not have suffered the extent of damages caused by Defendants' sales.

481.    Defendants' practices, acts, policies, and course of conduct violate NYGBL § 349 in that, among others things, Defendants actively and knowingly misrepresented or omitted disclosure of material information to Plaintiffs and class members at the time they purchased the Band-Aid Products, including the fact that Defendants' Products contained PFAS, and that

Defendants failed to disclose and give timely warnings or notices regarding the presence of PFAS in their Products that were purchased by Plaintiffs and New York Subclass members.

482.    The conduct alleged herein constitutes an unconscionable business practice in that Defendants have, by the use of false statements and/or material omissions, failed to properly represent and/or concealed the presence of detectable levels of PFAS in their Band-Aid Products.

483.    Members of the public, including Plaintiffs and class members, were deceived by and relied upon Defendants' affirmative misrepresentations and failures to disclose.

484.    Such acts and practices by Defendants are and were likely to mislead a reasonable consumer purchasing Band-Aid Products. Said acts and practices are material. The sales of Defendants' Band-Aid Products in New York, through such means occurring in New York, were consumer-oriented acts and thereby fall under the New York consumer protection statute, NYGBL § 349.

485.    To this day, Defendants continue to engage in unlawful practices in violation of the NYGBL § 349. Defendants continue to conceal the defective and harmful nature of the Band-Aid Products and have failed to disclose the true nature of the those Products, including that they contain PFAS.

486.    As a direct and proximate cause of Defendants' conduct, Plaintiffs and New York Subclass members suffered actual damages as alleged above.

487.    In addition to or in lieu of actual damages, because of the injury, Plaintiffs and the New York Subclass members seek statutory and treble damages for each injury and violation which has occurred.

488.    Plaintiffs also seek injunctive relief for Defendants to refrain from the continued advertising of Band-Aid Products that omits material facts, including that the Products contain

PFAS. Plaintiffs further seek injunctive relief forcing Defendants to replace all Band-Aid Products for class members with a non-toxic bandage.

**COUNT FOURTEEN**
**Violation of New York General Business Law § 350**
*(On Behalf of the New York Subclass)*

489.    Plaintiffs, individually and on behalf of the New York Subclass, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

490.    This claim is brought by Plaintiffs on behalf of the New York Subclass under New York law.

491.    NYGBL § 350 prohibits false advertising in the conduct of any business, trade, or commerce, or in the furnishing of any service in the State of New York.

492.    By reason of the conduct alleged herein, Defendants engaged in material and misleading labeling and advertising of their Band-Aid Products by statements and omission within the meaning of the NYGBL § 350. The false advertising occurred in part within New York State.

493.    Defendants' Band-Aid Products contains PFAS—a fact it omitted to disclose—and Defendants misrepresented that its Products were safe for use on the skin. Defendants knew or should have known that their Band-Aid Products should not contain PFAS and that by manufacturing and providing for commercial sale Products containing PFAS, Plaintiffs and New York Subclass members were not getting safe products to use on a sensitive part of the face, the eye.

494.    Plaintiffs and class members would not have purchased the Band-Aid Products at issue had they known the truth about the presence of PFAS. There is no other use for Defendants' tainted Products.

495.    Defendants violated the NYGBL § 350 by designing, manufacturing, marketing, and selling Band-Aid Products containing PFAS and failing to properly represent, both by affirmative conduct and by omission, the actual contents of those Products.

496.    If Defendants had not sold Band-Aid Products containing undisclosed PFAS, Plaintiffs and class members would not have suffered the extent of damages caused by Defendants' sales.

497.    Defendants' advertisements and labels for their Band-Aid Products violate NYGBL § 350 in that, among others things, Defendants actively and knowingly misrepresented or omitted disclosure of material information, including the fact that Defendants' Products contained PFAS, on the labels and advertisements, knowing that Plaintiffs and class members would see and rely on the labels at the time they purchased the Band-Aid Products, and that Defendants failed to disclose and give timely warnings or notices regarding the presence of PFAS in their Band-Aid Products that were purchased by Plaintiffs and class members.

