**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JO ARONSTEIN, *et al.*, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Civil Action No. 24-4665 (MAS) (RLS) |
| v. | **MEMORANDUM OPINION** |
| KENVUE, INC., *et al.*, | |
| Defendants. | |

**SHIPP, District Judge**

This matter comes before the Court upon Defendants Johnson & Johnson Consumer Inc., Johnson & Johnson, and Kenvue, Inc.'s[1] (collectively, "Defendants") Motion to Dismiss (ECF No. 51) the Amended Consolidated Class Action Complaint (the "Amended Complaint") (ECF No. 40). Plaintiffs[2] opposed (ECF No. 54) and Defendants replied (ECF No. 55). The Court has carefully considered the parties' submissions and reaches its decision without oral argument under Local Civil Rule 78.1(b). For the reasons below, Defendants' Motion to Dismiss is granted.

---

[1] Defendants allege that Johnson & Johnson and Kenvue, Inc. are incorrectly named in this action because "[t]he correct entity regarding the allegations is Kenvue Brands LLC, successor in interest to Johnson & Johnson Consumer Inc." (Defs.' Motion to Dismiss 2 n.1, ECF No. 51.)

[2] The individually-named Plaintiffs in this consolidated class action, bringing this action individually and on behalf of all others similarly situated, include individual purchasers of the Band-Aid Products: (1) Jo Aronstein; (2) Mary Jane Castle; (3) Brandi Baldwin-Jones; (4) Sharnay Moultrie; (5) Carl Saputo, Jr.; (6) Valerie Torres; (7) Joycette Goodwin; (8) Rebekah Badilla; (9) Frank Ortega; (10) Paula Skopow; (11) Christina Otey; (12) Pradeep Arora; (13) Serge Belozerov; (14) Elizabeth Witowski; (15) Reinhard Mazariegos; (16) Melissa Pavlick; (17) Eric Wilim; (18) Sari Weiner; (19) Grace Sit; and (20) Lester Pounder (collectively, "Plaintiffs"). (*See generally* Am. Consolidated Class Action Compl. (the "Am. Compl."), ECF No. 40.)

# I.    BACKGROUND[3]

## A.    Factual Background

### 1.    General Overview

Plaintiffs, individually and on behalf of all other similarly-situated consumers (the "Class Members"), bring the present class action litigation alleging claims related to Defendants' sale of certain Band-Aid bandages[4] (the "Band-Aid Products"). (Am. Compl. ¶ 1.) Plaintiffs allege that the Band-Aid Products "contain harmful levels of toxic [per- or polyfluoroalkyl substances ('PFAS')][5], a class of harmful 'forever chemicals' linked to cancer, hormone disruption, immune system harm, and other health risks." (*Id.* ¶ 2.) Plaintiffs allege that Defendants marketed the Band-Aid Products without disclosing the presence of PFAS despite the fact that "Defendants have used and continue to use PFAS chemicals in their adhesive bandages for the water-proof qualities." (*Id.* ¶¶ 8, 14.) Specifically, Plaintiffs allege that: (1) they purchased the Band-Aid Products because they "reasonably believed they were safe for use around, adjacent to, and near skin and open wounds"; (2) they "followed the instructions and applied the Band-Aid Products" to their and their family members' skin and open wounds; (3) prior to purchase, they relied upon Defendants' packaging and ingredient list to make their purchasing decisions; (4) they were unaware that the Band-Aid Products contained harmful levels of PFAS; (5) independent testing and published

---

[3] For the purpose of considering the instant motion, the Court accepts all factual allegations in the Complaint as true. *See Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

[4] The Band-Aid Products at issue include: (1) Band-Aid Flexible Fabric Comfortable Protection Bandages (the "Flexible Fabric Bandages"); and (2) Band-Aid OURTONE Flexible Fabric Bandages (the "OURTONE Bandages") including OURTONE BR45 Bandages, OURTONE BR55 Bandages, and OURTONE BR65 Bandages. (Am. Compl. ¶ 1, n.1.)