498.    The conduct alleged herein constitutes an unconscionable business practice in that Defendants have, by the use of false statements and/or material omissions in their labels and advertisements, failed to properly represent and/or concealed the presence of detectable levels of PFAS in their Band-Aid Products.

499.    Members of the public, including Plaintiffs and New York Subclass members, were deceived by and relied upon Defendants' affirmative misrepresentations and failures to disclose.

500.    Such material and misleading advertisements and labels designed and disseminated by Defendants are and were likely to mislead a reasonable consumer purchasing Band-Aid Products. The sales of Defendants' Band-Aid Products in New York, through such means

occurring in New York, were consumer-oriented acts and thereby fall under the New York consumer protection statute, NYGBL § 350.

501.     To this day, Defendants continue to engage in unlawful misleading advertising in violation of the NYGBL § 350.  Defendants continue to conceal the defective nature of the Band-Aid Products and have failed to disclose the true nature of the Band-Aid Products, including that they contains PFAS.

502.     As a direct and proximate cause of Defendants' conduct, Plaintiffs and New York Subclass members suffered actual damages as alleged above.

503.     In addition to or in lieu of actual damages, because of the injury, Plaintiffs and the New York Subclass members seek statutory and treble damages for each injury and violation which has occurred.

504.     Plaintiffs also seek injunctive relief for Defendants to refrain from the continued advertising of Band-Aid Products that omits and misrepresents material facts, including that the Products contain PFAS. Plaintiffs further seek injunctive relief forcing Defendants to replace all Band-Aid Products for class members.

**COUNT FIFTEEN**
**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law**
***(On Behalf of the Pennsylvania Subclass)***

505.     Plaintiffs, individually and on behalf of the Pennsylvania Subclass, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

506.     This claim is brought by Plaintiffs on behalf of the Pennsylvania Subclass under Pennsylvania law.

507. Plaintiffs and members of the Pennsylvania Subclass purchased Band-Aid Products for personal, family or household use within the meaning of 73 P.S. § 201-9.2.

508. All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

509. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have . . . characteristics, . . . . Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

510. Defendants' Band-Aid Products contains PFAS—a fact they omitted to disclose— and Defendants misrepresented that its Products were safe for use on the skin. Defendants knew or should have known that their Band-Aid Products should not contain PFAS and that by manufacturing and providing for commercial sale Band-Aid Products containing PFAS, Plaintiffs and Pennsylvania Subclass members were not getting safe products to use on their skin.

511. Plaintiffs and class members would not have purchased the Band-Aid Products at issue had they known the truth about the presence of PFAS. There is no other use for Defendants' tainted Band-Aid Products.

512. In the course of its business, Defendants willfully failed to disclose and actively concealed that the Band-Aid Products contained PFAS. Accordingly, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices including representing that the Band-Aid Products have characteristics or components

that they do not have and  that they are of a particular standard when they are of another; failed to reveal a material fact, the omission of which tends to deceive the consumer and which cannot be reasonably known to the consumer; made a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failed to reveal material facts in light of representations made in a positive manner.

513.    By failing to disclose and by actively concealing the presence of PFAS in the Band-Aid Products, which they marketed as safe, reliable, and of high quality, Defendants engaged in unfair and deceptive business practices in violation of the Pennsylvania CPL.

514.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their Band-Aid Products.

515.    Defendants knew or should have known that their conduct violated the Pennsylvania CPL.

516.    As alleged herein, Defendants made material statements about the safety and suitability of the Band-Aid Products that were either false or misleading.

517.    Defendants owed Plaintiffs and members of the Pennsylvania Subclass a duty to disclose the true safety and suitability of the Band-Aid Products because Defendants (1) possessed exclusive knowledge about the presence of PFAS in the Band-Aid Products, (2) intentionally concealed that fact from consumers, and (3) made incomplete representations about the safety and suitability of the Band-Aid Products, while purposefully withholding material facts from consumers that contradicted those representations.

518.    Because Defendants fraudulently concealed the PFAS in the Band-Aid Products, Plaintiffs and members of the Pennsylvania Subclass were deprived of the benefit of their bargain since the bandages they purchased were worth less than they would have been if free from defects.