[5] PFAS include long-chain PFAS such as perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"), and short-chain PFAS like GenX. (Am. Compl. ¶¶ 161, 171, 201; *see also* Defs.' Ex. A to Mot. to Dismiss 1, ECF No. 51-4 (detailing PFOA and PFOS).)

research "confirms that Defendants' Band-Aid Products contain PFAS at the point of sale, and it is highly likely that Plaintiff[s'] Band-Aid Products, purchased in temporal proximity to those Band-Aid Products independently tested, . . . contain the same or substantially similar levels of PFAS"; and (6) "Plaintiff[s] would not have purchased the Band-Aid Products, or would have paid significantly less for them, had [they] known that the products contained dangerous PFAS[ and] Plaintiff[s] . . . stopped using the Band-Aid Products since learning they contain PFAS." (*Id.* ¶¶ 26-28, 32-34, 38-40, 44-46, 50-52, 56-58, 62-64, 68-70, 74-76, 80-82, 86-88, 92-94, 98-100, 104-06, 110-12, 116-18, 122-24, 128-30, 134-36, 140-42.)

### 2.    *PFAS Risks*

"PFAS are a category of highly persistent—stain-resistant, oil-resistant, and water-resistant—and toxic manufactured chemicals that have been used in industry and consumer products since the 1940s." (*Id.* ¶ 157 (citing *Our Current Understanding of the Human Health and Environmental Risks of PFAS*, United States Environmental Protection Agency, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas).) Upon information and belief, Plaintiffs allege that PFAS "are used by Defendants for their waterproof qualities." (*Id.* ¶ 158.) PFAS can be harmful to humans at extremely low levels. (*Id.* ¶ 163 (citing *EPA warns toxic "forever chemicals" more dangerous than once thought*, Washington Post (June 15, 2022), https://www.washingtonpost.com/climate-environment/2022/06/15/epa-pfas-forever-chemicals/).) In June 2022, the Environmental Protection Agency (the "EPA") "announced a lifetime health advisory related to PFAS[,]" setting "lifetime health advisory levels for PFOA at 0.004 [parts per trillion ('ppt')] and PFOS at 0.02 ppt" and "for the short-chain GenX at 10 ppt[.]" (*Id.* ¶¶ 15, 163, 171.) About one month later, the National Academy of Science, Engineering, and Medicine produced a report regarding PFAS

detection, health effects, and testing, recommending "that doctors screen blood tests for a range of PFAS and advis[ing] that if a patient's blood shows combined PFAS above 20 nanograms per milliliter, the person is at high risk of adverse health effects." (*Id.* ¶ 172.) Then, in 2024, the Biden Administration issued legally-enforceable drinking water standards limiting PFAS levels allowed in drinking water, setting a maximum contaminant level of 4 ppt for PFOA and PFOS individually. (*Id.* ¶ 173.) The EPA also "set[] a Maximum Contaminant Level health-based goal at zero." (*Id.* ¶ 174.)

### 3.    *Studies Testing the Band-Aid Products for PFAS*

There are two primary methods of testing for PFAS: (1) "targeted" analysis, which "seeks to detect the presence of specific PFAS forms in a sample"; and (2) total organic fluorine analysis, which "detect[s] organic fluorine, which is the foundational element (and defining characteristic) of PFAS chemicals" and is measured in parts per million ("ppm") (*Id.* ¶¶ 175, 177-81.) Plaintiffs allege two different studies of PFAS testing in their Amended Complaint. (*See generally id.*)

First, Plaintiffs allege that Mamavation, a "consumer 'watchdog' community group, which provides 'eco-wellness product investigations for moms[,]'" commissioned "scientific studies on indications of PFAS in bandages, to analyze popular bandages marketed to consumers." (*Id.* ¶¶ 189, 191 (citing *"Band-Aids & Bandages with Indications of PFAS "Forever Chemicals" Report*, Mamavation (Apr. 2, 2024), available at: https://www.mamavation.com/health/band-aids-bandages-pfas-forever-chemicals-report.html).) The Mamavation testing included "Band-Aid Flexible Fabric Comfortable Protection Bandages, Band-Aid OURTONE Flexible Fabric BR45 Bandages, Band-Aid OURTONE Flexible Fabric BR55 Bandages, and Band-Aid OURTONE Flexible Fabric BR65 Bandages manufactured by Defendants." (*Id.* ¶ 193.) Of the Band-Aid branded products tested, the levels of organic fluorine ranged from 169 ppm to 262 ppm on the

"absorbent pad" and the testing of the Band-Aid OURTONE Flexible Fabric BR65 Bandages also yielded a test result of 374 ppm organic fluorine on the "sticky flaps." (*Id.* ¶ 196.) In response to this study, Plaintiffs point to statements from professors that: (1) "'Because bandages are placed upon open wounds, it's troubling to learn that they may also be exposing children and adults to PFAS. It's obvious from the data that PFAS are not needed for wound care[]'"; and (2) "'It is discouraging to find yet another important product space, bandaids or bandages, containing PFAS compounds where transfers into users are conceivable.'" (*Id.* ¶¶ 197-98.)