519.    As a direct and proximate result of Defendants' violations of the Pennsylvania CPL, Plaintiffs and members of the Pennsylvania Subclass have suffered injury-in-fact and/or actual damage as alleged herein.

520.    Defendants are liable to Plaintiffs and members of the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiffs are also entitled to an award of punitive damages given that Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, individually and on behalf of all other members of the proposed Nationwide Class and/or State Subclasses, respectfully requests that the Court enter judgment in Plaintiffs' favor and against Defendants as follows:

A.    Declaring, adjudging, and decreeing that this action is a proper class action, and certifying the proposed Class and/or Subclasses pursuant to Federal Rule of Civil Procedure 23, including designating Plaintiffs as Class Representatives and appointing Plaintiffs' counsel as Class Counsel;

B.    Awarding Plaintiffs and the Classes appropriate monetary relief, including actual damages; statutory damages; consequential damages; punitive damages; exemplary damages; nominal damages; restitution; and disgorgement of all earnings, interest, profits, compensation, and benefits received as a result of their unlawful acts, omissions, and practices;

C.      Awarding Plaintiffs and the Classes equitable, injunctive, and declaratory relief as may be appropriate to protect the interests of Plaintiffs and Class Members, including but not limited to an Order enjoining Defendants from engaging in the wrongful and unlawful conduct complained of herein;

D.      Compelling Defendants to pay the costs associated with notification of Class Members about the judgment and administration of claims;

E.      Awarding Plaintiffs and the Classes pre-judgment and post-judgment interest to the maximum extent allowable;

F.      Awarding Plaintiffs and the Classes reasonable attorneys' fees, costs, and expenses; and

G.      Awarding Plaintiffs and the Classes such other favorable relief as allowable under law.

## **JURY TRIAL DEMANDED**

Plaintiffs, individually and on behalf of the Class and/or Subclass, hereby demand a trial by jury of all issues in this Complaint so triable.

Dated:  March 10, 2025                          Respectfully submitted,

                                        By: /s/ *Christopher L. Ayers*
                                             Christopher A. Seeger
                                             Stephen A. Weiss
                                             Christopher L. Ayers
                                             Justin M. Smigelsky
                                             **SEEGER WEISS LLP**
                                             55 Challenger Road, 6th Floor
                                             Ridgefield Park, New Jersey 07660
                                             Telephone: (973) 639-9100
                                             Facsimile: (973) 639-9393
                                             cayers@seegerweiss.com
                                             cseeger@seegerweiss.com
                                             sweiss@seegerweiss.com
                                             jsmigelsky@seegerweiss.com

James E. Cecchi
Jason H. Alperstein*
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
jalperstein@carellabyrne.com

E. Powell Miller (*pro hac vice*)
Dennis A. Lienhardt (*pro hac vice*)
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
dal@millerlawpc.com

Philip J. Furia, Esq.
Jason P. Sultzer, Esq.*
**SULTZER & LIPARI, PLLC**
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
pfuria@thesultzerlawgroup.com
sultzerj@thesultzerlawgroup.com

Joshua D. Arisohn*
**ARISOHN LLC**
94 Blakeslee Rd.
Litchfield, CT 06759
Telephone: (917) 656-0569
josh@arisohnllc.com

Nick Suciu III*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
nsuciu@milberg.com

114

Kenneth J. Grunfeld
Kristen Lake Cardoso*
**KOPELOWITZ OSTROW P.A.**
1 West Las Olas Blvd., Ste. 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
grunfeld@kolawyers.com
cardoso@kolawyers.com

James Bilsborrow
**WEITZ & LUXENBERG, PC**
700 Broadway
New York, NY 10003
Tel: (212) 558-5500
jbilsborrow@weitzlux.com

Charles E. Schaffer, Esq.
Daniel C. Levin, Esq.*
Nicholas J. Elia, Esq.*
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut St., Suite 500
Philadelphia, PA 19106
Tel: (215)592-1500
Fax: (215)592-4663
cschaffer@lfsblaw.com
dlevin@lfsblaw.com
nelia@lfsblaw.com

*Attorneys for Plaintiff and the Proposed Classes*
*\*Pro Hac Vice forthcoming*