Second, Plaintiffs allege that in 2024, Plaintiffs also had independent lab testing completed to determine whether the Band-Aid Products contained PFAS. (*Id.* ¶ 199.) "To perform this testing, Plaintiffs sought an independent laboratory that utilized EPA-approved methodology to detect PFAS constituents in the adhesive strips and pads of the Band-Aid Products." (*Id.* ¶ 200.) Plaintiffs allege that "independent testing . . . determined that PFAS, including certain long-chain PFAS like PFOA, were present at detectable levels within each of the Band-Aid Products." (*Id.* ¶¶ 201-04.)

### 4.    *The Band-Aid Products*

Plaintiffs allege that the PFAS found in Defendants' Band-Aid Products go "well beyond the limitations set forth by the government on drinking water" and are at "harmful levels." (*Id.* ¶¶ 175, 203.) Plaintiffs further allege that "[t]he presence of harmful levels of PFAS in the Band-Aid Products that are applied to open wounds is material to Plaintiffs, customers, and putative Class Members[,]" particularly in light of the existing guidance about harmful PFAS levels. (*Id.* ¶¶ 205-06.)

According to Plaintiffs, despite the presence of such PFAS, Defendants have made a variety of statements regarding the Band-Aid Products and their safety. (*See generally id.*) Specifically, Defendants have made statements, including that: (1) they make a "sustainability

promise," stating the Band-Aid brand is "working for a healthy future"; (2) "We prioritize safety and quality in the development of every wound care product"; (3) "Every piece of material in our BAND-AID Brand bandages and every ingredient in our antibiotic treatments are chosen with safety as the top concern. We thoroughly vet each supplier and only partner with those who meet our rigorous standards"; (4) and "Our manufacturing facilities undergo regular audits and certification so that we can ensure our products are manufactured with the highest standards and comply with most discerning regulatory standards." (*Id.* ¶¶ 223-26, 234-39.) According to Plaintiffs, "[t]hroughout the class period, Defendants have targeted consumers who seek the highest quality and safest bandages, and have done so by falsely and misleadingly representing that their Band-Aid Products are safe, healthy, and made with the 'best ingredients,' and that the bandages and packaging are environmentally friendly." (*Id.* ¶¶ 236, 239.) Further, according to Plaintiffs, "Defendants' representations that their Band-Aid Products are healthy for humans and the environment . . . are false because products containing toxic, synthetic ingredients like PFAS chemicals are neither safe for consumers nor safe for the environment." (*Id.* ¶ 248.)

### B.    Procedural Background

Plaintiffs initially filed suit in April 2024. (*See generally* Compl., ECF No. 1.) In January 2025, the Court consolidated the several then-pending actions containing substantially similar allegations. (*See generally* Consolidation Order, ECF No. 28.) On March 10, 2025, Plaintiffs filed a Consolidated Class Action Complaint (*see generally* Consolidated Compl., ECF No. 29), and subsequently filed the operative Amended Complaint (*see generally* Am. Compl.) which strikes certain allegations contained in the Consolidated Class Action Complaint (*see generally* Stip. & Order, ECF No. 42).

The operative Amended Complaint now contains fifteen counts. (*See generally* Am. Compl.) Four of the counts are alleged on behalf of the nationwide class or, in the alternative, on behalf of statewide classes: (1) breach of express warranty ("Count One"); (2) breach of implied warranty ("Count Two"); (3) fraudulent concealment ("Count Three"); and (4) unjust enrichment ("Count Four").[6] (*Id.* ¶¶ 305-44.) Two counts are alleged as to the California subclass: (1) violation of California unfair competition law ("Count Five"); and (2) violation of the California false advertising law ("Count Six"). (*Id.* ¶¶ 345-70.) One count is alleged as to the Florida subclass: violation of Florida's Unfair and Deceptive Trade Practices Act ("Count Seven"). (*Id.* ¶¶ 371-85.) Two counts are alleged as to the Georgia subclass: (1) violation of the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390, *et seq.* ("Count Eight"); and (2) violation of Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370, *et seq.* ("Count Nine"). (*Id.* ¶¶ 386-422.) One count is alleged as to the Hawaii subclass: violation of Hawaii Revised Statute § 480, *et seq.* ("Count Ten"). (*Id.* ¶¶ 423-38.) One count is alleged as to the Illinois subclass: violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Count Eleven"). (*Id.* ¶¶ 439-55.) One count is alleged as to the Michigan subclass: violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903, *et seq.* ("Count Twelve"). (*Id.* ¶¶ 456-70.) Two counts are alleged as to the New York subclass: (1) violation of New York General Business Law ("NYGBL") § 349 ("Count Thirteen"); and (2) violation of NYGBL § 350 ("Count Fourteen"). (*Id.* ¶¶ 471-502.) Lastly, one count is alleged as to the Pennsylvania subclass: violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law

---

[6] Counts One through Four are brought on behalf of the nationwide class under New Jersey law, or in the alternative, on behalf of the California, Florida, Georgia, Hawaii, Illinois, Massachusetts, Michigan, Nevada, New York, Pennsylvania, and Texas statewide classes under each individual state law. (Am. Compl. ¶¶ 306, 319, 328, 338.)

("Count Fifteen"). (*Id.* ¶¶ 503-18.) Defendants move to dismiss the Amended Complaint in its entirety. (*See generally* Defs.' Mot. to Dismiss, ECF No. 51.)

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure[7] 12(b)(1), a defendant may move to dismiss a matter for want of standing "because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) (citations omitted). "When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991). A motion to dismiss for lack of subject matter jurisdiction may either "attack the complaint on its face . . . [or] attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

A facial challenge asserts that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction." *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999). As such, a facial challenge "calls for a district court to apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6), *i.e.*, construing the alleged facts in favor of the nonmoving party." *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). District courts considering a facial challenge, then, must construe the allegations in the complaint as true and determine whether subject matter jurisdiction exists. *Mortensen*, 549 F.2d at 891; *Cardio-Med. Assocs., Ltd. v. Crozer-Chester Med. Ctr.*, 721 F.2d 68, 75 (3d Cir. 1983). "Thus, '[t]o survive a motion to dismiss [for lack of standing], a complaint must contain sufficient factual matter' that would establish standing if accepted as true." *In re Horizon*

---

[7] All references to "Rule" or "Rules" hereafter refer to the Federal Rules of Civil Procedure.

*Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) (alterations in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

**III.    DISCUSSION**

Defendants raise multiple arguments in support of their motion to dismiss: (1) Plaintiffs lack standing; (2) Plaintiffs have failed to plausibly allege that PFAS chemicals on the Band-Aid Products could cause harm; (3) Plaintiffs fail to allege actionable misrepresentations, omissions, or reliance; (4) Plaintiffs fail to state the nationwide claims; and (5) Plaintiffs fail to state claims under the various state consumer protection laws. (*See generally* Defs.' Moving Br., ECF No. 51-1.) Because Defendants' argument on standing is dispositive, the Court need only address the first argument.

"[T]he question of standing in the federal courts is to be considered within the framework of Article III [of the Constitution,] which restricts judicial power to 'cases' or 'controversies.'" *Township of Lyndhurst, N.J. v. Priceline.com Inc.*, 657 F.3d 148, 154 (3d Cir. 2011) (alterations in original) (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 151 (1970)). A party invoking federal jurisdiction bears the burden of demonstrating it has standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430-31 (2021). If Article III standing cannot be established on the part of the named plaintiffs, a district court "must dismiss a putative class action for lack of subject matter jurisdiction." *Finkleman v. Nat'l Football League*, 810 F.3d 187, 195 (3d Cir. 2016).

Under Article III, a plaintiff has standing if it has: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The "injury in fact" inquiry is often determinative of standing. *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 205 (3d Cir.

2021). "The requirements for an injury-in-fact are well established: a plaintiff must show that [it has] suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *In re Plum Baby Food Litig.*, 637 F. Supp. 3d 210, 223 (D.N.J. 2022) (quoting *Lujan*, 504 U.S. at 560).

### A.      Benefit of the Bargain

According to Defendants, "Plaintiffs lack standing to assert their economic injury theory of harm, which is their sole theory of injury" because they have not alleged an economic injury-in-fact. (Defs.' Moving Br. 9-12.) Plaintiffs argue in opposition that they have standing because they "sufficiently allege [that] they did not receive the benefit of their bargain." (Pls.' Opp'n Br. 7, ECF No. 54.)

"Under the benefit of the bargain theory, a plaintiff [may] successfully plead an economic injury by alleging that she bargained for a product worth a given value but received a product worth less than that value." *In re Johnson & Johnson Talcum Powder Prods. Marketing, Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 283 (3d Cir. 2018). "The economic injury is calculated as the difference in value between what was bargained for and what was received." *Id.* Notably, "[h]owever, '[p]laintiffs receive[] the benefit of their bargain so long as there were no adverse health consequences, and the product work[ed] as intended[.]'" *In re Plum Baby Food*, 637 F. Supp. 3d at 223 (alterations in original) (quoting *James v. Johnson & Johnson Consumer Cos.*, No. 10-3049, 2011 WL 198026, at *2 (D.N.J. Jan. 18, 2011)).

Here, Plaintiffs allege that they "were deprived of the benefit of their bargain since the Band-Aid Products they purchased were worth less than they would have been if free from defects." (Am. Compl. ¶¶ 382, 452, 468, 516; Pls.' Opp'n Br. 8.) According to Plaintiffs, they "bargained for safe bandages but received products contaminated with PFAS—chemicals that the

EPA recognizes as harmful even at 'near zero' levels[,]" yet "[t]esting confirmed PFAS presence at 188-262 ppm (Mamavation) and up to 6.7 ng/g (independent testing)." (Pls.' Opp'n Br. 8 (citing Am. Compl. ¶¶ 163-64, 196, 204).) As Defendants note, however, "Plaintiffs have not alleged any adverse health consequences from using the bandages, and there is no claim that the bandages did not work as intended, to cover minor scrapes and wounds." (Defs.' Moving Br. 10.)

Moreover, to the extent that Plaintiffs allege that Defendants misrepresented their products, Plaintiffs have not alleged sufficient facts to support their claims. "To allege economic harm under the benefit[ ]of[ ]the[ ]bargain theory, it is required that plaintiffs identify the specific misrepresentation that induced their purchase." *In re Plum Baby Food*, 637 F. Supp. 3d at 224 (citing *Estrada v. Johnson & Johnson*, No. 16-7492, 2017 WL 2999026, at *9 (D.N.J. July 14, 2017)). For example, in *In re Mercedes-Benz Emissions Litigation*, plaintiffs alleged that they were induced to purchase "BlueTEC Clean Diesel" vehicles because they were purportedly better for the environment. No. 16-881, 2016 WL 7106020, at *1 (D.N.J. Dec. 6, 2016). There, plaintiffs pointed to specific statements made by defendants about the technology, including marketing statements like: (1) "the world's cleanest [*sic*] and most advanced diesel"; (2) "ultra-low emissions, high fuel economy and responsive performance"; (3) "up to 30% lower greenhouse-gas emissions than gasoline"; and (4) Mercedes "represents that its BlueTEC vehicles 'convert[] the nitrogen oxide emissions into harmless nitrogen and oxygen' and 'reduces the nitrogen oxide in the exhaust gases by up to 90%.'" *Id.* at *5. Based on these highly specific statements, the court found that "at the motion to dismiss stage and as to the standing issue, [p]laintiffs have plausibly pled that the products did not live up to the claims made by [d]efendants." *Id.* at *4.

Here, however, Plaintiffs point to Defendants' product statements such as: (1) "Better Ingredients, Better Processes"; (2) "Every piece of material in our BAND-AID Brand

bandages . . . are chosen with safety as the top concern"; and (3) "Our scientists ensure the safety and efficacy of our products through clinical studies and laboratory models". (Am. Compl. ¶ 224.) Plaintiffs allege that these, and other, statements "lead a reasonable consumer to believe that the Band-Aid Products are safe, healthy, made with the 'best ingredients,' and environmentally conscious." (*Id.* ¶ 236.) None of the statements Plaintiffs point to, however, directly relate to the presence of PFAS in components of the Band-Aid Products. (*See generally id.*) Rather, all of the statements Defendants make about the Band-Aid Products could still be true, even if PFAS exists in certain product components, as Plaintiffs have not alleged facts about any studies about the presence of PFAS in bandages actually causing harm or any adverse health consequences to users.[8] (*See generally id.*)

Plaintiffs' allegations, therefore, are not sufficient to establish Article III standing under a benefit of the bargain theory of economic harm. *See, e.g.*, *In re Plum Baby Food*, 637 F. Supp. 3d at 223-25 (finding plaintiffs did not have Article III standing where they claimed a presence of heavy metals in baby food and alleged that "they did not receive the benefit of the bargain because they believed they were buying 'healthy, nutritious' baby food products" because the complaint lacked "factual support of adverse health consequences or plausible allegations of future risk[s]"); *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010) (finding plaintiff lacked an injury-in-fact to confer standing where plaintiff asserted "a subjective allegation that . . . trace amounts of lead in . . . lipsticks are unacceptable" but conceded that plaintiff "ha[d] suffered no

---

[8] While the Amended Complaint alleges facts related generally to PFAS studies and potential health risks for humans who "may be exposed to PFAS through a variety of pathways, including ingestion, inhalation, and skin absorption" (*see, e.g.*, Am. Compl. ¶¶ 157-76, 189-209) and levels allowable in *drinking water* (*id.* ¶ 173), it is silent as to allegations of any potential health effects caused by bandages containing PFAS or migration of PFAS from bandages into human skin such that the PFAS in bandages would cause users some type of harm (*see generally id.*).

adverse health effects from using the lipsticks"); *James v. Johnson & Johnson Consumer Cos.*, No. 10-3049, 2011 WL 198026, at *2 (D.N.J. Jan. 20, 2011) (rejecting plaintiffs' benefit of the bargain theory related to shampoo that contained methyl chloride because "[p]laintiffs received the benefit of their bargain so long as there were no adverse health consequences, and the product worked as intended").

### B.    Premium Price or Alternative Product Theories

"[U]nder the alternative product theory, 'a plaintiff might successfully plead economic injury by alleging that, absent the defendant's conduct, she would have purchased an alternative product that was less expensive.'" *Kimca v. Sprout Foods, Inc.*, No. 21-12977, 2022 WL 1213488, at *8 (D.N.J. Apr. 25, 2022) (quoting *In re Johnson & Johnson Talcum*, 903 F.3d at 282). "[U]nder the premium price theory, 'a plaintiff may plead economic injury by alleging that the defendant unlawfully advertised its product as being "superior" to others.'" *Id.* (quoting *In re Johnson & Johnson Talcum Powder*, 903 F.3d at 283).

According to Defendants, Plaintiffs also lack standing under either a premium price or alternative product theory because the Amended Complaint fails to allege facts regarding "the price of [the Band-Aid Products] or any other alternative bandage[,]" a requirement under either theory of injury. (Defs.' Moving Br. 10-11.) Plaintiffs argue, albeit in a footnote, that they have sufficiently alleged a cognizable economic injury under a premium price theory based on allegations that Defendants' "'misrepresentations or omissions caused [them] to overpay for a product' and such allegations 'permit a factfinder to determine that [they] suffered at least *some* economic injury.'" (Pls.' Opp'n Br. 8 n.2 (citation omitted).)

Here, Plaintiffs' Amended Complaint contains only one passing reference to potential competitors to Band-Aid Products, namely TruColour and TrueTone, provided in the context of

discussing the independent lab study. (*See* Am. Compl. ¶ 208.) Plaintiffs do not allege that they would have bought either of these products, or other competitors' products, and fail to allege facts regarding price. (*See generally id.*) Instead, Plaintiffs merely allege that they would not have bought the Band-Aid Products or would not have paid the higher "premium" price for the Band-Aid Products if they knew that the Band-Aid Products contained PFAS. (*See, e.g.*, *id.* ¶¶ 218 ("Defendants are able to charge, and do charge, a premium above the price for bandages charged by competitors and generic manufacturers."), 271 ("Plaintiff[s] and Class Members paid money for Defendants' Band-Aid Products, and paid a premium for an expected quality above (or at least comparable to) that of Defendants' competitors."), 332 ("Plaintiffs and Class Members all paid a premium for the Band-Aid brand adhesive bandages based upon the way the product is represented, which did not include the inclusion of PFAS. Products that contain PFAS are not worth a premium to a reasonable consumer.").) These "threadbare" allegations that Plaintiffs paid an unfair premium are insufficient under either a premium price or alternative product theory. *See Kimca*, 2022 WL 1213488, at *8, *8 n.11 (finding insufficient plaintiffs' "threadbare" allegations that defendant's purported "misrepresentations and omissions caused [plaintiffs] to pay an unfair premium price" where plaintiffs "[did] not identify any other comparable, cheaper, or safer products to show that they, in fact, paid a premium" for the products at issue); *see also In re Johnson & Johnson Talcum Powder*, 903 F.3d at 282 (explaining that, under the alternative product theory, the economic injury is calculated "by determining the difference in price between the defendant's more expensive product and the less expensive alternative").

### C.    Standing to Pursue Injunctive Relief

Plaintiffs also seek injunctive relief "on grounds consistent with the standards articulated in Rule 23(b)(2) that establish final injunctive relief as an appropriate class-wide remedy, in that

Defendants continue to manufacture, market, and sell the contaminated bandages and omit material facts." (Am. Compl. ¶ 299.) Defendants argue that "Plaintiffs have not alleged a 'certainly impending' injury and lack standing to seek an injunction." (Defs.' Moving Br. 12 (citing *In re Plum Baby Food*, 637 F. Supp. 3d at 227).)

"While future harm may be sufficient to satisfy the 'concreteness' requirement in the injury-in-fact analysis and allow a plaintiff to pursue injunctive relief, the risk of harm must be 'sufficiently imminent and substantial,' such that exposure to the risk of harm itself generates an independent injury[.]" *In re Plum Baby Food*, 637 F. Supp. 3d at 226 (quoting *TransUnion*, 594 U.S. at 435). "The Third Circuit has also held that once a plaintiff knows of the health risks of a product alleged to be improperly marketed, the 'law accords people the dignity of assuming that they act rationally, in light of the information they possess.'" *Id.* at 227 (quoting *In re Johnson & Johnson Talcum Powder*, 903 F.3d at 293). As such, plaintiffs are not at risk of suffering an economic injury in the future once they are aware of potential health risks associated with a product. *See In re Johnson & Johnson Talcum Powder*, 903 F.3d at 292-93 (declining to "give cognizance to this sort of 'stop me before I buy again' claim").

Here, Plaintiffs have alleged that they have "stopped using the Band-Aid Products since learning they contain PFAS" and do not allege that they would purchase the products again. (*See* Am. Compl. ¶¶ 28, 34, 40, 46, 52, 58, 64, 70, 76, 82, 88, 94, 100, 106, 112, 118, 124, 130, 136, 143); *see, e.g., Hernandez v. Johnson & Johnson Consumer Inc.*, No. 19-15679, 2023 WL 2634496, at *4 (D.N.J. Mar. 24, 2023) ("[V]iewing [p]laintiffs as rational actors in the free market possessing information that affects their purchasing decisions, there is no risk of future harm where [p]laintiffs will presumedly no longer purchase [d]efendant's [products].")). Beyond alleging that testing of the Band-Aid Products showed levels of PFAS, Plaintiffs do not allege the harm that

would be caused to users of the Band-Aid Products, making any risk of future harm purely speculative. (*See generally* Am. Compl.); *see e.g.*, *In re Plum Baby Food*, 637 F. Supp. 3d at 226-27 (finding plaintiffs cannot establish injury as required for Article III standing to seek injunctive relief where plaintiffs sought injunctive relief, but failed to "establish a causal link" between levels of heavy metal in baby food and the likelihood that would cause physical harm).

Plaintiffs have, therefore, failed to demonstrate standing to pursue injunctive relief.[9]

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is granted. Plaintiffs will be afforded an opportunity to file an amended complaint to address the deficiencies identified herein. The Court will issue an Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated:    2/2/2026

---

[9] Because the Court finds that the named Plaintiffs do not have standing to seek relief under any theory discussed herein, the Court need not reach Defendants' remaining arguments, including the argument about non-Florida plaintiffs lacking standing to bring Florida claims on behalf of the class. *See Finkelman*, 810 F.3d at 195 ("Absent standing on the part of the named plaintiffs, we must dismiss a putative class action for lack of subject matter jurisdiction."); *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 362 (3d Cir. 2015) ("[T]he 'cases or controversies' requirement is satisfied so long as a class representative has standing[.]").